UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re TELETECH LITIGATION | : | Master File No. 1:08-cv-00913 (LTS)(FM) |
| | : | |
| | : | <u>CLASS ACTION</u> |
| This Document Relates To: | : | |
| | : | CONSOLIDATED AMENDED |
| ALL ACTIONS. | : | COMPLAINT FOR VIOLATIONS OF |
| | : | FEDERAL SECURITIES LAWS |
| | : | |
| | : | <u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff Electrical Workers Local No. 357 Pension and Health & Welfare Trusts ("Electrical Workers Local No. 357," "Plaintiff" or "Lead Plaintiff") has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by TeleTech Holdings, Inc. ("TeleTech" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former TeleTech employees and media reports about the Company, and Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This case concerns, among other things, defendants' manipulation of the Company's stock option grants to enrich themselves in an undisclosed and inherently deceptive manner, which manipulation caused the Company's financial statements to be false and misleading and resulted in the Company's stock price being artificially inflated throughout the Class Period.  Lead Plaintiff's investigation has revealed strong and cogent evidence that the backdating scheme alleged herein was knowingly carried out at the highest levels of the Company.  *As early as 1999, TeleTech's former senior vice president of global human resources admitted to other Company employees that "we're backdating the grants."*

2.      A stock option granted to an employee of a corporation allows the employee to purchase the specified number of shares of company stock at a specified price – referred to as the "exercise price" or "strike price" – for a specified period of time.  Stock options are granted by public companies as part of compensation packages for executives – supposedly to create incentives for them to boost long-term corporate performance and profitability by good, honest management efforts.  When the executive exercises the option, he or she purchases the stock from the company at

the exercise price, regardless of the stock's market price at the time the option is exercised.  Options

are normally priced at the market price on the date of grant – so if the stock goes up over time, the

executive makes a profit.  If the system is abused by "backdating," which refers to picking an option-

grant date earlier than the actual date the option was granted – a date when the stock price was lower

than the actual grant date, or by "spring loading," *i.e.*, granting the stock option just before the

company is going to issue positive news which will likely push the stock price higher, the executive

gets an instant, guaranteed and riskless profit.  The company, however, is hurt as the "spread"

between the true grant exercise price and the market price is required by law to be treated as

compensation expense, which reduces profits.  In addition, the corporate stock option plan loses its

tax protection and the corporation's internal non-public information is misappropriated by the

executives for their personal profit.  Shareholders and share purchasers are also hurt, as reported

corporate profits are improperly inflated, as is the trading price of the stock (at least until the truth

comes out); their ownership interest in the corporation is unfairly diluted, and their corporate

suffrage rights are violated because they voted to approve the stock option plan and elect the

directors who proposed the plan and were required to oversee its implementation and administration.

## NATURE OF THE ACTION

3.    This is a federal class action seeking to pursue remedies under the Securities Act of

1933 (the "Securities Act") and the Securities and Exchange Act of 1934 (the "Exchange Act") on

behalf of a class of all consisting of all persons, other than Defendants,  who purchased or otherwise

acquired the securities of TeleTech between October 25, 2006 and July 16, 2008 inclusive (the

"Class Period"), including: (i) those who purchased TeleTech stock on the NASDAQ or other public

exchanges; (ii) those who purchased TeleTech common stock in connection with the Company's

March 30, 2007 Secondary Public Offering (defined below); and (iii) those who owned TeleTech

common stock in 2007 at the time TeleTech's 2007 Proxy Statement was circulated to shareholders to solicit their votes on various matters.

4.      Prior to and during the Class Period, defendants issued materially false and misleading statements regarding the Company's business, its stock option plans and compensation practices and its financial results, while employing contrivances and manipulative acts in connection with TeleTech's stock option programs and financial statements.  As a result of defendants' false statements, contrivances and manipulative acts, TeleTech's publicly traded securities traded at artificially inflated prices during the Class Period, with its common stock reaching a trading high of $40.26 per share before closing at $39.94 on April 13, 2007, as TeleTech consistently reported outstanding financial results and completed numerous acquisitions using the inflated price of TeleTech common stock as currency for the transactions.  In addition, TeleTech's 1999 Stock Incentive Plan (the "1999 Stock Plan") was approved and its directors were elected and re-elected by shareholder votes made pursuant to false and misleading Proxy Statements.  Certain of the defendants took advantage of these falsified financial results, the artificial inflation of TeleTech's stock and the manipulation of its stock option plans by selling millions of shares of their TeleTech stock, resulting in illegal insider trading gross proceeds of more than $152.1 million that were materially enhanced due to the improper "backdating" and "spring loading" of their options, while they pocketed millions more in unjustified bonus payments enhanced in part by TeleTech's falsified profits.  As a result of the defendants' misrepresentations of TeleTech's business and financial success, they were also able to successfully pursue and complete the Company's March 30, 2007 Secondary Public Offering – whereby Company CEO and Board Chairman, Kenneth D. Tuchman ("Tuchman"), sold 5.75 million shares of his privately owned TeleTech common stock at $36.50 per share for gross proceeds of nearly $210 million.

**TeleTech's False and Misleading Proxy Solicitations**

> 5.      Among the false statements made prior to and during the Class Period and in the 2007

Proxy Statements were misrepresentations that:

- TeleTech's stock option plans would help assure the Company's future success by offering to top executives incentives to put forth maximum effort for the success of the Company's business.

- TeleTech's stock option plans assured favorable tax treatment of stock-based awards and ensured stock-option compensation was tax deductible for the Company.  Stock options could not and would not be granted at less than 100% of fair market value (*i.e.*, stock market closing price) on the date of grant.

- TeleTech's stock option plans were administered by a Compensation Committee of all independent directors.

- The Compensation Committee was authorized only to grant options in accordance with the terms of the plan, including limiting option exercise prices to not less than 100% of fair market value of the stock on the date of grant.

- The value of the Company's stock option grants was tied to the Company's performance.

- The Company's internal financial, accounting and disclosure controls were adequately designed and functioning in a manner so as to prevent fraud or manipulation.

- TeleTech's strong financial results were due to consistent operational performances across the full spectrum of its businesses.

- TeleTech's financial reports and statements fairly presented its financial condition and results in accordance with Generally Accepted Accounting Principles ("GAAP").

- Specified officers of TeleTech had been granted options to buy specified numbers of shares of TeleTech stock at specified prices, *i.e.*, fair market value on the date the options were granted.

- Because of the way TeleTech's stock option plans were structured and administered and because the Company grants stock options at an exercise price not less "than the fair market value of the Company's common stock on the date of grant," TeleTech did not have to recognize compensation expense in connection with its grant, or any subsequent exercise, of stock options.

- TeleTech's stock option plans had been voted for and adopted by its Board of Directors (or the "Board") and its shareholders and, therefore, the option shares were

validly issued and would not dilute existing stockholders' ownership stake in TeleTech.

**TeleTech Announces Review of Equity-Based Compensation Accounting Practices**

6.     On November 8, 2007, TeleTech shocked investors by announcing that the Company was conducting a "review of equity-based compensation practices and likely restatement of previous issued financial statements" would be required – possibly as far back as 1999.  The release published by defendants that day stated, in part, the following:

> REVIEW OF EQUITY-BASED COMPENSATION PRACTICES AND LIKELY RESTATEMENT OF PREVIOUSLY ISSUED FINANCIAL STATEMENTS
> TeleTech announced that it will file a Notification of Late Filing on Form 12b-25 with the Securities and Exchange Commission indicating that it will not meet the prescribed deadline for filing its Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 due to a review of TeleTech's historical stock option and other equity-based compensation grant practices being conducted by the Company's Audit Committee.  The review, which was initiated by the Company during the third quarter, is being conducted with the assistance of independent legal counsel to the Audit Committee and outside accounting experts.
>
> Although TeleTech believes that significant progress has been made in the review, it is not complete.  ***Based on the work conducted so far, management presently believes that it will be required to incur additional non-cash compensation charges for prior periods and that restatement of previous interim and annual financial statements for the periods 1999 through 2007 is likely.  There also may be an impact on the current fiscal year's results of operations including those reported in this release.  Accordingly, management and the Audit Committee concluded on November 8, 2007 that TeleTech's financial statements for the periods 1999 through 2006 and the first and second quarters of 2007 should not be relied upon***. . . .

[Emphasis added.]

7.     At that time, investors were also amazed by defendants' sudden disclosure that TeleTech would likely be forced to take an undisclosed amount in charges and reserves, and that the Company could be forced to restate almost a full decade of financial results to account for the Company's true employment costs, expenses, reserves, payroll taxes, fines and penalties.

8.      As a result, the following day, November 9, 2007, shares of TeleTech fell from a prior day's closing price of $22.61 per share, to an intra-day and 52-week trading low of $18.76 per share – an immediate decline of over 17%.  That day, over 4.13 million shares traded as TeleTech shares fell to a mere half of the $36.50 price at which defendant Tuchman liquidated almost $210 million of his personally held TeleTech shares at the end of March 2007.

**TeleTech Announces Findings of Equity-Based Compensation Review**

9.      On February 20, 2008, TeleTech announced that it had completed the review of its equity-based compensation practices previously announced on November 8, 2007.  While a press release issued by TeleTech that day emphasized that the review had not uncovered any "willful misconduct," the findings of the review, which were more fully set forth in TeleTech's Form 8-K filed with the SEC on February 20, 2008, indicated that defendants acted in an extremely reckless manner in the granting, valuation and reporting of stock option compensation awards while downplaying the significance thereof.  The Form 8-K stated, in pertinent part, the following:

- Certain employees/officers involved in the administration of the Company's stock options, none of which are actively employed by the Company, did not adequately meet all of the demands of their positions and/or did not adequately appreciate their responsibilities in the stock option granting process, particularly in the period prior to 2002.

- There were control and other deficiencies in the Company's equity compensation granting process.

- The Company's policies were not sufficient to ensure compliance with all applicable accounting and disclosure rules relevant to equity compensation.

- ***There were episodic instances of selecting grant dates with some hindsight.***

- ***There was some evidence that certain employees involved in selecting grant dates, none of which are actively employed by the Company, had some understanding of the accounting implications of selecting dates with hindsight.  However, there was no conclusive evidence demonstrating that those involved in selecting dates knowingly and/or purposely violated accounting or disclosure rules.***

- 6 -

- There were instances where the Company failed to appreciate that certain required granting actions needed to be completed before a measurement date for a grant could be established under applicable equity compensation accounting rules.

- Certain stock option awards were not properly recorded under applicable equity compensation accounting rules, including in connection with:

  - modification of grants;

  - a recipient's status as a consultant or an employee; and

  - treatment of performance-based vesting conditions.

[Emphasis added.]

10.    TeleTech's self-serving statements that its review had failed to uncover any intentional misconduct continued to mislead TeleTech's public shareholders as reflected in the appreciation of TeleTech common stock prices over the next three trading days.  On or about February 22, 2008, TeleTech common stock closed at $19.51 per share, up $1.42 per share from the closing price of $18.09 per share on or about February 19, 2008.

**TeleTech's Restatement of Its Historical Financial Statements**

11.    On July 16, 2008, TeleTech filed its December 31, 2007 Form 10-K (the "2007 10K") with the SEC.  The 2007 10K included the Company's restated financial statements for the periods ended December 31, 2005 and 2006.[1]  In addition, the 2007 10K revealed that TeleTech's previously reported pre-tax earnings was overstated in each and every period prior to 2005 by more than $67.5 million since the Company went public in August 1996.  The following table from TeleTech's 2007 10K summarizes the Company's estimates of its earnings overstatements by period:

---

[1]    On that same day the Company filed amended Forms 10-Q/A for the quarters ended March 31, 2007 and June 30, 2007.

| Year Ended December 31, | Pre-Tax Accounting Adjustments | | | | | |
| | Equity-Based Compensation | Leases | Other | Total Pre-Tax Adjustments | Provision for Income Tax | Total Accounting Adjustments |
|---|---|---|---|---|---|---|
| 1996 | $ 763 | $ 132 | $ – | $ 895 | $ (334) | $ 561 |
| 1997 | 1,776 | 515 | – | 2,291 | (862) | 1,429 |
| 1998 | 2,396 | 1,552 | – | 3,948 | (1,412) | 2,536 |
| 1999 | 12,779 | 1,112 | – | 13,891 | (5,022) | 8,869 |
| 2000 | 26,684 | 3,022 | – | 29,706 | (9,004) | 20,702 |
| 2001 | 5,648 | 679 | 10 | 6,337 | (2,354) | 3,983 |
| 2002 | 6,105 | 150 | 817 | 7,072 | (1,475) | 5,593 |
| 2003 | 2,214 | 492 | 3 | 2,709 | (4,390) | (1,681) |
| 2004 | 237 | 477 | (3) | 711 | (340) | 371 |
| Cumulative effect at December 31, 2004 | 58,602 | 8,131 | 827 | 67,560 | (25,197) | 42,363 |
| 2005 | 965 | (922) | 392 | 435 | 1,437 | 1,872 |
| 2006 | 611 | (1,437) | (111) | (937) | 1,798 | 861 |
| First quarter 2007 | (209) | (75) | (863) | (1,147) | 711 | (436) |
| Second quarter 2007 | (272) | 227 | (559) | (604) | 1,056 | 452 |
| Total | $ 59,697 | $ 5,924 | $ (314) | $ 65,307 | $ (20,195) | $ 45,112 |

**Restatement of Equity-Based Compensation**

12.     The 2007 10K reduced TeleTech's reported pre-tax earnings by more than $59.6 million for the periods 1996 through June 30, 2007 due to previously hidden compensation expenses related to the Company's stock option plan.  The 2007 10K revealed the full extent of a massive scheme whereby 945 stock options given to employees, and others, had been backdated requiring "changes to the original grant measurement date" and recognition of appropriate compensation expenses.  These backdated options were granted to attract and retain senior managers with compensation incentives that purportedly did not impact earnings.  TeleTech misleadingly disclosed in its Proxies that defendant Tuchman exercised exclusive control over the "key elements" of any particular stock option grant based on his "subjective assessment" of the "factors" involved, while failing to disclose these "subjective assessments" including the backdating of hundreds of stock option grants.

13.     Immediately following the filing of TeleTech's 2007 10K, TeleTech common stock fell $4.63 per share closing at $13.27 per share on or about July 17, 2008 on extremely heavy

volume of more than 11.6 million shares – a nearly 26% decline from the previous closing price of $17.90 per share on or about July 16, 2008.

**The Options Backdating Scheme**

14.     In violation of the Company's own stated policies and applicable laws, defendants engaged in or permitted "backdating" and "spring loading" in the issuance of executive stock options for many years.  While TeleTech has not admitted any "willful" misconduct in connection with the backdating scheme, it is evident that the backdating scheme was carried at the highest executive levels of the Company.  ***As early as 1999, a former TeleTech employee, Confidential Informant 1 ("CI 1"),***[2] ***was told, "We're backdating the grants" by Deborah C. Gentry ("Gentry"), TeleTech's former senior vice president of Global Human Resources.***

15.     CI 1's knowledge of the option grant process came from Gentry, who told CI 1 that Tuchman decided who received grants, the number of options, and that there were no company guidelines.  CI 1 was personally responsible for preparing a spreadsheet for these grants.  The spreadsheet identified all qualified managers at the Director level and above (TeleTech only grants merit options to these upper management levels).  Gentry then took this spreadsheet to Tuchman who made his decisions about the options, which were then subjected to the Board or the Compensation Committee for approval.  CI 1 believed that executive and Board level grants required full Board approval, whereas the corporate charter delegated the authority to approve all other grants up to certain amounts to the Compensation Committee.  CI 1 would get the spreadsheets back after

[2]     CI 1 is a former vice president of Human Resources employed by TeleTech from 1998 until mid-2003.  CI 1 reported to Gentry.  According to TeleTech's 1999 Proxy Statement, Gentry joined TeleTech in April 1998.

this process, with the new approved grant information, which was then maintained until the next grant.

16.     CI 1 stated that Gentry had meetings and email communications with Tuchman when preparing the option grants.  According to CI 1, James Kaufman, TeleTech's then General Counsel was an "insider" along with Michael Foss ("Foss"),[3] and Tuchman.  CI 1 said that option grants were tightly controlled by Tuchman working with Gentry, and that sometime in 1999 or 2000, Gentry made a comment to CI 1 referring to work Gentry was doing with Tuchman, stating, "We're backdating the grants."  At the time, CI 1 did not understand what the impact of this conduct would be as CI 1 was not familiar with the rules or procedures that governed the process.

17.     CI 1's statement regarding Tuchman's virtual control over the option granting process is consistent with TeleTech's 1999 Proxy Statement which stated that:

> Mr. Tuchman generally recommends, for approval by the Compensation Committee, the size, vesting schedule and other key elements of a particular stock option grant based upon his subjective assessment of the same factors that are considered in determining and approving annual salaries and salary increases.

18.     Unfortunately for TeleTech's public shareholders, the 1999 Proxy failed to disclose that Tuchman's "***subjective assessment***" of the option granting process included the backdating of options for his own enrichment and that of other TeleTech senior executives.  Tuchman himself was the recipient of option grants in 2001, 2002 and 2007 totaling 1,340,000 shares.  Barlett was the recipient of option grants in 2000-2002, 2005 and 2007 totaling 1,281,000 shares.  Indeed, many high ranking corporate executives received vast numbers of grants, as summarized on the following table:

---

[3]     TeleTech's 2000 Proxy Statement indicates that Foss was president of "TeleTech Companies Group."

| Last Name | First Name | Grant Date | Shares | Price | Date Options Vested | Date Options Expire |
|---|---|---|---|---|---|---|
| **For the Year Ended 12/31/96** | | | | | | |
| WEINGARTEN | RICHARD | 8/15/1996 | 55,000 | $18.00 | | 8/15/2006 |
| | | | | | | |
| **For the Year Ended 12/31/97** | | | | | | |
| DAMMEYER | RODNEY | 5/20/1997 | 18,750 | $25.00 | 5/20/1997 | 5/20/2007 |
| SILVERMAN | ALAN | 5/20/1997 | 25,000 | $24.50 | 11/20/1997 | 5/20/2007 |
| SILVERMAN | ALAN | 5/20/1997 | 25,000 | $24.50 | 11/20/1997 | 5/20/2007 |
| SLOAN | STUART | 5/20/1997 | 18,750 | $24.50 | 11/20/1997 | 5/20/2007 |
| ZELL | SAMUEL | 5/20/1997 | 12,500 | $24.50 | 11/20/1997 | 5/20/2007 |
| | | | | | | |
| **For the Year Ended 12/31/98** | | | | | | |
| GENTRY | DEBORAH | 2/18/1998 | 100,000 | $9.50 | | 2/18/2008 |
| DAMMEYER | RODNEY | 5/8/1998 | 18,750 | $14.13 | 11/18/1998 | 5/8/2008 |
| SILVERMAN | ALAN | 5/8/1998 | 25,000 | $14.13 | 11/8/1998 | 5/8/2008 |
| | | | | | | |
| **For the Year Ended 12/31/99** | | | | | | |
| ERICKSON | SEAN | 2/23/1999 | 100,000 | $6.50 | | 2/23/2009 |
| COBURN | STEVEN | 2/25/1999 | 120,000 | $6.00 | 1/1/2000 | 2/25/2009 |
| CIPOLLA | VINCENT | 3/16/1999 | 300,000 | $6.63 | | 3/16/2009 |
| LIVINGSTON | JOSEPH | 3/29/1999 | 180,000 | $6.13 | 3/29/1999 | 3/29/2009 |
| COBURN | STEVEN | 4/12/1999 | 34,285 | $6.25 | 5/1/2000 | 4/12/2009 |
| ERICKSON | SEAN | 4/12/1999 | 32,464 | $6.25 | 5/1/2000 | 4/12/2009 |
| LIVINGSTON | JOSEPH | 4/13/1999 | 50,000 | $6.13 | 5/1/2000 | 4/13/2009 |
| GENTRY | DEBORAH | 4/13/1999 | 32,464 | $6.13 | 5/1/2000 | 4/12/2009 |
| HEILMEIER | GEORGE | 5/13/1999 | 40,000 | $5.63 | 11/13/1999 | 5/13/2009 |
| SILVERMAN | ALAN | 5/13/1999 | 25,000 | $5.63 | 11/13/1999 | 5/13/2009 |
| MCLENNAN | JOHN | 5/13/1999 | 25,000 | $5.63 | 11/13/1999 | 5/13/2009 |
| DAMMEYER | RODNEY | 5/13/1999 | 18,750 | $5.63 | 5/13/1999 | 5/13/2009 |
| HEILMEIER | GEORGE | 5/13/1999 | 12,500 | $5.63 | 11/13/1999 | 5/13/2009 |
| MEYERSON | MORTON | 5/13/1999 | 12,500 | $5.63 | | |
| THOMPSON | SCOTT | 10/18/1999 | 1,000,000 | $13.13 | | 10/18/2009 |
| GENTRY | DEBORAH | 11/9/1999 | 40,000 | $11.81 | 11/9/2000 | 11/9/2009 |

| Last Name | First Name | Grant Date | Shares | Price | Date Options Vested | Date Options Expire |
|---|---|---|---|---|---|---|
| **For the Year Ended 12/31/00** | | | | | | |
| KESSLER | LARRY | 3/27/2000 | 250,000 | $30.81 | | 3/27/2010 |
| DAMMEYER | RODNEY | 5/3/2000 | 31,000 | $31.63 | 11/3/2000 | 5/3/2010 |
| BARLETT | JAMES | 5/3/2000 | 31,000 | $31.63 | 11/3/2000 | 5/3/2010 |
| SILVERMAN | ALAN | 5/3/2000 | 23,000 | $31.63 | 11/3/2000 | 5/3/2010 |
| HEILMEIER | GEORGE | 5/3/2000 | 23,000 | $31.63 | 11/3/2000 | 5/3/2010 |
| MEYERSON | MORTON | 5/3/2000 | 23,000 | $31.63 | 11/3/2000 | 5/3/2010 |
| ERICKSON | SEAN | 8/16/2000 | 50,000 | $29.63 | | 8/16/2010 |
| FOSS | MICHAEL | 12/6/2000 | 50,000 | $21.56 | 12/6/2001 | 12/6/2010 |
| THOMPSON | SCOTT | 12/7/2000 | 200,000 | $21.56 | 12/7/2001 | 12/7/2010 |
| **For the Year Ended 12/31/01** | | | | | | |
| O DELL | MARGOT | 2/8/2001 | 70,000 | $16.19 | 2/8/2002 | 2/8/2011 |
| O DELL | MARGOT | 3/21/2001 | 50,000 | $8.19 | 3/21/2002 | 3/21/2011 |
| KAUFMAN | JAMES | 4/9/2001 | 60,000 | $6.99 | 4/9/2002 | 4/9/2011 |
| ERICKSON | SEAN | 4/9/2001 | 25,000 | $6.99 | 4/9/2002 | 4/9/2011 |
| BATSON | CHRIS | 4/9/2001 | 10,000 | $6.99 | 4/9/2002 | 4/9/2011 |
| FOSS | MICHAEL | 4/9/2001 | 15,000 | $6.99 | 4/9/2002 | 4/9/2011 |
| SPERBER | JEFFREY | 4/9/2001 | 5,250 | $6.99 | 4/9/2003 | 4/9/2011 |
| TUCHMAN | KENNETH | 10/1/2001 | 420,000 | $6.98 | 10/1/2001 | 10/1/2011 |
| O DELL | MARGOT | 10/1/2001 | 100,000 | $6.98 | 10/1/2002 | 10/15/2011 |
| BARLETT | JAMES | 10/15/2001 | 400,000 | $7.84 | 10/15/2002 | 10/15/2011 |
| **For the Year Ended 12/31/02** | | | | | | |
| TUCHMAN | KENNETH | 2/25/2002 | 420,000 | $11.83 | 2/25/2003 | 2/25/2012 |
| BARLETT | JAMES | 2/25/2002 | 100,000 | $11.83 | 2/25/2003 | 2/25/2012 |
| ERICKSON | RICHARD | 2/28/2002 | 55,000 | $11.63 | 2/28/2003 | 2/28/2012 |
| KAUFMAN | JAMES | 2/28/2002 | 40,000 | $11.63 | 2/28/2003 | 2/28/2012 |
| FOSS | MICHAEL | 2/28/2002 | 30,000 | $11.63 | 2/28/2003 | 2/28/2012 |
| BATSON | CHRIS | 2/28/2002 | 10,000 | $11.63 | 2/28/2003 | 2/28/2012 |
| SPERBER | JEFFREY | 2/28/2002 | 10,000 | $11.63 | 2/28/2003 | 2/28/2012 |
| DAMMEYER | RODNEY | 5/23/2002 | 15,000 | $12.30 | | 5/23/2012 |
| SILVERMAN | ALAN | 5/23/2002 | 15,000 | $12.30 | | 5/23/2012 |
| HEILMEIER | GEORGE | 5/23/2002 | 15,000 | $12.30 | | 5/23/2012 |

| Last Name | First Name | Grant Date | Shares | Price | Date Options Vested | Date Options Expire |
|---|---|---|---|---|---|---|
| **For the Year Ended 12/31/03** | | | | | | |
| O LEARY | SHARON | 1/27/2003 | 20,000 | $5.87 | | 1/27/2013 |
| LINNENBRINGER | WILLIAM | 2/27/2003 | 10,000 | $5.23 | 2/27/2003 | 2/27/2013 |
| LACEY | DENNIS | 5/5/2003 | 200,000 | $4.32 | | 5/5/2013 |
| DAMMEYER | RODNEY | 5/15/2003 | 15,000 | $4.25 | 5/15/2003 | 5/15/2013 |
| YOUNG | SHIRLEY | 5/15/2003 | 15,000 | $4.25 | | 5/15/2013 |
| HEILMEIER | GEORGE | 5/15/2003 | 15,000 | $4.25 | 5/15/2003 | 5/15/2013 |
| MEYERSON | MORTON | 5/15/2003 | 15,000 | $4.25 | 5/15/2003 | 5/15/2013 |
| LIPPER | RUTH | 5/15/2003 | 15,000 | $4.25 | 5/15/2003 | 5/15/2013 |
| LINNENBRINGER | WILLIAM | 5/15/2003 | 15,000 | $4.25 | | 5/15/2013 |
| BEANS | WILLIAM | 7/1/2003 | 150,000 | $4.02 | 7/1/2007 | 7/1/2013 |
| **For the Year Ended 12/31/04** | | | | | | |
| THOMPSON | MARK | 2/26/2004 | 10,000 | $7.73 | | 2/26/2014 |
| HOPKINS | GREGORY | 4/12/2004 | 300,000 | $6.24 | | 4/12/2014 |
| BEANS | WILLIAM | 5/7/2004 | 50,000 | $6.38 | 5/7/2005 | 5/7/2014 |
| MEHTA | SHRIKANT | 6/22/2004 | 10,000 | $8.37 | 6/22/2004 | 6/22/2014 |
| YOUNG | SHIRLEY | 7/27/2004 | 15,000 | $8.80 | | 7/27/2014 |
| HEILMEIER | GEORGE | 7/27/2004 | 15,000 | $8.80 | | 7/27/2014 |
| LIPPER | RUTH | 7/27/2004 | 15,000 | $8.80 | | 7/27/2014 |
| LINNENBRINGER | WILLIAM | 7/27/2004 | 15,000 | $8.80 | | 7/27/2014 |
| LACEY | DENNIS | 9/7/2004 | 75,000 | $8.57 | 9/7/2005 | 9/7/2014 |
| SIMON | JOHN | 9/7/2004 | 75,000 | $8.57 | 9/7/2005 | 9/7/2014 |
| O LEARY | SHARON | 9/7/2004 | 50,000 | $8.57 | 9/7/2005 | 9/7/2014 |
| **For the Year Ended 12/31/05** | | | | | | |
| POWELL | DANIEL | 2/1/2005 | 80,000 | $11.71 | 2/1/2007 | 2/1/2016 |
| BARLETT | JAMES | 5/13/2005 | 250,000 | $7.34 | 5/13/2006 | 5/13/2015 |
| YOUNG | SHIRLEY | 5/24/2005 | 15,000 | $8.36 | 5/24/2006 | 5/24/2015 |
| MEHTA | SHRIKANT | 5/24/2005 | 15,000 | $8.36 | 5/24/2005 | 5/24/2015 |
| LIPPER | RUTH | 5/24/2005 | 15,000 | $8.36 | 5/24/2006 | 5/24/2015 |
| LINNENBRINGER | WILLIAM | 5/24/2005 | 15,000 | $8.36 | 5/24/2005 | 5/24/2015 |
| SIMON | JOHN | 10/25/2005 | 70,000 | $10.58 | 1/25/2006 | 10/25/2015 |
| TUCHMAN | KENNETH | 11/4/2005 | 800,000 | $11.35 | | 11/4/2015 |

- 13 -

| Last Name | First Name | Grant Date | Shares | Price | Date Options Vested | Date Options Expire |
|---|---|---|---|---|---|---|
| **For the Year Ended 12/31/07** | | | | | | |
| LINNENBRINGER | WILLIAM | 6/1/2007 | 15,000 | $35.81 | 6/1/2007 | 6/1/2017 |
| LIPPER | RUTH | 6/1/2007 | 15,000 | $35.81 | 6/1/2007 | 6/1/2017 |
| MEHTA | SHRIKANT | 6/1/2007 | 15,000 | $35.81 | 6/1/2007 | 6/1/2017 |
| MEHTA | SHRIKANT | 6/1/2007 | 15,000 | $35.81 | 6/1/2007 | 6/1/2017 |
| YOUNG | SHIRLEY | 6/1/2007 | 15,000 | $35.81 | 6/1/2007 | 6/1/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2008 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2009 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2010 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2011 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2012 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2013 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2014 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2015 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2016 | 6/22/2017 |
| BARLETT | JAMES | 6/22/2007 | 50,000 | $32.67 | 1/22/2017 | 6/22/2017 |
| TUCHMAN | KENNETH | 6/22/2007 | 500,000 | $32.67 | 1/22/2008 | 6/22/2017 |

## JURISDICTION AND VENUE

19.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o] and §§10(b), 14(a) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. This Court has jurisdiction of this action pursuant to §27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337.

20.    Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). Defendant TeleTech conducts significant business in this district. The Underwriter Defendants and Auditor Defendant maintain corporate headquarters in this District and much of the purported preoffering due diligence investigation and analysis took place in this District. The acts and conduct complained of herein occurred in substantial part in this District.

- 14 -

21. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ, a national securities exchange.

## PARTIES

22. Lead Plaintiff Electrical Workers Local No. 357 purchased TeleTech common stock at artificially inflated prices during the Class Period and was damaged thereby. Lead Plaintiff's certification has been previously submitted to the Court, is hereby incorporated by reference.

**Corporate Defendant**

23. Defendant TeleTech is a Delaware corporation with its principal place of business located in Englewood, CO. TeleTech purports to be a global business process outsourcing company that provides a range of "front-to-back" office outsourced solutions including customer management, transaction-based processing, and database marketing services.

**Individual Defendants**

24. Defendant Tuchman is, and during the Class Period was, Chief Executive Officer and Chairman of the Board of Directors. Tuchman founded TeleTech's predecessor company in 1982 and has served as the Chairman of The Board of Directors since TeleTech's formation in 1994. He served as President and Chief Executive Officer from TeleTech's inception until October of 1999. In March 2001, Tuchman resumed the position of Chief Executive Officer. During the Class Period, defendant Tuchman signed and certified the Company's SEC filings, including but not limited to TeleTech's Form(s) 10-Q and Forms 10-K, and/or the materially false and misleading Registration Statement and joint Proxy/Prospectus issued in connection with his registration and sale of over $209 million of his personally held Company shares – shares which were granted to defendant Tuchman illegally, and at prices below actual market, on a "back-dated" basis.

25.     Defendant John R. Troka ("Troka") is, and during the Class Period was, Chief Financial Officer, Principal Accounting Officer, and Executive Vice President of the Company. Troka was named TeleTech's Interim Chief Financial Officer in August 2006 and has served as TeleTech's Vice President of Global Finance since joining the Company in 2002. During the Class Period, defendant Troka signed and certified the Company's SEC filings, including but not limited to TeleTech's Forms 10-Q and Forms 10-K, and the materially false and misleading Registration Statement and Prospectus issued in connection with the Secondary Public Offering of 5.75 million shares of common stock by defendant Tuchman, while in possession of material adverse non-public information about TeleTech.

26.     Defendant James E. Barlett ("Barlett") has served as a director of TeleTech since February 2000 and vice chairman of TeleTech since October 2001.  Previously, Barlett was a partner with Touche Ross and Co., now known as Deloitte & Touche, among other positions.  Barlett was elected to TeleTech's Board pursuant to a false and misleading Proxy Statement.

27.     Defendant Ruth C. Lipper ("Lipper") was elected to the Board of Directors of TeleTech in May 2002.  Lipper was elected to TeleTech's Board pursuant to a false and misleading Proxy Statement.

28.     Defendant William A. Linnenbringer ("Linnenbringer") was elected to the Board of Directors of TeleTech in February 2003.   Previously, Linnenbringer was a partner with PricewaterhouseCoopers ("PwC") for 32 years, retiring as a partner of PwC in 2002.  Linnenbringer was elected to TeleTech's Board pursuant to a false and misleading Proxy Statement.

29.     Defendant Shrikant Mehta ("Mehta") was elected to the Board of Directors of TeleTech in June 2004.  Mehta was elected to TeleTech's Board pursuant to a false and misleading Proxy Statement.

30.    Defendant Shirley Young ("Young") was elected to the Board of Directors of TeleTech in August 2002.  Young was elected to TeleTech's Board pursuant to a false and misleading Proxy Statement.

31.    Defendants Tuchman, Troka, Barlett, Lipper, Linnenbringer, Mehta and Young are collectively referred to herein as the "Individual Defendants."

32.    Each officer and director of TeleTech owed TeleTech shareholders the duty to exercise care and diligence in the management and administration of the affairs of the Company.

33.    By reason of their positions as officers and directors of TeleTech and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed TeleTech shareholders an obligation of candor.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, finances and compensation practices.

34.    Because of their positions of control and authority as directors or officers of TeleTech, each of the Individual Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  These acts include: (i) agreement to and/or acquiescence in the improper stock option practices; (ii) causing TeleTech to disseminate false Proxy Statements, which failed to disclose defendants' improper option activities and failed to disclose that executives were able to "backdate" or "spring load" their stock option grants via oral notification in order to lower the exercise price of the stock options they received, or pick the grant date of their option grants so as to benefit from the upcoming release of positive corporate news which would likely boost the stock price; (iii) causing TeleTech to file false SEC filings, including TeleTech's third quarter 2006 Form 10-Q, 2006 Form 10-K, its first and second quarter 2007 Forms 10-Q, its Proxy Statements and the March 2007 Secondary Offering Registration Statement and Prospectus, all in violation of

the U.S. securities laws. Because of their positions with TeleTech, each of the Individual Defendants had access to adverse non-public information and was required to disclose these facts promptly and accurately to TeleTech shareholders and the financial markets, but failed to do so.

35. To discharge their duties, the directors of TeleTech were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of TeleTech. By virtue of such duties, the officers and directors of TeleTech were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of TeleTech in accordance with applicable federal law, government rules and regulations, and the charter and bylaws of TeleTech, including its stock option plans;

(b)    not permit any officer, director or employee of TeleTech to engage in self-dealing, insider trading or stock manipulation;

(c)    not permit any officer, director or employee of TeleTech to violate applicable laws, rules and regulations;

(d)    remain informed as to the status of TeleTech's operations, including its practices in relation to its executive compensation practices, financial statement preparation and internal financial, accounting and disclosure controls, and upon receipt of notice or information of imprudent, improper or unsound practices, to make inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the federal securities laws and their duty of candor to the Company's shareholders;

(e)    establish and maintain systematic and accurate records and reports of the business and affairs of TeleTech and procedures for the reporting to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    maintain and implement an adequate, functioning system of internal legal, financial, disclosure and accounting controls, such that TeleTech's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and in accordance with applicable laws;

(g)    exercise control and supervision over the public statements to the securities markets and trading in TeleTech stock by the officers and employees of TeleTech; and

(h)    supervise the preparation and filing of any financial reports or other information required by law from TeleTech and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of TeleTech and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.    The Individual Defendants, as corporate officers and/or directors, were obligated to comply with applicable laws and to disclose the truth about TeleTech.  Each of the Individual Defendants participated in the issuance and/or review of the false and/or misleading statements, including the false SEC filings and reports issued to TeleTech shareholders.

37.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of TeleTech's Proxy Statements, quarterly reports, press releases, SEC filings, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports, Proxy Statements, SEC filings, registration statements and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

**The Underwriter Defendants**

38.    In connection with the March 2007 Secondary Offering, defendants Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. Inc. ("Morgan Stanley," collectively with Citigroup, the "Underwriter Defendants") acted as joint book-running managers of the Offering, and as representatives of the Underwriters and/or as "Lead Underwriters" of the Offering – distributing millions of shares of TeleTech stock to investors. Not including another 750,000 shares distributed upon exercise of the Underwriters' Over-Subscription Allotment Option, the distribution of Secondary Offering shares awarded Underwriters occurred as follows:

| Underwriter | Number of Shares |
|---|---|
| Citigroup Global Markets Inc. | 1,548,000 |
| Morgan Stanley & Co. Incorporated | 1,548.000 |
| Merrill Lynch, Pierce, Fenner & Smith, Inc. | 833,500 |
| Credit Suisse Securities (USA) LLC | 595,500 |
| Craig-Hallum Capital Group LLC | 295,000 |
| Janco Partners, Inc. | 180,000 |
| Total | 5,000,000 |

39.    In connection with the March 2007 Secondary Offering, the Underwriter Defendants were paid combined fees of at least $5.429 million, which were indirectly paid by purchasers of the Company's shares.  The Underwriter Defendants were paid at least $1.75375 per share in connection with their portion of the sale of the 5.75 million shares, including shares sold pursuant to the exercise of the Underwriter's Over-subscription Option.

40.    Shareholders were willing to, and did, pay these fees – equal to almost 5% of the gross sales price – to compensate the Underwriter Defendants for conducting a purported significant due diligence investigation into TeleTech.  The Underwriter Defendants' due diligence investigation is a critical component of the Company's public offering, and it was supposed to provide investors with important safeguards and protections.

41. The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into TeleTech's accounting and assumptions that extended well beyond a mere casual review of TeleTech's accounting, financial report and operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

42. In addition to the foregoing, because of the Underwriter Defendants' role in the March 2007 Secondary Offering and the Individual Defendants' positions with the Company, they all had access to the adverse undisclosed information about TeleTech's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings, and committees thereof, and via reports and other information provided to them in connection therewith.

43. Each of the Individual Defendants and Underwriter Defendants is liable for making or allowing the inclusion of materially false and misleading statements in the Secondary Offering Registration Statement.

**Auditor Defendant**

44. Defendant Ernst & Young LLP ("Ernst & Young") is one of the world's largest accounting and auditing firms and, from May 2002 until May 2007 – prior to and during the Class Period and at the time of the March 2007 Secondary Offering – Ernst & Young purportedly served as the Company's "independent" auditors. While defendant Ernst & Young resigned from the Company on or about May 7, 2007, this was not until after it certified and provided a "clean" audit opinion that was included in TeleTech's 2006 Form 10-K, completed an interim review of the

Company's financial statements for the quarter ended March 31, 2007, and consented to the use of its opinion in the March 2007 Secondary Offering Registration Statement. On August 5, 2008, the SEC censured and fined Ernst & Young for professional misconduct because it lacked independence during the period it audited TeleTech's financial statements due to a business relationship with one of TeleTech's directors. Ernst & Young's participation in the materially false and misleading statements and omissions alleged herein is described in detail in ¶¶198-208 below.

## CLASS ACTION ALLEGATIONS

45.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of TeleTech between October 25, 2006 and July 16, 2008, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TeleTech common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TeleTech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tuchman and Troka; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### CLAIMS AGAINST ALL DEFENDANTS UNDER
### SECTIONS 11, 12 AND 15 OF THE SECURITIES ACT

51.     These claims are brought against TeleTech, Tuchman, Barlett, Lipper, Linnenbringer, Mehta and Young, who signed the Registration Statement and Prospectus for the March 30, 2007

offering of 5.75 million shares of TeleTech common stock at $36.50 per share (the "March 2007 Secondary Offering"). In addition, Lead Plaintiff's Securities Act claims are brought against the Underwriter Defendants and TeleTech's outside auditor Ernst & Young which consented to the inclusion of its 2006 "clean" audit opinion in the Registration Statement. The Defendants mentioned in this paragraph are collectively referred to herein as the "Securities Act Defendants."

52.     The materially false and misleading statements contained in the Secondary Offering Registration Statement: (i) deceived the investing public regarding TeleTech's business, operations, management, and the intrinsic value of TeleTech common stock; (ii) enabled defendant Tuchman to register for sale and sell more than $209 million of his privately held Company stock in connection with the March 2007 Secondary Offering; (iii) enabled TeleTech insiders to sell millions of dollars of their privately held TeleTech shares while in possession of material adverse non-public information about the Company; and (iv) caused plaintiff and other members of the Class to purchase TeleTech common stock at artificially inflated prices.

## Overview of Securities Act Claims

53.     During the Class Period, the Securities Act Defendants issued and sold 5.75 million shares of TeleTech common stock in a public offering on March 30, 2007.

54.     The Securities Act claims are brought on behalf of persons who purchased TeleTech common stock pursuant or traceable to a public offering on March 30, 2007. This claim alleges that the registration statement (the "Registration Statement") filed with the SEC by TeleTech on or about March 19, 2007, and signed by Defendants Tuchman, Bartlett, Lipper, Linnenbringer, Mehta and Young, and the prospectus filed with the SEC by TeleTech on or about March 30, 2007 (the "Prospectus") issued in connection with the March 2007 Secondary Offering misrepresented and omitted material facts, including that the financial statements incorporated therein were materially false and misleading and violated GAAP and SEC reporting requirements in numerous ways.

55.     Indeed, TeleTech has now admitted that every financial statement issued to the public since its IPO in August 1996 can no longer be relied upon and has been restated.  The Company has admitted that its pre-tax earnings reported for the fiscal years 1996 through 2006 and the first and second quarters of 2007 were overstated by $65.307 million due to improper accounting for equity-based compensation, leases and other improper accounting matters.

56.     The financial statements included in the Registration Statement and Prospectus for the March 2007 Secondary Offering, including those for 2004, 2005 and 2006 were purportedly audited by Ernst & Young.  The Company has now admitted that those financial statements were materially false and misleading.

57.     Ernst & Young did not just audit the year-end financial statements of TeleTech.  Ernst & Young performed a subsequent events review of the Company's interim financial statements for the quarter ended March 31, 2007.  Ernst & Young also reviewed the offering documents including all factual portions of the Registration Statement and Prospectus and consented to its association with the representations made in these documents and their designation as experts.  Ernst & Young's "Consent Letter," attached as an exhibit to the Registration Statement effectively represented that Ernst & Young was not aware of any material violations of GAAP in TeleTech's 2004, 2005 and 2006 financial statements and was not aware of any material changes in the Company's previously audited financial statements.

58.     On August 5, 2008, Ernst & Young entered into a cease-and-desist order with the SEC admitting, among other things, that it knowingly lacked independence, under GAAS and PCAOB standards, while performing its annual examination of TeleTech's financial statements for the year ended December 31, 2004.  Ernst & Young's admitted lack of independence to conduct TeleTech's audits arose from a consultancy agreement entered into during 2002 that ran through

early May 2004, between Ernst & Young and one of TeleTech's former directors, Mark C. Thompson ("Thompson"). Thompson was a director of TeleTech from February 26, 2004 until May 10, 2004. The SEC found, among other things, that Ernst & Young knew of the conflict-of-interest since May 2004 when it conducted an internal investigation into the relationship with Thompson but erroneously concluded that no conflict existed.

59.    Furthermore, the SEC determined that each time Ernst & Young signed an audit report for TeleTech where either the period covered by the audit, or the period of the audit work, or both, overlapped with its business relationship with Thompson, Ernst & Young directly violated Rule 2-02(b) of Regulation S-X. *See* Rule 2-02(b), requiring an accountant's report to "state whether the audit was made in accordance with generally accepted auditing standards" (or PCAOB standards after May 24, 2004 – the effective date of PCAOB Auditing Standard 1). Moreover, each time non-independent audit reports were filed with TeleTech's annual reports and Proxy Statements, TeleTech violated federal securities statutes and rules requiring that those Commission filings include independently audited financials. *See* Exchange Act §§13(a) and 14(a) and Rules 13a-1 and 14a-3 thereunder (requiring annual reports and proxy statements to include independently audited financials).

60.    Ernst & Young issued its first false and misleading unqualified audit report for TeleTech's 2004 financial statements on March 7, 2005. Subsequent false and misleading unqualified audit reports which pertained to the Company's 2004 financial statements were issued by Ernst & Young on February 20, 2006 and February 7, 2007.

61.    Plaintiff's Securities Act claims allege only that the Registration Statement and Prospectus issued in connection with the March 2007 Secondary Offering negligently

misrepresented and omitted material facts.  There is no allegation in these claims with respect to

Counts I, II and III that any of the Securities Act Defendants acted with scienter.

### False and Misleading March 2007 Registration Statement

62.    During the Class Period, on or about March 30, 2007, as shares of the Company

traded at artificially inflated prices above $35.00 per share, defendant Tuchman was allowed, and the

Securities Act Defendants assisted him, in registering 5.75 million shares of his privately owned

TeleTech shares for sale.  Priced at $36.50 each, this registration allowed defendant Tuchman to sell

more than $209.87 million of his privately held TeleTech shares.

63.    The TeleTech March 2007 Secondary Offering was made through an underwriting

syndicate led by Morgan Stanley and Citibank, which acted as Joint Book-Runners and Co-Lead

Managers of the March 2007 Secondary Offering. In connection with the Secondary Offering, on

March 30, 2007, the Securities Act Defendants also filed with the SEC, pursuant to Form 424B7, a

copy of the Prospectus. In addition to describing the terms and conditions of the offering itself, the

Prospectus also represented the Company's financial condition at that time, stating, in part, as

follows:

**Summary Consolidated Financial Data**

[Notes Omitted]

| | As of and for the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | (In thousands except per share amounts) | | |
| **Statement of Operations Data** | | | |
| Revenue | $1,052,690 | $  1,086,673 | $  1,211,297 |
| Cost of services | (774,521) | (812,174) | (885,602) |
| Depreciation and amortization | (59,378) | (53,317) | (51,429) |
| Other operating expenses | (170,323) | (189,646) | (201,421) |
| Income from operations | 48,468 | 31,536 | 72,845 |
| Other income (expense) | (14,263) | 680 | (4,459) |
| Provision for income taxes | (9,464) | (2,516) | (14,676) |
| Minority interest | (738) | (1,542) | (1,868) |
| Net income | 24,003 | $  28,158 | 51,842 |
| Weighted average shares outstanding | | | |
| Basic | 74,751 | 72,121 | 69,184 |
| Diluted | 76,109 | 73,631 | 70,615 |

- 27 -

[Notes Omitted]

|  | As of and for the Years Ended December 31, | | |
|  | 2004 | 2005 | 2006 |
|  | (In thousands except per share amounts) | | |
| **Statement of Operations Data** | | | |
| Net income per share | | | |
| Basic | $ 0.32 | $ 0.39 | $ 0.75 |
| Diluted | $ 0.32 | $ 0.38 | $ 0.73 |
| **Balance Sheet Data** | | | |
| Cash and cash equivalents | $ 75,066 | $ 32,505 | $ 60,484 |
| Total assets | $ 496,795 | $ 522,172 | $ 658,716 |
| Total debt | | $ 26,700 | $ 65,000 |

64.     The financial statements and reports presented in the Registration Statement and Prospectus were required to be prepared in conformity with Generally Accepted Accounting Principals, SEC audit and accounting rules, and with the Company's own stated reporting and disclosure controls and procedures.

**Auditor's False and Misleading Consent
Letter for March 2007 Registration Statement**

65.     The Registration Statement issued in connection with the March 2007 Secondary Offering incorporated TeleTech's December 31, 2004, 2005 and 2006 financial statements. The Registration Statement was filed with the SEC on March 19, 2007 and signed by each of Individual Defendants or their Attorney-In-Fact. The Registration Statement contained a consent letter signed by Ernst & Young dated March 13, 2007, which stated:

INDEPENDENT AUDITORS' CONSENT

We consent to the reference to our firm under the caption "Experts" in the Registration Statement on Form S-3 for the registration of common stock and related Prospectus of TeleTech Holdings, Inc., and to the incorporation by reference therein of our reports dated February 7, 2007, with respect to the consolidated financial statements of TeleTech Holdings Inc. and TeleTech Holdings, Inc.'s management's assessment of the effectiveness of internal control over financial reporting, and the effectiveness of internal control over financial reporting of TeleTech Holdings, Inc., included in its Annual Report (Form 10-K) for the year ended December 31, 2006, filed with the Securities and Exchange Commission.

Ernst & Young LLP
March 13, 2007

- 28 -

66.     Unbeknownst to investors, however, the Registration Statement and Prospectus were materially false and misleading, contained untrue statements of material fact, and omitted to disclose material facts necessary to make the Securities Act Defendants' statements, as set forth herein, not false and misleading.  Specifically, the Company's statements regarding the Company's financial results were not true and accurate because TeleTech's financial statements were not prepared in accordance with GAAP or SEC accounting rules because they did not properly account for $65.307 million of accounting charges primarily related to back-dated, improperly reported, and unreserved stock option compensation awards – including options that were granted to, exercised and the underlying shares sold by, defendant Tuchman.  The Company has restated its financial statements for 2005 and 2006 to correct pre-tax earnings overstatements of $1.437 million and $1.798 million, respectively, and further admitted that its 2004 pre-tax earnings were overstated by $711,000.

67.     Additionally, the Registration Statement and Prospectus were materially false and misleading because they falsely represented that TeleTech's financial statements for 2004 had been independently audited in accordance with GAAS and PCAOB standards.  Ernst & Young has admitted that it lacked independence in conducting its audit of TeleTech's 2004 financial statements.

68.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

69.     However, pursuant to GAAP and pursuant to SEC Rule 12b-20, the Company's periodic reports must contain information that is necessary to make the required statements, in light

of the circumstances under which they are made, not misleading. In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.

70.    Instructions to Item 303 require that this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business.  Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

71.    Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past...

72.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates.  To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

73.     The Company's financial statements contained in the Registration Statement and Prospectus were presented in a manner that violated the principles of fair financial reporting and the following GAAP provisions, among others:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)    The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

74.    In addition, at the time of the March 2007 Secondary Offering, the Securities Act Defendants also violated SEC disclosure rules and the Company's own stated disclosure policies and procedures, as follows:

(a)    in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), the Securities Act Defendants failed to disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way; and that failure to disclose the information rendered the statements that were made during at the time of the March 2007 Secondary Offering, materially false and misleading; and

(b)    by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

75.    In the Registration Statement and Prospectus, the Securities Act Defendants were required to disclose the existence of the material facts described herein – including having failed to properly account for tens of millions of dollars in under-reported compensation expenses as a result of years of backdating options.  Defendants failed to make such disclosures and failed to properly account for or properly report its financial statements in conformity with GAAP.  Defendants knew, or were reckless or negligent in not knowing, the facts which indicated that the Secondary Offering Registration Statement and Prospectus which were disseminated to the investing public, were materially false and misleading for the reasons set forth herein.

76.     Had the true financial position of the Company been reported, along with the Company's true compensation costs and options grant dates, the Securities Act Defendants would not have been able to sell 27.5 million shares of TeleTech common stock for gross proceeds of almost $210 million – if at all.

## COUNT I

### For Violations of Section 11 of the Securities Act
### Against the Securities Act Defendants

77.     Lead Plaintiff purchased TeleTech common stock in, or traceable to, the March 2007 Secondary Offering, as defined herein.  As a result of Defendants' false statements in the Registration Statement for the March 30, 2007 Secondary Offering, Lead Plaintiff purchased TeleTech common stock at artificially inflated prices.  The price of TeleTech stock declined significantly when the truth began to be publicly revealed about the Company's equity-based compensation accounting, lease accounting, accounts receivable and related revenues and accruals and related expenses, among other false statements, that had been negligently included in the Registration Statement by Defendants, and accordingly Plaintiff was damaged as a proximate result.

78.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  Plaintiff incorporates, repeats and realleges only the allegations contained in ¶¶53-76, above.  This Count does not contain any allegations sounding in fraud.  Moreover, for purposes of this Count only, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

79.     The Registration Statement for the Secondary Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to

make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

80.    TeleTech is the registrant for the Secondary Offering.  The Securities Act Defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

81.    As issuer of the shares, TeleTech is strictly liable to Plaintiff and the Class for the misstatements and omissions.

82.    The Individual Defendants each signed the Registration Statement either personally or through an Attorney-in-Fact and/or caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements made misleading.  The Individual Defendants failed to do so.  None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

83.    The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the March 2007 Secondary Offering and the Company's securities sold through the Registration Statement.  The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit to state material facts.  None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the

belief that the statements described herein, which were contained in the Registration Statement and Prospectus, were true, were without omission of any material facts, and/or were not misleading.

84.    The Securities Act Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

85.    Plaintiff acquired TeleTech common stock traceable to and in reliance on, the Registration Statement.

86.    Plaintiff and the Class have sustained damages. The price of TeleTech common stock has declined substantially subsequent to and due to Defendants' violations as described herein.

87.    At the times they purchased TeleTech common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to July 16, 2007. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act
### Against the Securities Act Defendants

88.    Plaintiff repeats and realleges only the allegations contained in ¶¶53-87, above.

89.    This Count is brought by Plaintiff pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all purchasers of TeleTech shares in connection with, and traceable to, the

March 2007 Secondary Offering. This Count does not contain any allegations sounding in fraud. Moreover, for purposes of this Count, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

90.    Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus. Defendants issued, caused to be issued, and/or signed the Registration Statement in connection with the March 2007 Secondary Offering. The Registration Statement contained a Prospectus, which was used to induce investors, such as the Plaintiff and the other members of the Class, to purchase TeleTech common stock.

91.    The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus. TeleTech and the Underwriter Defendants, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectus.

92.    TeleTech and its employees and agents and the Individual Defendants, owed Plaintiff and the other members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants, as underwriters of the March 2007 Secondary Offering, were required to investigate the representations contained in the Prospectus with due diligence to confirm that it did not contain materially misleading statements or omit to state material facts. Defendants knew of, or in the exercise of reasonable care by their employees and agents, should

have known of, the misstatements and omissions contained in the March 2007 Secondary Offering materials, including the Prospectus, as set forth above.

93.     Plaintiff and other members of the Class purchased or otherwise acquired TeleTech common stock pursuant to and/or traceable to the defective Prospectus.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

94.     By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold TeleTech common stock purchased in the March 2007 Secondary Offering have the right to rescind and recover the consideration paid for their TeleTech common stock and hereby elect to rescind and tender their TeleTech common stock to the Defendants sued herein in return for the consideration paid for those securities together with interest thereon.  Plaintiff and Class members who have sold their TeleTech common stock are entitled to rescissory damages.

## COUNT III

### For Violations of Section 15 of the Securities Act
### Against the Individual Defendants

95.     Plaintiff repeats and realleges only the allegations contained in ¶¶53-94, above.

96.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants.  This Count does not contain any allegations sounding in fraud. Moreover, for purposes of this Count, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

97.     Each of the Individual Defendants was a control person of TeleTech by virtue of his position as a director and/or senior officer of TeleTech and/or his ownership of TeleTech common

stock.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of TeleTech.  They each had the power and authority to cause the issuer to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading statements and omissions in the Prospectus.

98.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the March 2007 Secondary Offering to be successfully completed.  None of these Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement, including the Prospectus, were true and devoid of any omissions of material facts.  Therefore, by reason of their positions of control, as alleged herein, each of these Defendants is jointly and severally liable to Plaintiffs and the Class as a result of the wrongful conduct alleged herein.

99.    Plaintiff and the other members of the Class who acquired TeleTech common stock pursuant to the Registration Statement and Prospectus did so without knowledge of the materially untrue statements or omission therein.  As a direct and proximate result of the Defendants' wrongdoing, Plaintiff and the Class members have suffered substantial damages.

**CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS FOR
DISSEMINATION OF AN UNLAWFUL PROXY STATEMENT**

**COUNT IV**

**Claims Against the Individual Defendants
Under Section 14(a) of The Exchange Act**

100.    Lead Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein, except allegations of fraud or intent which are not necessary to assert this Claim for Relief.

**2007 Proxy Statement**

101.    On or about May 15, 2007, TeleTech issued its 2005 Proxy Statement to its shareholders for its 2006 Annual Meeting to be held June 1, 2007, which solicited shareholder votes to elect certain directors, among other various proposals.  A shareholder vote was required to elect these directors.

102.    Regarding the election of directors and ratification of Ernst & Young, the 2006 Proxy Statement provided:

PROPOSAL 1:
ELECTION OF DIRECTORS

At the annual meeting, six persons will be elected to the board of directors of the Company to hold office until the next annual meeting of stockholders and until their respective successors are duly elected and qualified.  The Nominating and Governance Committee and the board of directors have nominated each of the persons named below and it is the intention of the persons named as proxies in the enclosed proxy to vote FOR the election of all such nominees.  Each of the nominees is currently serving as a director of TeleTech and has consented to being named in this proxy statement as a nominee and to continue to serve as a director if elected.

\*        \*        \*

Recommendation of the Board of Directors

The Board of Directors recommends that you vote "FOR" all of the nominees for election to the Board of Directors.

103.    The six individuals nominated were elected.

104.    The 2007 Proxy Statement represented that under TeleTech's option grants the exercise price of the options equals ***"the fair market value on the date of grant."***  The 2006 Proxy Statement also described the existing executive compensation structure as follows:

DISCUSSION AND ANALYSIS
Compensation, Discussion & Analysis
Role of Compensation Committee

The compensation committee of TeleTech is charged with and has the following responsibilities (i) consider and make recommendations to the board of directors regarding the chief executive officer's salary, annual incentives and bonuses, perquisites, benefits, stock option grants, and employment agreements and other compensation matters, and all changes thereto; (ii) review with TeleTech management and approve the compensation policy for executive officers, and such other managers as directed by the board; (iii) ***consider and approve all other executive officers' (as defined by Section 16 of the Exchange Act) salaries, annual incentives and bonuses, perquisites, benefits, stock option grants, RSU grants, and employment agreements and compensation matters, and all changes thereto; (iv) consider and approve the terms of offers of employment for all Section 16 officers and employees that shall report directly to the chief executive officer;*** (v) evaluate the need for, and provisions of, employment contracts/severance arrangements for the chief executive officer and other executive officers; (vi) evaluate the performance of the office of the chief executive officer (and such other executive officers as deemed appropriate) in light of TeleTech's current business environment and strategic objectives; (vii) review with management and approve recommendations with regard to aggregate salary budget and guidelines for all employees; (viii) act as administrator of the stock option plans and make recommendations to the board of directors with respect to amendments to the plans and changes in the number of shares reserved for issuance thereunder; (ix) consider and make recommendations to the board of directors with respect to a pool of stock options and RSUs available for grant under the annual management stock option and RSU program; (x) consider and approve management proposals regarding the establishment, termination or modification of retirement, long-term disability and other management welfare and benefit plans; (xi) prepare a report (to be included in the proxy statement) which describes (a) the criteria on which compensation paid to the chief executive officer for the last completed fiscal year is based, (b) the relationship of such compensation to TeleTech's performance and (c) the compensation committee's executive compensation policies applicable to executive officers, specifically addressing the other "named executive officers" included in the proxy statement; (xi) review and discuss management succession at least annually; and (xii) monitor summary data on the employee population (*e.g.*, total personnel costs, compensation benchmark data, employee diversity, turnover levels).

*      *      *

Executive Compensation Philosophy and Policies
Elements of Executive Compensation

Our primary compensation philosophy is: (i) to develop a compensation package that attracts highly qualified executives to work for TeleTech; (ii) to provide appropriate incentives and to reward superior executive performance that creates long-term investor value; and (iii) to encourage executives who deliver that performance to remain with TeleTech and to continue that level of performance. ***Under the supervision of the compensation committee, TeleTech has developed and implemented compensation policies, plans and programs that are designed to closely align the financial interests of the senior executives with those of our stockholders*** in order to enhance the long-term growth and profitability of our company and therefore the creation of long-term stockholder value. Our compensation programs provide a balanced mix of cash, incentive and equity-based compensation that we believe meets these goals.

\*        \*        \*

Long-Term Incentive Compensation

Long term incentive compensation is primarily comprised of equity based incentive in the form of (i) options and more recently (ii) in the form of RSUs.

***Stock-based compensation is an important element of our compensation policy. Stock options have generally been offered to induce an executive to accept employment with TeleTech.  The compensation committee believed that stock options, which vest over time and are subject to forfeiture, align the interests of executive management with the interests of TeleTech's stockholders.*** In February 2007, we moved to a RSU program.  Under the RSU program, shares of restricted stock are granted to eligible employees.  RSUs vest in two ways: time based and performance based.  The RSU program operates under the same philosophy as stock options, and the compensation committee also believes that substantial equity ownership by individuals in leadership positions ensure that these individuals will remain focused on building stockholder value. ***An executive officer level committee, consisting of the chief executive officer, the chief financial officer and the executive vice president of global human capital, has the authority to administer the stock option and RSU plans*** with respect to grants of not more than 100,000 RSUs to employees who are not executive officers. Any grants in excess of 100,000 RSUs or to an executive officer must be approved by the compensation committee.

In December 2004, the board of directors approved the long term incentive plan under which executive management and other key leaders were eligible. Under the long term incentive plan, participants were eligible to earn an incentive award upon completion of the 2007 fiscal year provided the company met certain revenue and EBIT targets approved by the board of directors. In February 2007, the long term incentive plan was replaced by the RSU program and participating individuals

received grants of RSUs which contain vesting based upon company performance and time.

*     *     *

*Limitations on the Deductibility of Compensation.*  Under Section 162(m) of the Internal Revenue Code of 1986, as amended, and applicable Treasury regulations, no tax deduction is allowed for annual compensation in excess of $1 million paid to the five most highly compensated executive officers.  Performance-based compensation that has been disclosed to and approved by stockholders, by a majority of the vote in a separate stockholder vote before the payment of such compensation, is excluded from the $1 million limit if, among other requirements, the compensation is payable only upon attainment of pre-established, objective performance goals and the board committee that establishes such goals consists only of "outside directors" as defined for purposes of Section 162(m).  Each of the members of the compensation committee qualify as "outside directors."  The compensation committee intends to maximize the extent of tax deductibility of executive compensation under the provisions of Section 162(m) so long as doing so is compatible with its determinations as to the most appropriate methods and approaches for the design and delivery of compensation to executive officers.

*     *     *

Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus[1]($) | Stock Awards($) | Option Awards ($)[3] | Non-Equity Incentive Plan Compensation ($)[2] | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All other Compensation ($)[4] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Kenneth D. Tuchman | 2006 | 350,000 | -0- | -0- | -0- | -0- | -0- | 60,985 | 410,985 |
| (PEO) | 2005 | 350,000 | -0- | -0- | 5,376,000 | 500,000 | -0- | 55,292 | 6,281,292 |
| | 2004 | 289,615 | -0- | -0- | -0- | -0- | -0- | 45,486 | 335,101 |
| John R. Troka, Jr. | 2006 | 180,000 | -0- | -0- | 62,600 | 121,000 | -0- | 190 | 363,790 |
| (CFO)[5] | 2005 | 180,000 | -0- | -0- | -0- | 6,500 | -0- | 182 | 186,682 |
| | 2004 | 178,462 | 7,000 | -0- | 112,600 | 26,800 | -0- | 4,777 | 329,639 |
| Dennis J. Lacey | 2006 | 226,576[6] | -0- | -0- | -0- | -0- | -0- | 1,582,139 | 1,808,718 |
| (CFO)[5] | 2005 | 300,000 | -0- | -0- | -0- | 300,000 | -0- | 12,575 | 612,575 |
| Delivery) | 2004 | 312,482 | -0- | -0- | 430,500 | 300,000 | -0- | 4,715 | 1,047,697 |
| Brian James Delaney | 2006 | 250,000 | -0- | -0- | -0- | 400,000 | -0- | 137,462 | 787,462 |
| (EVP Global Service | 2005 | 246,154 | -0- | -0- | 524,000 | 250,000 | -0- | 41,007 | 1,061,161 |
| Delivery) | 2004 | 202,981 | -0- | -0- | 326,100 | 162,000 | -0- | 75 | 691,156 |
| Kamalesh Dwivedi | 2006 | 250,000 | -0- | -0- | -0- | 300,000 | -0- | 37,545 | 587,545 |
| (EVP CIO) | 2005 | 250,000 | -0- | -0- | -0- | 250,000 | -0- | 488,091 | 988,091 |
| | 2004 | 259,615 | -0- | -0- | 430,500 | 225,000 | -0- | 349,747 | 1,264,862 |
| Gregory Hopkins | 2006 | 275,000 | -0- | -0- | -0- | 550,000 | -0- | 904,391 | 1,729,391 |
| (EVP Global Accounts) | 2005 | 275,000 | -0- | -0- | -0- | 275,000 | -0- | 12,406 | 562,406 |
| | 2004 | 195,673[6] | -0- | -0- | 1,248,000 | 100,000 | -0- | 6,138 | 1,549,811 |
| John R. Simon | 2006 | 250,000 | -0- | -0- | -0- | 350,000 | -0- | 8,886 | 608,886 |
| (EVP — Human | 2005 | 250,000 | -0- | -0- | 438,200 | 250,000 | -0- | 10,010 | 948,210 |
| Capital)[7] | 2004 | 259,615 | -0- | -0- | 287,000 | 200,000 | -0- | 65,627 | 812,242 |

*     *     *

- 42 -

### GRANTS OF PLAN BASED AWARDS IN 2006

| Name | Grant Date | Approval Date | Number of Non-Equity Incentive Plan Units Granted (#) | Estimated Future Payouts Under Non-Equity Incentive Plan Awards[1] | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($ / Sh) | Closing Price on Grant Date ($ / Sh) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| Kenneth D. Tuchman | — | — | — | — | — | — | — | — | — | — | — | — | — |
| John R. Troka, Jr.[1] | 2/15/06 | 2/15/06 | — | — | — | — | — | — | — | 10,000 | 10,000 | 12.75 | 12.75 |
| | 12/31/06 | 2/15/07 | — | -0- | 50,000 | — | — | — | — | — | — | — | — |
| Dennis J. Lacey | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Brian J. Delaney | 12/31/06 | 2/15/07 | — | -0- | 300,000 | 600,000 | — | — | — | — | — | — | — |
| Kamalesh Dwivedi | 12/31/06 | 2/15/07 | — | -0- | 180,000 | 450,000 | — | — | — | — | — | — | — |
| Greg Hopkins | 12/31/06 | 2/15/07 | — | -0- | 275,000 | 550,000 | — | — | — | — | — | — | — |
| John R. Simon | 12/31/06 | 2/15/07 | — | -0- | 300,000 | 450,000 | — | — | — | — | — | — | — |

\*      \*      \*

### OUTSTANDING EQUITY AWARDS AT DECEMBER 31, 2006

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Kenneth D. Tuchman | 420,000 | 420,000 | — | 6.98 | 10/1/2011 | — | — | — | — |
| | 420,000 | 420,000 | — | 11.83 | 2/15/2012 | — | — | — | — |
| | 200,000 | 600,000 | — | 11.35 | 11/4/2015 | — | — | — | — |
| John R. Troka, Jr. | 35,000 | 35,000 | — | 13.10 | 1/14/2012 | — | — | — | — |
| | 7,500 | 7,500 | — | 11.63 | 2/29/2012 | — | — | — | — |
| | 2,000 | 1,000 | — | 5.01 | 3/3/2013 | — | — | — | — |
| | 10,000 | 10,000 | — | 8.36 | 6/23/2014 | — | — | — | — |
| | -0- | 10,000 | — | 12.75 | 2/15/2016 | — | — | — | — |
| Dennis J. Lacey | | | | | | | | | |
| Brian J. Delaney | 3,000 | 3,000 | — | 8.86 | 12/2/2012 | — | — | — | — |
| | -0- | 750 | — | 5.01 | 3/3/2013 | — | — | — | — |
| | -0- | 18,000 | — | 7.78 | 6/7/2014 | — | — | — | — |
| | -0- | 15,000 | — | 8.36 | 6/23/2014 | — | — | — | — |
| | 25,000 | 75,000 | — | 8.59 | 9/9/2015 | — | — | — | — |
| Kamalesh Dwivedi | 42,300 | 50,000 | — | 4.05 | 8/4/2013 | — | — | — | — |
| | 18,750 | 37,500 | — | 8.57 | 9/7/2014 | — | — | — | — |
| Greg Hopkins | -0- | 150,000 | — | 6.24 | 4/12/2014 | — | — | — | — |
| John Simon | 15,000 | 15,000 | — | 12.62 | 10/21/2009 | — | — | — | — |
| | 6,000 | 6,000 | — | 30.87 | 3/30/2010 | — | — | — | — |
| | 35,000 | 35,000 | — | 11.63 | 2/29/2012 | — | — | — | — |
| | 16,000 | 4,000 | — | 6.25 | 9/30/2012 | — | — | — | — |
| | 25,000 | 25,000 | — | 8.57 | 9/7/2014 | — | — | — | — |
| | 17,500 | 52,500 | — | 10.58 | 10/25/2015 | — | — | — | — |

\*      \*      \*

### OPTION EXERCISES AND STOCK VESTED DURING 2006

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise | Value Realized on Exercise | Number of Shares Acquired on Vesting | Value Realized on Vesting |
| (a) | (#) | ($) | (#) | ($) |
| Kenneth Tuchman | — | — | — | — |
| John R. Troka, Jr. | — | — | — | — |
| Dennis J. Lacey | 168,750 | 1,573,263 | — | — |
| Brian J. Delaney | 27,750 | 129,922 | — | — |
| Kamalesh Dwivedi | — | — | — | — |
| Greg Hopkins | 150,000 | 892,147 | — | — |
| John Simon | — | — | — | — |

[Footnotes omitted.]

- 43 -

105.    The 2007 Proxy Statement also described TeleTech's employee agreement with defendant Tuchman.

106.    The 2007 Proxy Statement was false in the following respects:

- The 2007 Proxy Statement failed to disclose that options had been "backdated" or "spring loaded" through modification of the effective date of grant.

- The 2007 Proxy Statement failed to disclose that TeleTech's compensation expense, including compensation expenses paid to its named executives, was understated by $611,000 during 2006 due to backdating or spring loading.

- The way the Annual Option Grant Program had been administered was inconsistent with the representation that options were granted only at fair market value on the grant date.

- Because option grants were "backdated" or "spring loaded," they did not provide increased motivation to corporate employees to contribute to the future success of the Company; nor was the value of the options tied to Company performance.

- Because option grants were "backdated" or "spring loaded," it was not assured favorable tax treatment or that the executive option compensation would be tax deductible.

107.    The statements in TeleTech's 2007 Proxy Statement, stock incentive plan and other SEC filings that stock options were not be granted at less than fair market value on the dates granted and that TeleTech's compensation plans were important to the Company because they were structured to ensure that the stock option compensation is tax deductible for the Company were false. In reality, Tuchman and/or other top executives could pick the grant dates for their options – picking a date before the actual grant date to take advantage of a lower price ("backdating") or picking a date just before they knew the Company was about to release positive news which would boost the stock price ("spring loading").  Thus, options were granted at less than fair market value on the date of the grant.  As a result, the stock option program exposed TeleTech to unrecorded and unreported employee compensation expense that caused its financial statements to be false.

108.    The statements that Tuchman and others were awarded options at an exercise price which was equal to the fair market value of the stock on the grant date was also false and misleading. It failed to disclose that award dates were picked to coincide with a low stock price by way of "backdating" or "spring loading." Furthermore, this statement was materially false and misleading because it failed to disclose that Tuchman and/or other top insiders had authority to pick the grant date, *i.e.*, exercise price of their options in violation of the option plan.

109.    The 2007 Proxy Statement stated that:

- The Company's compensation policy for executive management is: (i) to develop a compensation package that attracts highly qualified executives to work for TeleTech; (ii) to provide appropriate incentives and to reward superior executive performance that creates long-term investor value; and (iii) to encourage executives who deliver that performance to remain with TeleTech and to continue that level of performance.

*        *        *

- [T]hat substantial equity ownership by individuals in leadership positions within the Company ensure that such individuals will remain focused on building stockholder value.

110.    These statements were materially misleading because they failed to disclose that the options were priced at or near the lowest price possible. When an option is priced at an artificially low price, by "backdating" or "spring loading," those granted options receive windfall compensation even if performance goals are not met. These statements were also misleading because the executives' interests were not aligned with shareholders, as options granted with artificially low exercise prices by design are not contingent upon the long-term performance of the Company.

111.    The statements in the 2007 Proxy Statement were materially false and misleading because when the Company allowed Tuchman and the top officers to manipulate the exercise price for options, it did not align their interests with the shareholders at all. Nor did it provide them with an incentive to act in the ***long-term*** best interest of the Company. When options are granted at artificially low prices or just before good corporate news is announced, the Company does not need

- 45 -

long-term success for the option holder to prosper. Indeed, they stood to make hundreds of millions of dollars if the stock price simply returned to the price it was at before the price decline or moved up as expected on good news they knew was coming, which the insiders took full advantage of.

112.    The statements were also materially false and misleading to the extent that they did not disclose that option grants were backdated or spring loaded. Furthermore, these statements were false and misleading because the Company failed to disclose that Tuchman was permitted to manipulate the option grant process and had picked grant dates that were best for him and hurt the other shareholders.

113.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

114.    The Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that defendants were causing TeleTech to engage in an option backdating scheme, a fact which defendants were aware of and participated in from at least 1996.

115.    In the exercise of reasonable care, the Individual Defendants should have known that the Proxy Statements were materially false and misleading.

116.    The equity compensation misrepresentations and omissions in the 2007 Proxy Statement were material to voting on the 2007 Proxy Statement. The 2007 Proxy Statement was an essential link in the accomplishment of the continuation of defendants' unlawful stock option manipulation scheme, as revelations of the truth would have immediately thwarted a continuation of

shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

117.    TeleTech shareholders were damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

### CLAIMS AGAINST THE COMPANY, THE INDIVIDUAL DEFENDANTS AND AUDITOR DEFENDANT UNDER SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5 AND CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(A) OF THE EXCHANGE ACT

### Materially False and Misleading Statements

**Pre-Class Period**

118.    Prior to the start of the Class Period, TeleTech issued numerous press releases announcing, among other things, its financial results and TeleTech filed quarterly and annual reports with the SEC on Forms 10-Q and 10-K.  The Company's press releases and quarterly and annual reports filed with the SEC were each materially false and misleading because TeleTech was overstating its reported financial results by materially understating its equity-based compensation, among other accounting improprieties.  Moreover, the Company's SEC filings falsely represented that the financial statements contained therein were prepared in accordance with GAAP and also falsely represented the Company's net earnings and financial condition.  These materially false and misleading statements remained alive and uncorrected during the Class Period.

119.    *1996 10K*: On or about March 25, 1997, TeleTech filed its Form 10-K for the year ended December 31, 1996 with the SEC, which was signed by Defendant Tuchman, among others (the "1996 10-K").  The 1996 10-K included TeleTech's financial statements for the year ended December 31, 1996, which were represented to have been presented in conformity with U.S. GAAP. The 1996 10-K represented that:

- •    TeleTech's pre-tax earnings for 1996 were $23.345 million.

- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

120.    Regarding the Company's Stock Compensation Plans and compliance with equity –

based compensation GAAP standards, the 1996 10K stated in pertinent part as follows[4]:

STOCK COMPENSATION PLANS

The Company adopted a stock option plan during 1995 and amended and restated the plan in January 1996, for directors, officers, employees, consultants and independent contractors. The plan reserves 7.0 million shares of common stock and permits the award of incentive stock options, non-qualified options, stock appreciation rights and restricted stock.  Outstanding options vest over a three- or five-year period and are exercisable for ten years from the date of grant.

In January 1996, the Company adopted a stock option plan for non-employee directors (the "Director Plan") covering 750,000 shares of common stock. All options are to be granted at fair market value at the date of grant. Options vest as of the date of the option and are not exercisable until six months after the option date. Options granted are exercisable for ten years from the date of grant unless a participant is terminated for cause or one year after a participant's death. The Director Plan had options to purchase 262,500 shares outstanding at December 31, 1996.

*        *        *

STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 123 ("SFAS 123")

During 1995, the Financial Accounting Standards Board issued SFAS 123, "Accounting for Stock Based Compensation," which defines a fair value based method of accounting for an employee stock option, employee stock purchase plan or similar equity instrument and encourages all entities to adopt that method of accounting for all of their employee stock compensation plans. However, it also allows an entity to continue to measure compensation cost for those plans using the method of accounting prescribed by the Accounting Principles Board Opinion No. 25 ("APB 25), "Accounting for Stock Issued to Employees." Entities electing to remain

---

[4]    Substantially, identical disclosures were made in each of the Company's Forms 10-K for the years 1997 though 2001.

with the accounting in APB 25 must make pro forma disclosures of net income and earnings per share, as if the fair value based method of accounting defined in SFAS 123 has been applied.

***The Company has elected to account for its stock-based compensation plans under APB 25; however, the Company has computed for pro forma disclosure purposes the value of all options granted during 1995 and 1996 using the Black-Scholes option pricing model as prescribed by SFAS No. 123*** and the following weighted average assumptions used for grants:

| | |
|---|---|
| Risk-free interest rate........................... | 6.32% |
| Expected dividend yield...................... | 0% |
| Expected lives..................................... | 4.11 years |
| Expected volatility............................... | 59% |

Options were assumed to be exercised upon vesting for the purpose of this valuation. Adjustments are made for options forfeited prior to vesting. The pro forma compensation expense was computed to be the following approximate amounts:

| | |
|---|---|
| Year ended December 31, 1995............... | $341,000 |
| Year ended December 31, 1996............... | $3,922,000 |

121.    The statements referenced above in ¶¶119-120 and were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    that TeleTech's 1997 pre-tax earnings were overstated by $895,000 primarily due to options backdating. TeleTech's 1996 financial statements failed to include at least $763,000 of equity-based compensation expenses associated with the Company's stock compensation plans due to defendants' backdating scheme. Unbeknownst to TeleTech's public shareholders, Defendant Tuchman and other of TeleTech's then senior management were backdating the "grant dates" associated with the Company's stock compensation option grants which artificially lowered the "strike price" of the option and guaranteed the option-holder a riskless profit when the option was exercised;

(b)    that TeleTech's financial statements were not prepared in accordance with GAAP as detailed further herein. TeleTech has now admitted that its Class Period financial

statements violated GAAP in numerous respects and has restated those financial statements to correct its improper accounting;

(c)    that TeleTech's quarterly financial statements did not contain "all adjustments" necessary for a "fair presentation" of the Company's financial performance as the financial statements violated GAAP in material respects as detailed herein;

(d)    that TeleTech failed to disclose sufficient information regarding its business and accounting practices to investors;

(e)    that TeleTech did not have effective controls to detect that its financial statements were not in conformity with GAAP; and

(f)    based upon the foregoing, each of Defendants' statements, opinions and projections concerning TeleTech's current and future operating results and financial condition were materially false and misleading when made.

122.    On or about March 30, 1998, TeleTech filed its Form 10-K for the year ended December 31, 1997 with the SEC, which was signed by Defendant Tuchman, among others (the "1997 10-K"). The 1997 10-K included TeleTech's financial statements for the year ended December 31,1997, which were represented to have been presented in conformity with U.S. GAAP. The 1997 10-K represented that:

- TeleTech's pre-tax earnings for 1997 were $33.569 million.

- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

123.    The statements referenced above in ¶122 were each materially false and misleading for the reasons stated at ¶121. In addition, the statements in ¶122 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 1997 pre-tax earnings were overstated by $2,291,000 primarily due to options backdating.

124.    On or about March 30, 1999, TeleTech filed its Form 10-K for the year ended December 31, 1998 with the SEC, which was signed by Defendant Tuchman, among others (the "1998 10-K").  The 1998 10-K included TeleTech's financial statements for the year ended December 31, 1998, which were represented to have been presented in conformity with U.S. GAAP. The 1998 10-K represented that:

- TeleTech's pre-tax earnings for 1998 were $31.897 million.

- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

125.    The statements referenced above in ¶124 were each materially false and misleading for the reasons stated at ¶121.  In addition, the statements in ¶124 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 1998 pre-tax earnings were overstated by $3,948,000, primarily due to options backdating.  TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $2,396,000 during 1998.

126.    On or about March 29, 2000, TeleTech filed its Form 10-K for the year ended December 31, 1999 with the SEC, which was signed by Defendants Tuchman and Barlett, among others (the "1999 10-K").  The 1999 10-K included TeleTech's financial statements for the year ended December 31, 1999, which were represented to have been presented in conformity with U.S. GAAP.  The 1999 10-K represented that:

- TeleTech's pre-tax earnings for 1999 were $48.415 million.

- The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

127.    The statements referenced above in ¶126 were each materially false and misleading for the reasons stated at ¶121.  In addition, the statements in ¶126 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 1999 pre-tax earnings were overstated by $13,891,000, primarily due to options backdating.  TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $12,779,000 during 1999.

128.    On or about March 30, 2001, TeleTech filed its Form 10-K for the year ended December 31, 2000 with the SEC, which was signed by Defendants Tuchman and Barlett, among others (the "2000 10-K").  The 2000 10-K included TeleTech's financial statements for the year ended December 31, 2000, which were represented to have been presented in conformity with U.S. GAAP.  The 2000 10-K represented that:

- TeleTech's pre-tax earnings for 2000 were $122.303 million.

- The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

129.    The statements referenced above in ¶128 were each materially false and misleading for the reasons stated at ¶121.  In addition, the statements in ¶128 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 2000 pre-tax earnings were overstated by $29,706,000, primarily due to options backdating.  TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $26,664,000 during 2000.

130.    On or about April 1, 2002, TeleTech filed its Form 10-K for the year ended December 31, 2001 with the SEC, which was signed by Defendants Tuchman and Barlett, among others (the "2001 10-K"). The 2001 10-K included TeleTech's financial statements for the year ended December 31, 2001, which were represented to have been presented in conformity with U.S. GAAP. The 2001 10-K represented that:

- TeleTech's pre-tax losses for 2001 were $0.241 million.

- The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, disclosure of contingent liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

131.    The statements referenced above in ¶130 were each materially false and misleading for the reasons stated at ¶121. In addition, the statements in ¶130 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 2001 pre-tax earnings were overstated by $6,337,000, primarily due to options backdating. TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $5,648,000 during 2001.

132.    On or about March 31, 2003, TeleTech filed its Form 10-K for the year ended December 31, 2002 with the SEC, which was signed by Defendants Tuchman, Barlett, Lipper and Young, among others (the "2002 10-K"). The 2002 10-K included TeleTech's financial statements for the year ended December 31, 2002, which were represented to have been presented in conformity with U.S. GAAP. The 2002 10-K represented that:

- TeleTech's pre-tax losses for 2002 were $4.368 million.

- The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, disclosure of contingent liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

- Stock Option Accounting. The Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations in accounting for its employee stock options. ***Under APB 25, because the exercise price of the Company's employee stock options is generally equal to the market price of the underlying stock on the date of the grant, no compensation expense is recognized.*** Statement No. 123, "Accounting and Disclosure of Stock-Based Compensation" ("SFAS 123"), establishes an alternative method of expense recognition for stock-based compensation awards to employees based on fair values. The Company elected not to adopt SFAS 123 for expense recognition purposes.

[Emphasis added.]

133.    The statements referenced above in ¶132 were each materially false and misleading for the reasons stated at ¶121. In addition, the statements in ¶132 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 2002 pre-tax earnings were overstated by $7,072,000, primarily due to options backdating. TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $6,105,000 during 2002.

134.    On or about March 8, 2004, TeleTech filed its Form 10-K for the year ended December 31, 2003 with the SEC, which was signed by Defendants Tuchman, Barlett, Linnenbringer, Lipper and Young, among others (the "2003 10-K"). The 2003 10-K included TeleTech's financial statements for the year ended December 31, 2003, which were represented to have been presented in conformity with U.S. GAAP. The 2003 10-K represented that:

- TeleTech's pre-tax losses for 2003 were $2.772 million.[5]

---

[5]    On or about March 1, 2005, TeleTech filed an amended Form 10-K/A for the year ended December 31, 2003, restating the Company's previously reported losses for 2003, 2002 and 2001 to pre-tax earnings of $5.358 million for 2003, pre-tax losses of $8.164 million for 2002, and pre-tax losses of $2.918 million for 2001. The amended Form 10-K/A continued to misrepresent the true nature of the Company's finances as it failed to restate the financial results to account for the options backdating scheme.

- The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, disclosure of contingent liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.

- Stock Option Accounting. The Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations in accounting for its employee stock options including statement No. 148, "Accounting for Stock-Based Compensation— Transition and Disclosures." Under APB 25, because *the exercise price of the Company's employee stock options is generally equal to the market price of the underlying stock on the date of the grant, no compensation expense is recognized.* Statement No. 123, "Accounting and Disclosure of Stock-Based Compensation" ("SFAS 123"), establishes an alternative method of expense recognition for stock-based compensation awards to employees based on fair values. The Company elected not to adopt SFAS 123 for expense recognition purposes.

[Emphasis added.]

135. The statements referenced above in ¶134 were each materially false and misleading for the reasons stated at ¶121. In addition, the statements in ¶134 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 2003 pre-tax earnings were overstated by $2,709,000, primarily due to options backdating. TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $2,214,000 during 2003.

136. On or about March 8, 2005, TeleTech filed its Form 10-K for the year ended December 31, 2004 with the SEC, which was signed by Defendants Tuchman, Barlett, Linnenbringer, Lipper, Mehta and Young, among others (the "2004 10-K"). The 2004 10-K included TeleTech's financial statements for the year ended December 31, 2004, which were represented to have been presented in conformity with U.S. GAAP. The 2004 10-K represented that:

- TeleTech's pre-tax earnings for 2004 were $34.205 million.

- The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, disclosure

- 55 -

of contingent liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period.

- Stock Option Accounting. The Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations in accounting for its employee stock options including SFAS No. 148, "Accounting for Stock-Based Compensation – Transition and Disclosures" ("SFAS 148"). **Under APB 25, because the exercise price of the Company's employee stock options is generally equal to the market price of the underlying stock on the date of the grant, no compensation expense is recognized.** SFAS No. 123, "Accounting and Disclosure of Stock-Based Compensation" ("SFAS 123"), establishes an alternative method of expense recognition for stock-based compensation awards to employees based on fair values. The Company elected not to adopt SFAS 123 for expense recognition purposes.

[Emphasis added.]

137.    The statements referenced above in ¶136 were each materially false and misleading for the reasons stated at ¶121.  In addition, the statements in ¶136 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 2004 pre-tax earnings were overstated by $711,000. TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $237,000 during 2004.

138.    On or about February 21, 2006, TeleTech filed its Form 10-K for the year ended December 31, 2005 with the SEC, which was signed by Defendants Tuchman, Barlett, Linnenbringer, Lipper, Mehta and Young, among others (the "2005 10-K").  The 2005 10-K included TeleTech's financial statements for the year ended December 31, 2005, which were represented to have been presented in conformity with U.S. GAAP.  The 2005 10-K represented that:

- TeleTech's pre-tax earnings for 2005 were $32.216 million.

- The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions in determining the reported amounts of assets and liabilities, disclosure of contingent liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period.

- 56 -

- Stock Option Accounting. The Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations in accounting for its employee stock options including SFAS No. 148, "Accounting for Stock-Based Compensation Transition and Disclosure" ("SFAS No. 148"). ***Under APB 25, because the exercise price of the Company's employee stock options is generally equal to the market price of the underlying stock on the date of the grant, no compensation expense is recognized.*** SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123"), establishes an alternative method of expense recognition for stock-based compensation awards to employees based on fair values. The Company elected not to adopt SFAS 123 for expense recognition purposes.

[Emphasis added.]

139.    The statements referenced above in ¶138 were each materially false and misleading for the reasons stated at ¶121. In addition, the statements in ¶138 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 2005 pre-tax earnings were understated by $435,000. TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $965,000 during 2005.

**False and Misleading Statements Issued During the Class Period**

140.    *Third Quarter 2006 Results Announced.* The Class Period begins on October 25, 2006. On that date, TeleTech issued a press release announcing its financial results for the third quarter ended September 30, 2006. The press release stated, in pertinent part, as follows:

TeleTech Reports Third Quarter 2006 Financial Results

Record Third Quarter Revenue Grows 11 Percent with EPS of 18 Cents

\*      \*      \*

TeleTech reported record third quarter revenue of $304 million, an 11 percent increase over the year-ago quarter. Revenue in TeleTech's North American and International BPO segments grew 17 percent over the year-ago quarter and represented 98 percent of consolidated revenue.

Income from operations increased 71 percent to $20.4 million from the year-ago quarter. Operating margin was 6.7 percent compared to 4.3 percent in the year-ago

- 57 -

quarter.  TeleTech achieved its fourth quarter 2006 operating margin goal of 6 to 7 percent one quarter earlier than expected.

Earnings before interest, taxes, depreciation and amortization (EBITDA) was $34 million or 11 percent of revenue, a 38 percent increase over the year-ago quarter. Please refer to the discussion of Non-GAAP financial measures below.

Fully diluted earnings per share was 18 cents, up from 16 cents in the year ago quarter. Included in the 16 cents in the year-ago quarter was an 8 cent net benefit from certain tax items.

*    *    *

Solid Balance Sheet Continues to Fund Organic Growth and Share Repurchase Program

- As of quarter-end, TeleTech had cash and cash equivalents of $55 million and total debt to equity of 26 percent.  The increase in total debt from the year-ago quarter is primarily related to the acquisition of DAC and the Company's share repurchase program.

- TeleTech generated $26 million of free cash flow in the third quarter compared to $7 million in the year-ago quarter.

- Capital expenditures were $23 million, up from $11 million a year-ago. Approximately 70 percent of this quarter's capital expenditures were growth related with the balance for maintenance.

141.    This release also quoted Defendant Tuchman, as follows:

"We are very pleased to have achieved the fourth consecutive quarter of double-digit revenue growth while increasing income from operations by 71 percent. Our continued strong performance is the result of solid top-line growth, operational excellence, and our commitment to increased profitability as we progress towards achieving our year-end 2007 financial goals.

Our offshore BPO operations that serve U.S. and European clients have organically grown 40 percent year-to-date.  We believe this makes TeleTech one of the fastest growing BPO companies of its size. During the fourth quarter, we are looking forward to the largest sequential revenue ramp in our company's history. To support this growth we have more than 3,700 employees moving from training into production during the fourth quarter."

142.    The press release further discussed the Company's performance outlook for the

remainder of fiscal year 2006, stating, in pertinent part:

Business Outlook

- For the 2006 fiscal year, TeleTech estimates revenue will grow approximately 11 to 12 percent over 2005. Furthermore, TeleTech believes fourth quarter 2006 operating margin will increase to between 7 and 8 percent, higher than its previously stated goal of between 6 and 7 percent, excluding any unusual charges.

143.    *Third Quarter 2006 Form 10-Q.*  Also on October 25, 2006, TeleTech filed its September 30, 2006 Form 10-Q with the SEC, which was signed by Defendants Tuchman and Troka and repeated the Company's previously announced financial results for the quarter.  The Form 10-Q included TeleTech's financial statements for the quarter ended September 30, 2006, which were represented to have been presented in conformity with U.S. GAAP.  In addition, the Form 10-Q represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared without audit pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). The unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal recurring entries) which, in the opinion of management, are necessary to present fairly the financial position of the Company as of September 30, 2006, and the results of operations and cash flows of the Company and its subsidiaries for the three months and nine months ended September 30, 2006 and 2005.

*       *       *

EQUITY-BASED COMPENSATION

The Company maintains several equity compensation plans (the "Plans") for the benefit of certain of its directors, officers, and employees.

During the first quarter of fiscal 2006, the Company adopted SFAS 123(R), applying the modified prospective method. ***SFAS 123(R) requires all equity-based payments to employees, including grants of employee stock options, to be recognized in the Condensed Consolidated Statements of Operations and Comprehensive Income at the fair value of the award on the grant date.*** Under the modified prospective method, the Company is required to record equity-based compensation expense for all awards granted after the date of adoption and for the unvested portion of previously granted awards outstanding as of the date of adoption. The fair values of all stock options granted by the Company were determined using the Black-Scholes-Merton model ("B-S-M Model").

- 59 -

The fair values of the options granted to the Company's employees were estimated on the date of grant using the B-S-M Model. The following table provides the range of assumptions used for stock options granted during the three months ended September 30, 2006 and 2005:

| | Three Months Ended September 30, | | | | |
|---|---|---|---|---|---|
| | **2006** | | | **2005** | |
| Risk-free interest rate | 4.73% — 5.03 | % | | 3.75% — 4.17 | % |
| Expected life in years | 3.8 – 4.8 | | | 4.4 | |
| Expected volatility | 54.81 | % | | 75.53 | % |
| Dividend yield | 0.00 | % | | 0.00 | % |
| Weighted-average volatility | 54.81 | % | | 75.53 | % |
| Weighted-average fair value | $ 5.85 | | $ | 5.09 | |

A summary of option activity under the Plans as of September 30, 2006 and changes during the nine months then ended is presented below:

| | Shares | Weighted Average Exercise Price | Weighted-Average Remaining Contractual Term Years | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| **Outstanding as of Dec 31, 2005** | 8,486,681 | $ 10.26 | | |
| Grants | 1,414,950 | $ 12.52 | | |
| Exercises | (1,386,186) | $ 7.58 | | |
| Cancellations/expirations | (511,966) | $ 12.91 | | |
| **Outstanding as of Sep 30, 2006** | 8,003,479 | $ 10.95 | 6.9 | $ 43,396 |
| **Vested and exercisable as of September 30, 2006** | 3,690,697 | $ 11.76 | 4.7 | $ 20,803 |

A summary of the status of the Company's unvested shares as of September 30, 2006, and changes during the nine months ended September 30, 2006, is presented below:

| | Shares | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| **Unvested as of December 31, 2005** | 4,129,995 | $ 5.62 |
| Granted | 1,414,950 | $ 5.85 |
| Vested | (914,655) | $ 5.33 |
| Forfeited | (317,508) | $ 5.57 |
| **Unvested as of September 30, 2006** | 4,312,782 | $ 5.76 |

As of September 30, 2006, there was approximately $19.8 million of total unrecognized compensation cost (including the impact of expected forfeitures as required under SFAS 123(R)) related to unvested share-based compensation arrangements granted under the Plans that the Company had not recorded. That cost is expected to be recognized over the weighted-average period of four years (the Company recognizes compensation expense straight-line over the vesting term of the

option grant). The total fair value of shares vested (excluding expected forfeitures) during the nine month period ended September 30, 2006 was $4.9 million.

Cash received from option exercises under all share-based payment arrangements for the three months ended September 30, 2006 and 2005 was $6.0 million and $1.1 million, respectively.

Cash received from option exercises under all share-based payment arrangements for the nine months ended September 30, 2006 and 2005 was $10.8 million and $3.5 million, respectively.

As a result of adopting SFAS 123(R) on January 1, 2006, the Company's income before income taxes and net income for the three months ended September 30, 2006 are $1.7 million and $1.0 million lower, respectively, than if it had continued to account for share-based compensation under Accounting Principles Board Opinion ("APB") No. 25 "Accounting for Stock Issued to Employees" ("APB 25"). For the nine months ended September 30, 2006, the Company's income before income taxes and net income are $5.0 million and $3.0 million lower, respectively, than if it had continued to account for share-based compensation under APB 25. Basic and diluted earnings per share for the three months ended September 30, 2006 are $0.02 and $0.01 lower, respectively, than if the Company had continued to account for share-based compensation under APB 25. Additionally, basic and diluted earnings per share for the nine months ended September 30, 2006 are $0.04 and $0.04 lower, respectively. The compensation cost that has been charged against income for the Plans is included in Selling, General and Administrative Expenses in the Condensed Consolidated Statements of Operations and Comprehensive Income.

[Emphasis added.]

144.    *Controls.*  The Company's 3Q:06 Form 10-Q also contained statements concerning the Company's purported controls and procedures, stating, in part, the following:

Evaluation of Disclosure Controls and Procedures

We have established disclosure controls and procedures to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms. Our disclosure controls and procedures have also been designed to ensure that information required to be disclosed in the reports that we file or submit under the Securities Exchange Act of 1934 is accumulated and communicated to management, including the principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

***Based on their evaluation as of September 30, 2006, the principal executive officer and principal financial officer of the Company have concluded that the Company's***

*disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) are effective.*

Changes in Internal Control Over Financial Reporting

There has been no change in our internal control over financial reporting that occurred during the quarter ended September 30, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

[Emphasis added.]

145.    On or about October 26, 2006, TeleTech common stock gained $3.33 per share due to the Company's highly positive 3Q:06 earnings release, closing at $19.14 per share, on heavy trading of more than 5.5 million shares.  This represented a 21% increase from the previous day's close of $15.81 per share on October 25, 2006.

146.    *"Record" Fourth Quarter 2006 Results Announced*.  On February 7, 2007, after the close of trading, TeleTech published a release announcing results for the fourth quarter and year end December 31, 2006.  This release stated, in part, the following:

TeleTech Reports Record Fourth Quarter Results

Fourth Quarter Revenue Grows 10.7% to a Record $337 Million

EPS Grows 114% to 30 Cents

Operating Income Increases 177 % and Operating Margin Expands to 8.6%

TeleTech Holdings, Inc. (NASDAQ:TTEC), one of the largest global business process outsourcing (BPO) providers with a customer management focus, today announced financial results for the fourth quarter and fiscal year ended December 31, 2006.

\*        \*        \*

TeleTech exceeded its fourth quarter 2006 operating margin goal of 7 to 8 percent, reporting an 8.6 percent operating margin compared to 3.4 percent in the year-ago quarter. The North American and International BPO segments combined had an operating margin of 10.0 percent.  Stock option expense included in income from operations for the current quarter was $1.9 million which lowered operating margin by 56 basis points.

***Fully diluted earnings per share in the fourth quarter 2006 was 30 cents, up from 14 cents in the year ago quarter.*** The current quarter EPS included a $3.3 million (5 cents per share) tax expense reduction related to recording the benefit of certain tax loss carry forwards.

*    *    *

Solid Balance Sheet Continues to Fund Organic Growth and Share Repurchase Program

- As of year-end, TeleTech had cash and cash equivalents of $60.5 million and total debt to equity of 20 percent.

- ***TeleTech generated $7.8 million of free cash flow in the fourth quarter*** compared to negative free cash flow of ($22.1) million in the year-ago quarter.

- Capital expenditures were $14.3 million in the fourth quarter, up from $10.8 million in the year-ago quarter. Approximately 70 percent of this quarter's capital expenditures were related to growth in offshore locations with the balance for maintenance capital.

[Emphasis added.]

This release also quoted Defendant Tuchman, as follows:

"We are extremely pleased that TeleTech delivered another quarter of strong financial performance. This is our fifth consecutive quarter of double-digit revenue growth driven by our expanding array of service offerings, vertical industry expertise and global delivery capabilities. Our revenue growth this quarter was combined with significant improvement in profitability as income from operations increased 177 percent[…]. This solid performance is the result of our outstanding global workforce and our carefully planned investments in proprietary technology and best operating practices to further position TeleTech as the premier global outsourcing partner in the minds of our clients. As we begin the year, we are focused on achieving both our 2007 and 2008 financial goals through continued top line growth and improving profitability."

[Emphasis added.]

The Company's February 7, 2007 release also provided purported forward guidance, in part,

as follows:

Business Outlook

- For 2007, TeleTech estimates revenue will grow approximately 15 percent over 2006 as it focuses on achieving its previously stated goal of reaching a $1.5 billion revenue

run-rate by the fourth quarter 2007. Furthermore, TeleTech estimates fourth quarter 2007 operating margin will increase to 10 percent, excluding unusual charges, if any.

- For 2008, TeleTech estimates revenue will grow between 12 and 15 percent and operating margin will improve by approximately 200 basis points over 2007.

[Emphasis added.]

147.    *2006 Form 10-K.*  The same day that the Company announced these purported "record" setting results, Defendants also filed with the SEC, pursuant to Form 10-K, the Company's full year 2006 financial results for the year ended December 31, 2006, signed by each of the Individual Defendants.  In addition to making substantially similar statements concerning the Company's operations and specific accounting practices and procedures as were contained in TeleTech's press releases, the Company's 2006 Form 10-K also stated, in part, the following:

Critical Accounting Policies and Estimates

Management's discussion and analysis of its financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with GAAP. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, sales and expenses as well as the disclosure of contingent assets and liabilities.  We regularly review our estimates and assumptions.  These estimates and assumptions, which are based upon historical experience and on various other factors believed to be reasonable under the circumstances, form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.  Reported amounts and disclosures may have been different had management used different estimates and assumptions or if different conditions had occurred in the periods presented.  Below is a discussion of the policies that we believe may involve a high degree of judgment and complexity.

[Emphasis added.]

148.    *Controls.* The Company's 2006 Form 10-K also contained statements concerning the Company's purported controls and procedures, stating, in part, the following:

ITEM 9A.  CONTROLS AND PROCEDURES

Evaluation of Disclosure Controls and Procedures

We have established disclosure controls and procedures to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 ("Exchange Act") is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms. Our disclosure controls and procedures have also been designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Exchange Act is accumulated and communicated to the Company's management, including the principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

Evaluation of Internal Control Over Financial Reporting

Pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, we have included a report on management's assessment of the design and effectiveness of its internal control over financial reporting as part of this Annual Report on Form 10-K for the fiscal year ended December 31, 2006. Our independent registered public accounting firm also audited and reported on management's assessment of the effectiveness of internal control over financial reporting.  Management's report and the independent registered public accounting firm's attestation report are included under the captions entitled "Management's Report on Internal Control Over Financial Reporting" and "Report of Independent Registered Public Accounting Finn on Internal Control Over Financial Reporting" in Item 15 of this Annual Report on Form 10-K and are incorporated herein by reference.

Based on their evaluation as of December 31, 2006, our principal executive officer and principal financial officer of the Company have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) are effective.

Changes in Internal Control Over Financial Reporting

There has been no change in our internal control over financial reporting during the fourth quarter of 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

149.    The 2006 Form 10-K also contained statements by Defendants Tuchman and Troka that also purported to attest to the sufficiency of management's control over the Company's financial reporting, and the results of Management's Report thereon, as follows:

## MANAGEMENT'S REPORT ON INTERNAL CONTROL
## OVER FINANCIAL REPORTING

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Interim Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2006 based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2006.

Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2006 has been audited by Ernst & Young, LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.

/s/ KENNETH D. TUCHMAN
Kenneth D. Tuchman
Chief Executive Officer

/s/ JOHN R. TROKA, JR.
John R. Troka, Jr.
Interim Chief Financial Officer

150.    The 2006 Form 10-K also contained statements regarding practice and procedures by which TeleTech valued its options and options grants, stating, in part, as follows:

Adoption of SFAS No. 123(R) and Equity-Based Compensation Expense

During the first quarter of 2006, we adopted SFAS No. 123 (revised 2004) "Share-Based Payment" ("SFAS 123(R)") applying the modified prospective method. SFAS 123(R) requires all equity-based payments to employees, including grants of employee stock options, to be recognized in the Consolidated Statement of Operations and Comprehensive Income based on the grant date fair value of the award. Prior to the adoption of SFAS 123(R), we accounted for equity-based awards under the intrinsic value method, which followed recognition and measurement principles of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations and equity-based compensation was included as pro-forma disclosure within the notes to the financial statements.

We did not modify the terms of any previously granted options in anticipation of the adoption of SFAS 123(R).

Income from Operations for the year ended December 31, 2006 was adversely affected by the impact of equity-based compensation due to the implementation of SFAS 123(R). For the year ended December 31, 2006, we recorded expense of $6.9 million for equity-based compensation. We expect that equity-based compensation expense for fiscal 2007 and 2008 from existing awards will be approximately $6.6 million and $5.8 million, respectively. However, any future significant awards granted or required changes in the estimated forfeiture rates may impact this estimate. See Note 17 to the Consolidated Financial Statements for additional information.

151. *Certifications*. The 2006 Form 10-K also contained Certifications by Defendants Tuchman and Troka, which attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

CERTIFICATION

I, [CHIEF EXECUTIVE OFFICER & CHIEF FINANCIAL OFFICER], certify that:

1. I have reviewed this Annual Report on Form 10-K of TeleTech Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By: /s/ KENNETH D. TUCHIVIAN          Date: February 7, 2007
Kenneth D. Tuchman
Chairman and Chief Executive Officer
(Principal Executive Officer)

*        *        *

By: /s/ JOHN R. TROKA, JR.          Date: February 7, 2007
John R. Troka, Jr.
Interim Chief Financial Officer
(Principal Financial and Accounting Officer)

Written Statement of Chief Executive Officer and Acting Chief Financial Officer
Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002
(18 U.S.C. Section 1350)

The undersigned, the Chief Executive Officer and the Acting Chief Financial Officer of TeleTech Holdings, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

a.    The Annual Report on Form 10-K of the Company for the year ended December 31, 2006 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

b.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ KENNETH D. TUCHMAN
Kenneth D. Tuchman
Chief Executive Officer

By: /s/ JOHN R. TROKA, JR.
John R. Troka, Jr.
Interim Chief Financial Officer

152.    *Auditor's Report.*  Included in the 2006 Form 10-K was also a report by the Company's Independent Public Accountants, Ernst & Young, that attested to the purported accuracy and completeness of TeleTech's financial and operational reports, as follows:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the
Board of Directors of TeleTech Holdings, Inc.:

We have audited the accompanying consolidated balance sheets of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2006 and 2005 and the related consolidated statements of operations and comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2006.  These consolidated financial statements are the responsibility of TeleTech Holdings, Inc.'s management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2006 and 2005 and the consolidated results of their operations and their cash flows for each of the three years in the period ended

- 69 -

December 31, 2006, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, in fiscal year 2006, Teletech Holdings, Inc. changed its method for stock-based compensation in accordance with the guidance provided in Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment"

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of TeleTech Holdings, Inc.'s internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 7, 2007 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP
Denver, Colorado
February 7, 2007

\*        \*        \*

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL CONTROL OVER FINANCIAL REPORTING

To the Stockholders and the
Board of Directors of TeleTech Holdings, Inc.:

We have audited management's assessment, included in the section entitled Management's Report on Internal Control over Financial Reporting, that TeleTech Holdings, Inc. (the "Company") maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). TeleTech Holdings, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control and performing such other procedures as we considered necessary in the circumstances.  We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

\*       \*       \*

In our opinion, management's assessment that TeleTech Holdings, Inc. maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, TeleTech Holdings, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2006 and 2005 and the related consolidated statements of operations and comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2006 and our report dated February 7, 2007 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP
Denver, Colorado
February 7, 2007

[Emphasis added.]

153.    The statements referenced above in ¶¶140-144 and 146-152 were each materially false and misleading for the reasons stated at ¶121. In addition, the statements in ¶¶140-144 and 146-152 were materially false and misleading due to the following reasons:

(a)    that TeleTech's 2006 pre-tax earnings were overstated by $937,000. TeleTech has admitted that the backdating scheme understated the Company's equity-based compensation expenses by $611,000 during 2006.

154.    Despite Ernst & Young having provided a clean audit opinion on the Company for 2006, Defendants announced, on May 9, 2007 (the same day that the Company reported results for the first quarter of 2007), that Ernst & Young had contacted the Chairman of the Audit Committee of the Board of Directors of TeleTech two days prior and informed the Committee that it would not stand for re-election as the Company's outside auditors.  That day, Defendants also filed with the SEC, a Form 8-K, including, in part, the following statement:

> Item 4.01 Change in Registrant's Certifying Accountant.
>
> ***(a) Previous Independent Registered Public Accounting Firm***
>
> ***On May 7, 2007, the Chairman of the Audit Committee of the Board of Directors (the "Audit Committee") of TeleTech Holdings, Inc. (the "Company") was notified by Ernst & Young LLP ("Ernst & Young") that it is declining to stand for reelection as the Company's independent registered public accounting firm for the year ending December 31, 2007. Ernst & Young will perform the procedures specified by the Public Company Accounting Oversight Board (United States) for a review of the interim financial information as described in AU 722, Interim Financial Information on the unaudited consolidated financial statements included in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.***  Ernst & Young completed its review on May 9, 2007.
>
> During the two years ended December 31, 2006 and the quarter ended March 31, 2007, there were no disagreements between the Company and Ernst & Young on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure that, if not resolved to Ernst & Young's satisfaction, would have caused it to make reference to the matter in connection with its report on the Company's consolidated financial statements for the relevant year.
>
> Ernst & Young's audit reports on the Company's consolidated financial statements for the fiscal years ended December 31, 2005 and December 31, 2006 did not contain an adverse opinion or disclaimer of opinion, nor were they qualified or modified as to uncertainty, audit scope or accounting principles. . . .

[Emphasis added.]

155.   The statements referenced above in ¶154 were materially false and misleading because they failed to disclose that Ernst & Young had not conducted its audit of TeleTech's 2004 financial statements in accordance with GAAS and PCAOB accounting standards. Ernst & Young has now admitted that it lacked "independence" during the course of it 2004 TeleTech audit engagement due to a business relationship it maintained with one TeleTech's directors, Mark C. McDermott.

156.   *"Record" First Quarter 2007 Results Announced*. Also on May 9, 2007, TeleTech published a release announcing purported "record" setting financial results for the first quarter ended March 31, 2007. This release stated, in part, the following:

TeleTech Reports Record First Quarter Results

Record First Quarter Revenue Grows More Than 17 Percent to $333 Million
EPS Grows 200 Percent to 24 Cents Operating Income Increases 185% and
Operating Margin Expands to 8.6 Percent

TeleTech Holdings, Inc. (NASDAQ: TTEC), one of the largest and most geographically diverse global providers of business process outsourcing (BPO) solutions, today announced financial results for the first quarter 2007.

\*      \*      \*

Income from operations in the first quarter 2007 increased 185 percent to $28.5 million or 8.6 percent of revenue, from $10.0 million or 3.5 percent of revenue in the year-ago quarter. Equity compensation expense included in income from operations for the current quarter was $2.9 million which lowered operating margin by approximately 90 basis points.

The BPO business had an operating margin of 10.0 percent, up from a 4.1 percent combined operating margin in the year ago quarter.

Fully diluted earnings per share in the first quarter 2007 was 24 cents, up 200 percent from 8 cents in the year ago quarter.

\*      \*      \*

Solid Balance Sheet Continues to Fund Organic Growth

•      As of quarter-end, TeleTech had cash and cash equivalents of $65.3 million and total debt to equity of approximately 12 percent.

- TeleTech generated $18.3 million of free cash flow in the first quarter compared to $2.1 million in the year-ago quarter.

- Capital expenditures were $13.5 million in the first quarter, down from $14.6 million in the year-ago quarter. Approximately 80 percent of this quarter's capital expenditures were related to growth in offshore locations with the balance for maintenance.

[Emphasis added.]

40.    This release also quoted Defendant Tuchman, in part, as follows:

"We are extremely pleased to have delivered our sixth consecutive quarter of double-digit revenue growth while significantly increasing profitability as income from operations increased 185 percent. This strong performance is the direct result of our ability to convert our investments in new service offerings, increased vertical industry expertise and growing global delivery capabilities into meaningful new revenue opportunities[…]. We continue to experience strong demand for our services, driven by our clients' increased desire for providers that can not only enhance their strategic capabilities but who can also provide a globally integrated, high-quality front and back office solution. With a strong start to the New Year, we remain focused on achieving both our 2007 and 2008 financial goals through continued top line growth and increasing profitability."

157.    The May 9, 2007 release also provided purported forward-looking guidance, in part, as follows:

Business Outlook

- For 2007, TeleTech estimates revenue will grow approximately 15 percent over 2006 as it focuses on achieving its goal of reaching a $1.5 billion revenue run-rate by the fourth quarter 2007. Furthermore, TeleTech estimates fourth quarter 2007 operating margin will increase to 10 percent, excluding unusual charges, if any.

- For 2008, TeleTech estimates revenue will grow between 12 and 15 percent and operating margin will improve by approximately 200 basis points over 2007.

158.    *First Quarter 2007 Form 10-Q.*  Also on May 9, 2007, in an effort to continue to inflate the price of TeleTech shares (and sustain such inflation), Defendants filed the Company's 1Q:07 Form 10-Q for the quarter ended March 31, 2007 with the SEC; the 10-Q was signed and certified by Defendants Tuchman and Troka. The 1Q:07 Form 10-Q continued to condition

investors to believe that TeleTech's disclosures were true and accurate, and that all necessary and proper options charges, costs, expenses, and reserves had been taken, stating, in part, as follows:

Basis of Presentation

The accompanying unaudited Condensed Consolidated Financial Statements have been prepared without audit pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). The unaudited Condensed Consolidated Financial Statements reflect all adjustments (consisting only of normal recurring entries) which, in the opinion of Management, are necessary to present fairly the financial position of the Company as of March 31, 2007, and the results of operations and cash flows of the Company for the three months ended March 31, 2007 and 2006. Operating results for the three months ended March 31, 2007 are not necessarily indicative of the results that may be expected for the fiscal year ending December 31, 2007.

The unaudited Condensed Consolidated Financial Statements should be read in conjunction with the Company's audited consolidated financial statements and footnotes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006.

159. *Certifications*. The Company's 1Q:07 Form 10-Q also contained Certifications by Defendants Tuchman and Troka that continued to attest to the purported accuracy and completeness of the Company's financial and operational reports, stating, in part, as follows:

CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned, the Chief Executive Officer of TeleTech Holdings, Inc. (the "Company"), hereby certifies that, to his knowledge on the date hereof:

(a) the Form 10-Q of the Company for the quarter ended March 31, 2007 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(b) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ KENNETH D. TUCHMAN
Kenneth D. Tuchman
Chairman and Chief Executive Officer
Date: May 9, 2007

CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned, the Interim Chief Financial Officer of TeleTech Holdings, Inc. (the "Company"), hereby certifies that, to his knowledge on the date hereof:

(a)     the Form 10-Q of the Company for the quarter ended March 31, 2007 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(b)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ JOHN R TROKA, JR.
John R. Troka, Jr.
Interim Chief Financial Officer
Date:  May 9, 2007

160.    The statements referenced above in ¶¶156-159 were each materially false and misleading for the reasons stated at ¶121.  In addition, the statements in ¶¶156-159 were materially false and misleading due to the following reasons:

(a)     that TeleTech's Q1:07 pre-tax earnings were understated by $1,147,000. TeleTech has admitted that the backdating scheme overstated the Company's equity-based compensation expenses by $209,000 during Q1:07.

161.    "*Record*" *Second Quarter 2007 Results Announced*.  On August 6, 2007, TeleTech published a release again announcing purported "record" setting financial results for the second quarter, ended June 30, 2007.  This release stated, in part, the following:

TeleTech Reports Second Quarter Results

Record Second Quarter Revenue Grows 15 Percent to $330 Million;
Offshore BPO Revenue Grows 44%; ROIC Doubles to 28 Percent

TeleTech Holdings, Inc. (NASDAQ:TTEC), one of the largest and most geographically diverse global providers of business process outsourcing (BPO) solutions, today announced financial results for the second quarter 2007.

*        *        *

- 76 -

Income from operations in the second quarter 2007 increased 22 percent to $15.4 million from $12.7 million in the year-ago quarter. Excluding asset impairment and restructuring charges, income from operations increased 122 percent to $29.2 million, or 8.9 percent of revenue. Equity compensation expense included in income from operations for the current quarter was $3.2 million and lowered operating margin by approximately 100 basis points.

GAAP earnings per share in the second quarter 2007 was 13 cents, compared to 17 cents in the year-ago quarter. Excluding the $13.8 million asset impairment and restructuring charge in the current quarter as well as a $5.2 million, or an approximate 6 cent per share, tax benefit in the year-ago quarter, non-GAAP earnings per share increased 118 percent to 24 cents in the current quarter from 11 cents in the year-ago quarter.

Return on invested capital, defined as earnings before asset impairment charges, interest and taxes (EBIT) divided by average shareholders' equity, was 28 % at June 30, 2007, double the 14 % at the end of the year ago quarter.

*     *     *

Solid Balance Sheet Continues to Fund Organic Growth

- As of quarter-end, TeleTech had cash and cash equivalents of $60.1 million and a total debt to equity ratio of approximately 13 percent.

- TeleTech generated $3.4 million of free cash flow in the second quarter compared to negative ($6.7) million in the year-ago quarter.

- Capital expenditures were $15.5 million in the second quarter. Approximately 80 percent of this quarter's capital expenditures were for growth related needs, which included the deployment of 1,300 new workstations, with the balance for maintenance capital.

[Emphasis added.]

162.    This release also quoted Defendant Tuchman, in part, as follows:

"As a result of significant contract awards from new and expanded business, we anticipate adding a record 5,000 workstations in six geographic locations during the second half of the year[…]. Our demand continues to be driven by an overwhelming flight to quality as more companies shift their focus from simply reducing costs to enhancing the customer experience. This plays directly to our 25 years of experience and industry-leading delivery capabilities, and has resulted in many companies exiting their current BPO providers or their captive operations and selecting TeleTech to further their business goals.

[…]Our financial results illustrate the solid execution of the TeleTech team in providing a globally integrated, high-quality front and back office solution and the success of our significant investments in new service offerings and global delivery capabilities over the past five years. Our second quarter 2007 results represent our seventh consecutive quarter of double-digit revenue growth, while increasing income from operations by 122 percent year over year, excluding this quarter's impairment and restructuring charges. We remain committed to continued profitable growth and are confident we can meet our 2007 and 2008 financial goals."

163.    The August 6, 2007 release also provided purported forward-looking guidance, in part, as follows:

Business Outlook

- TeleTech reaffirmed its previous full year 2007 business outlook, estimating revenue will grow approximately 15% over 2006 as it expects to achieve a $1.5 billion revenue run-rate and 10 percent operating margin, excluding unusual charges, if any, by the fourth quarter 2007.

- For 2008, TeleTech reaffirmed its expectation that revenue will grow between 12 and 15 percent and operating margin will improve by approximately 200 basis points over 2007.

[Emphasis added.]

164.    *Second Quarter 2007 Form 10-Q.* Also on August 6, 2007, Defendants filed with the SEC the Company's 2Q:07 Form 10-Q for the quarter ended June 30, 2007, signed and certified by Defendants Tuchman and Troka. The 2Q:07 Form l0-Q continued to condition investors to believe that TeleTech's disclosures were true and accurate, and that all necessary and proper options expenses, charges, expenses, and reserves had been taken, stating, in part, as follows:

Basis of Presentation

The accompanying unaudited Condensed Consolidated Financial Statements have been prepared without audit and do not include all of the disclosures required by accounting principles generally accepted in the U.S., pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). The unaudited Condensed Consolidated Financial Statements do reflect all adjustments (consisting only of normal recurring entries) which, in the opinion of Management, are necessary to present fairly the consolidated financial position of the Company as of June 30, 2007, and the consolidated results of operations and cash flows of the Company for the three and six months ended June 30, 2007 and 2006. . . .

- 78 -

These unaudited Condensed Consolidated Financial Statements should be read in conjunction with the Company's audited Consolidated Financial Statements and footnotes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006.

165.    The Company's 2Q:07 Form 10-Q also contained Certifications by Defendants Tuchman and Troka that continued to attest to the purported accuracy and completeness of the Company's financial and operational reports, stating, as follows:

CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned, the Chief Executive Officer of TeleTech Holdings, Inc. (the "Company"), hereby certifies that, to his knowledge on the date hereof:

(a)    the Form l0-Q of the Company for the quarter ended June 30, 2007 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(b)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ KENNETH D. TUCHMAN
Kenneth D. Tuchman
Chairman and Chief Executive Officer
Date:  August 6, 2007

CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned, the Interim Chief Financial Officer of TeleTech Holdings, Inc. (the "Company"), hereby certifies that, to his knowledge on the date hereof:

(a)    the Form 10-Q of the Company for the quarter ended June 30, 2007 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(b)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ JOHN R. TROKA, JR.
John R. Troka, Jr.
Interim Chief Financial Officer
Date:  August 6, 2007

166.    The statements referenced above in ¶¶161-165 were each materially false and misleading for the reasons stated at ¶121.  In addition, the statements in ¶¶161-165 were materially false and misleading due to the following reasons:

(a)    that TeleTech's Q2:07 pre-tax earnings were understated by $604,000. TeleTech has admitted that the backdating scheme overstated the Company's equity-based compensation expenses by $272,000 during Q2:07.

### TELETECH'S FALSE AND MISLEADING FINANCIAL STATEMENTS AND DISCLOSURES

167.    The Company has admitted that its financial results from 1996 to June 30, 2007 were false and misleading and should no longer be relied upon.  These financial statements were false due to Defendants' improper accounting practices, including improperly accounting for stock options, which artificially inflated the Company's income, earnings per share and operating margins.  The Company understated its compensation costs and tax liabilities.  The Company has restated its prior financial statements to adjust for this improper accounting.

168.    The Company's financial results for 1996-2007 were included in reports filed with the SEC, including Forms 10-K and 10-Q and Registration Statements.  The results were also included in press releases disseminated to the public investor.  The Individual Defendants also reiterated these financial results in conference calls and other communications with analysts.

169.    TeleTech has now admitted that it failed to properly represent in prior SEC filings that the stock options were priced at less than the fair market value of the stock on the date of the grant, thereby concealing the scheme set forth herein, and that its reporting of stock option grants is being investigated, such that the financial statements were not a fair presentation of TeleTech's results and were presented in violation of GAAP and SEC rules.

170.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

171.    TeleTech violated GAAP by failing to properly report compensation expense and understated its tax liabilities by misdating the option grants.

172.    GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 25, *Accounting for Stock Issued to Employees* – the standard for accounting for employee stock options in effect until 1995 required that any difference between the market price on the measurement date and the exercise price be accorded as compensation expense.  APB No. 25, ¶10 stated in part:

> Compensation for services that a corporation receives as consideration for stock issued through employee stock option, purchase, and award plans should be measured by the quoted market price of the stock at the measurement date less the amount, if any, that the employee is required to pay.

*    *    *

> Thus a corporation recognizes compensation cost for stock issued through compensatory plans unless the employee pays an amount that is at least equal to the quoted market price of the stock at the measurement date.

173.    In 1995, SFAS No. 123, *Accounting for Stock-Based Compensation*, became effective.  The new standard set forth "fair value" as the method for accounting for stock-based compensation plans.  This method was deemed preferable to APB No. 25.  However, companies

were permitted to continue to use APB No. 25 but with added disclosure requirements.  SFAS No. 123, ¶11 stated in part:

> 11.    This Statement provides a choice of accounting methods for transactions with employees that are within the scope of Opinion 25.  Paragraphs 16-44 of this Statement describe a method of accounting based on the fair value, rather than the *intrinsic value*, of an employee stock option or a similar equity instrument.  The Board encourages entities to adopt the fair value based method of accounting, which is preferable to the Opinion 25 method for purposes of justifying a change in accounting principle under APB Opinion No. 29, *Accounting Changes*.  However, an entity may continue to apply Opinion 25 in accounting for its stock-based employee compensation arrangements.  An entity that does so shall disclose pro forma net income and, if presented, earnings per share, determined as if the fair value based method had been applied in measuring compensation cost (paragraph 45).

174.    In December 2004, SFAS No. 123 was revised.  The new standard, SFAS No. 123R, required recognition of the cost of options (as per the fair value method) in the financial statements:

> 10.    An entity shall account for the compensation cost from share-based payment transactions with employees in accordance with the fair-value-based method set forth in paragraphs 11-63 of this Statement.

175.    Each of these standards required a company include in its calculation the fair market value of the stock on the measurement or grant date.  For a publicly traded company like TeleTech, the fair market value of the stock was the trading price of the stock on the grant date.  So long as the exercise price of the stock was the same as the quoted market price, there was no compensation cost recorded on the grant date under APB No. 25 (the standard which companies were permitted to continue to follow under SFAS No. 123) as long as they included disclosures about the pro forma impact of using the fair value method of measurement under SFAS No. 123.  However, granting options with exercise prices equal to market price on the date of grants was critical to the accounting under any of the standards.

176.    TeleTech represented the following about its compliance with stock option accounting rules in its 2006 Form 10-K:

During the first quarter of 2006, we adopted SFAS No. 123 (revised 2004) "Share-Based Payment" ("SFAS 123(R)") applying the modified prospective method. SFAS 123(R) requires all equity-based payments to employees, including grants of employee stock options, to be recognized in the Consolidated Statement of Operations and Comprehensive Income *based on the grant date fair value of the award*. Prior to the adoption of SFAS 123(R), we accounted for equity-based awards under the intrinsic value method, which followed recognition and measurement principles of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations and equity-based compensation was included as pro-forma disclosure within the notes to the financial statements.

[Emphasis added.]

177.    In reality, TeleTech's financial statements and related disclosures were materially false and misleading because TeleTech was violating a fundamental principle for the manner in which it accounted for stock options under all the various stock option accounting standards:  it was granting options with exercise prices at less than market value.  In fact, it was backdating options to dates when the price was lower than the market price on the day the options were actually granted.

178.    The Company has also admitted that the financial statements from 1997-2006 and interim periods Q1-Q2 2007 should no longer be relied upon and have been restated.

179.    As a result of TeleTech's improper accounting practices, it has restated its financial statements.  The fact that TeleTech has restated its financial statements is an admission that:

(a)    the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading;

(b)    the financial statements reported prior to and during the Class Period were incorrect based on information available to defendants at the time the results were originally reported; and

(c)    the financial statements can no longer be relied upon as being accurate.

180.    The SEC has reiterated its position regarding restatements:

[T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement

actions in order, ***inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter*** . . . .

[Emphasis added.] *In re Sunbeam Sec. Litig*., No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Feb. 22, 2002).

181.    The fact that TeleTech has restated its past financial statements and indicated that such financial statements should no longer be relied upon is an admission that the financial statements originally issued were false and that the overstatement of net income was material. Pursuant to GAAP, as set forth in APB No. 20, the type of restatement announced by TeleTech was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, ¶25, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."  Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements.  TeleTech's restatement is due to an error.  Thus, the restatement is an admission by TeleTech that its previously issued financial results and its public statements regarding those results were false.

182.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

183.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, defendants each knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## DEFENDANTS CERTIFIED FALSE AND MISLEADING
## FINANCIAL RESULTS

184.    Defendants Tuchman and Troka knowingly certified false and misleading financial statements.  Defendants Tuchman and Troka certified TeleTech's 2006 financial statements during the Class Period.

185.    TeleTech's 2006 financial statements were not in accordance with GAAP and SEC rules.  Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and SEC Rules 13a-14(a) and 15d-14(a) of the Exchange Act requires Defendants Tuchman, as the CEO, and Troka, as CFO,

to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report.  Defendants Tuchman and Troka were required to certify that the financial statements and other financial information included in the reports were fairly presented in all material respects.  Defendants Tuchman and Troka also stated that the reports did not contain any untrue statement of material fact or omit to state a material fact.  In addition, Defendants Tuchman and Troka stated that TeleTech has established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.

186.    Defendants Tuchman and Troka knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules.  In accordance with §906 of Sarbanes-Oxley and 18 U.S.C. §1350, Defendants Tuchman and Troka were required to certify each periodic report that includes financial statements.  Their signed certifications falsely stated that: (i) the report fully complied with the requirements of §13(a) or §15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of TeleTech.

187.    Defendants Tuchman and Troka signed and filed with the SEC certifications under SEC Rules 13a-14(a)/15d-14(a) of the Exchange Act and §906 of Sarbanes-Oxley attesting to the accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for TeleTech.  At the time Tuchman and Troka signed these certifications, they knew or recklessly disregarded that they were false for the reasons alleged herein.

## TELETECH FAILED TO MAKE REQUIRED DISCLOSURES

188.    The SEC requires that, as to annual and interim financial statements filed with the SEC, registrants include a management's discussion and analysis section which provides information with respect to the results of operations and "also shall provide such other information that the

registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." *See* Regulation S-K, 17 C.F.R. §229.303(a). Regulation S-K states that, as to annual results, the management's discussion and analysis section shall:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §229.303(a)(3)(i)-(ii).

      (a)     The SEC also requires that interim period financial statements filed with the SEC include a management's discussion and analysis of the financial condition and results of operations so as to enable the reader to assess material changes in financial condition and results of operations. Regulation S-K, 17 C.F.R. §229.303(b) states that: "The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item [as set forth above], except that the impact of inflation and changing prices on operations for interim periods need not be addressed."

      189.    During the Class Period, TeleTech failed to truthfully disclose its accounting policies and practices related to improper stock option grants in prior years.

      190.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASB Statement of Concepts ("FASCON") No. 1, ¶7. For this reason, in addition to TeleTech's failure to make the required disclosures in its financial statements and in its SEC

filings, TeleTech also shirked its duty to make such disclosures in its conference calls, its press releases, its quarterly financial reports and its Annual Reports.

**TELETECH LACKED ADEQUATE INTERNAL CONTROLS**

191.    Defendants were able to scheme TeleTech shareholders and inflate TeleTech stock prices through accounting improprieties which results in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting control over financial reporting relating to stock options.  The February 20, 2008 Form 8-K stated in part:

> Financial Statement Restatements
>
> Based on the Review and management's own additional review, the Company has concluded that incorrect measurement dates for certain equity grants were used at various times during the accounting periods covered by the Review.  As a result, the Company has determined that it will be necessary to restate its financial statements for the fiscal years 2005 and 2006 and the first two quarters of 2007.  The Company is working with its auditors to finalize the quantification of the restatement adjustment and the periods impacted.   The Company intends to complete this restatement concurrently with the filing of its third quarter 2007 Quarterly Report on Form 10-Q and its 2007 Annual Report on Form 10-K.  Restatement adjustments for periods prior to 2005 will be reflected as adjustments to the beginning balances of stockholders' equity in 2005.  Given that the restatement adjustments are expected to largely impact periods prior to 2002, additional information on all pre-2005 restatement adjustments will be set forth in the notes to the restated financial statements.  ***The Company has concluded that it has a material weakness in its internal control over financial reporting with respect to its equity compensation practices for 2007.*** The Company is in the process of remediating this material weakness by, among other things, implementing the Audit Committee's recommendations . . .

[Emphasis added.]

192.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:

> (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that

\*    \*    \*

  (ii)  transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A)-(B).

  193.  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

  194.  Defendants caused TeleTech to violate §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its accounting for stock options.  TeleTech's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods.  Accordingly, TeleTech violated §13(b)(2)(A) of the Exchange Act.

  195.  In addition, Individual Defendants caused TeleTech to violate §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  TeleTech failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting accounting for stock options.  In fact, despite knowing the true dismal state of the Company's lack of adequate controls, defendants regularly issued quarterly financial statements throughout the Class Period without ever disclosing the deficiencies in TeleTech's internal accounting controls, and falsely asserted that its financial statements complied with GAAP.

  196.  Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements.  *See* SFAC No. 1, ¶7.  For this reason, in addition to TeleTech's failure to make the

required disclosures in its financial statements and in its SEC filings, TeleTech also shirked its duty to make such disclosures in its conference calls, its press releases and its Annual Reports.

197.    As defendants allowed and were responsible for initiating a gross lack of internal controls over financial reporting, defendants were able to scheme TeleTech shareholders and inflate stock prices through accounting improprieties which resulted in materially misstated publicly filed financial statements.

## ERNST & YOUNG'S ROLE IN THE FRAUD

198.    Ernst & Young knew or recklessly ignored that it falsely represented that TeleTech's annual financial statements for at least the years ended December 31, 2002, 2003, 2004, 2005, 2006 and the first quarter ended March 31, 2007, were presented in conformity with GAAP.  In addition, Ernst & Young knew or recklessly ignored that it falsely represented that its audits of such financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB").

199.    In particular, past events have recently become public, which are highly probative of Defendant Ernst & Young's intent to deceive TeleTech's public shareholders concerning the Company's admitted improper equity-based compensation practices and other improper accounting practices. ***Specifically, on August 5, 2008, Ernst & Young entered into a cease-and-desist order with the SEC admitting, among other things, that it knowingly lacked independence, under GAAS and PCAOB standards, while performing its annual examination of TeleTech's financial statements for the year ended December 31, 2004.[6]*** As detailed herein, Ernst & Young issued its false and misleading unqualified audit report for TeleTech's 2004 financial statements on March 7,

---

[6]    The complaint filed by the SEC against Ernst & Young is available at http://www.sec.gov/litigation/admin/2008/34-58309.pdf.

2005.  Furthermore, both Ernst & Young and TeleTech were aware of the facts giving rise to the conflict since at least May 2004, yet neither Ernst & Young nor TeleTech made any public statement regarding these matters when Ernst & Young resigned as the Company's auditor's in May 2007.

200.    Ernst & Young's admitted their lack of independence to conduct TeleTech's audits arose from a consultancy agreement entered into during 2002 that ran through early May 2004, between Ernst & Young and one of TeleTech's former directors, Mark C. Thompson ("Thompson"). Thompson was a director of TeleTech from February 26, 2004 until May 10, 2004.  The SEC found, among other things, that Ernst & Young knew of the conflict-of-interest since May 2004 when it conducted an internal investigation into the relationship with Thompson but erroneously concluded that no conflict existed.  Similarly, it is highly likely that TeleTech and its Board knew of the conflict at the time of Thompson's abrupt resignation which came within days of shareholders' ratification of Thompson's appointment.

201.    According to the SEC, each time Ernst &Young signed an audit report for TeleTech *where either the period covered by the audit or the period of the audit work, or both, overlapped with its business relationship with Thompson, Ernst & Young directly violated Rule 2-02(b) of Regulation S-X.  See Rule 2-02(b)* (requiring accountant's report to "state whether the audit was made in accordance with generally accepted auditing standards").  Moreover, each time non-independent audit reports were filed with TeleTech's annual reports and Proxy Statements, TeleTech violated federal securities statutes and rules requiring that those Commission filings include independently audited financials.  *See* Exchange Act §§13(a) and 14(a) and Rules 13a-1 and 14a-3 thereunder (requiring annual reports and proxy statements to include independently audited financials).

202.    Issuing an audit report, or issuing a consent for the filing of an audit report, incorrectly stating that the audit was performed in accordance with the independence requirements of GAAS violates Rule 2-02(b). The Ernst & Young fiscal year-end audit reports incorrectly stating that they were performed in accordance with the independence standards of GAAS for TeleTech, included reports dated March 7, 2005, February 20, 2006 and February 7, 2007, each of which pertained to the Company's 2004 financial statements. In addition to issuing each of these reports, Ernst & Young also issued consent for their inclusion with later Commission filings.

203.    Ernst & Young issued the following false and misleading unqualified audit report, dated March 7, 2005, on TeleTech's financial statements for the years ended December 31, 2004 and 2003:[7]

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the

Board of Directors of TeleTech Holdings, Inc.:

We have audited the accompanying consolidated balance sheets of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2004 and 2003, the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2004. These consolidated financial statements are the responsibility of TeleTech Holdings, Inc.'s management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant

---

[7]    Ernst & Young' false and misleading audit reports on TeleTech's 2004, 2005 and 2006 year-end financial statements were included in the Company's filings with the SEC both prior to and during the Class Period.

estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of TeleTech Holdings, Inc. and subsidiaries *as of December 31, 2004* and 2003, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2002, the Company adopted Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" and Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets."

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of TeleTech Holdings, Inc.'s internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 7, 2005 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP
Denver, Colorado
March 7, 2005

204. Ernst & Young issued the following false and misleading unqualified audit report, dated February 20, 2006, on TeleTech's financial statements for the year ended December 31, 2005 and 2004:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the Board of Directors of TeleTech Holdings, Inc.:

We have audited the accompanying consolidated balance sheets of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2005.

These consolidated financial statements are the responsibility of TeleTech Holdings, Inc.'s management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan

and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, ***the consolidated financial position of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2005 and 2004,*** and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of TeleTech Holdings, Inc.'s internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 20, 2006 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP
Denver, Colorado
February 20, 2006

205.    Ernst & Young issued the following false and misleading unqualified audit report, dated February 7, 2007, on TeleTech's financial statements for the year ended December 31, 2006 and 2005:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the Board of Directors of TeleTech Holdings, Inc.:

We have audited the accompanying consolidated balance sheets of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2006 and 2005 and the related consolidated statements of operations and comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2006.  These consolidated financial statements are the responsibility of TeleTech Holdings, Inc.'s management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test

basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of TeleTech Holdings, Inc. and subsidiaries as of December 31, 2006 and 2005 and *the consolidated results of their operations and their cash flows for each of the three years [2004, 2005, 2006] in the period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles.*

As discussed in Note 1 to the consolidated financial statements, in fiscal year 2006, Teletech Holdings, Inc. changed its method for stock-based compensation in accordance with the guidance provided in Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment."

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of TeleTech Holdings, Inc.'s internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 7, 2007 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP
Denver, Colorado
February 7, 2007

206.    The above-noted Ernst & Young reports were materially false and misleading because, as alleged in detail herein, TeleTech's Class Period financial statements, by its own admission, violated GAAP in numerous respects, including:

(a)    that pursuant to Accounting Principles Board No. 25, *Accounting for Stock Issued to Employees*, Statement of Accounting Standards ("SFAS") No. 123 *Accounting for Stock-Based Compensation*, SFAS No. 123(R) Share-Based Payment, and related interpretations, TeleTech's financial statements understated the Company's equity-based compensation expense by at least $59.697 million from 1996 through the Second Quarter of 2007;

(b)    that pursuant to SFAS No. 13 Accounting for Leases and SFAS No. 143 *Accounting for Asset Retirement Obligations the Company's financial statements understated the*

Company's operating and lease expenses by at least $5.924 million from 1996 through the Second

Quarter of 2007;

(c)    that Ernst & Young knowingly lacked independence under GAAS and

PCOAB standards while conducting and reporting on their examination of the Company's 2004

financial statements.  Ernst & Young has now admitted it lacked independence and entered into a

cease-and-desist order with the SEC which acknowledges a business relationship existed between

Ernst & Young and one of TeleTech's former directors, Mark C. Thompson; and

(d)    based on the above it was not true that TeleTech's financial statements

"present fairly, in all material respects, the consolidated financial position of TeleTech."

207.    In addition to the foregoing violations of GAAS, Ernst & Young violated at least the

following provisions of GAAS in "auditing" TeleTech's financial statements during the Class

Period:

(a)    Auditing Standard AU §316 which required Ernst & Young to plan and

perform its audits in a manner which reasonably assured that TeleTech's Class Period financial

statements were free from misstatements caused by error or fraud.  Ernst & Young failed to

adequately plan and perform its audit procedures in a manner reasonably designed to identify the

numerous financial improprieties alleged herein.  Such failure permitted TeleTech to issue materially

false and misleading financial statements over a multi-year period.  Moreover, Section 10A of the

Securities Exchange Act required Ernst & Young to "determine" whether, in the course of its audits,

an illegal act occurred and to notify the SEC if it became aware of information indicating that an

illegal act occurred if TeleTech's management or Board of Directors failed to take appropriate

remedial action with respect to the illegal acts.  Ernst & Young knew or recklessly ignored that it

violated Section 10A of the Securities Exchange Act in the performance of its audits of TeleTech's 2004 and 2005 year end financial statements;

(b)     General Standard No. 3 which requires that due professional care be exercised by the auditor in the performance of the audit and the preparation of the audit report. Due professional care also requires that the auditor maintain professional skepticism in the course of auditing a client's financial statements. Ernst & Young conducted its audits of TeleTech's financial statements with such lack of care that it permitted systemic internal control deficiencies to exist over a multi-year period;

(c)     Auditing standard AU §342 which required that Ernst & Young perform the audit procedures necessary to determine that TeleTech's accounting estimates were reasonable during the Class Period. AU §342 provides that in establishing the reasonableness of an accounting estimate, the auditor normally concentrates on key factors and assumptions including the significance of the accounting estimate and its susceptibility to misstatement and bias;

(d)     Auditing standard AU §431, which provides that if management omits from the financial statements, including the accompanying notes, information that is required by GAAP, the auditor should express a qualified or an adverse opinion and should provide the required undisclosed information in its audit report;

(e)     GAAS Standard of Reporting No. 1 which requires the audit report to state whether the financial statements are presented in accordance with GAAP. Ernst & Young' opinion falsely represented that TeleTech's 2005 and 2006 financial statements were presented in conformity with GAAP when they were not for the myriad reasons herein alleged;

(f)     GAAS Standard of Reporting No. 4 which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. Ernst

& Young was required to either state that no opinion could be issued by it on TeleTech's 2005 or 2006 financial statements or they were required to issue an adverse opinion stating that such financial statements were not fairly presented in conformity with GAAP. Ernst & Young's failure to make such a qualification, correction, modification and/or withdrawal of its audit opinions was a violation of GAAS, including the fourth standard of reporting. Ernst & Young also failed to require TeleTech to restate its Class Period financial statements to correct the numerous violations of GAAP alleged herein;

> (g) GAAS General Standard No. 2, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit;

> (h) GAAS General Standard No. 1, which requires that audits be performed by persons having adequate technical training and proficiency;

> (i) GAAS Standard of Field Work No. 1, which requires that the audit is to be adequately planned and that assistants should be properly supervised; and

> (j) GAAS Standard of Reporting No. 2, which requires that the audit report identify circumstances in which GAAP has not been consistently observed.

208.   In certifying TeleTech's financial statements, Defendant Ernst & Young falsely represented that it conducted its audits of TeleTech's financial statements in accordance with each of the above-noted auditing standards.

### Additional Scienter Allegations for Count V Only

209.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal

securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tuchman and Troka, their control over, and/or receipt and/or modification of Tuchman and Troka's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Tuchman and Troka, participated in the fraudulent scheme alleged herein.

210.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

211.    The fact that the Company has now restated its financial results for fiscal years 1996 to 2006 and the first two quarters of fiscal 2007, and has admitted that it reported falsified financial statements throughout the Class Period, constitutes strong circumstantial evidence of Defendants' scienter.  Not only does the restatement confirm that the Company's reported financial results throughout the Class Period were false, but based on the magnitude, duration and pervasiveness of the fraudulent accounting practices, all of which violated GAAP, the Company's restatement constitutes strong circumstantial evidence that each of the Individual Defendants knew, or at a minimum deliberately disregarded, the overwhelming prevalence of improper accounting practices and falsification of the Company's financial results throughout the Class Period.

212.    The Individual Defendants were motivated to engage in such a scheme to inflate the price of TeleTech stock in order to enable TeleTech insiders to engage in profitable sales of their personally held Tuchman and Troka stock.  The Individual Defendants took full advantage of the artificial inflation in the Company's stock price caused by their material misrepresentations.  For

scienter purposes, all of Defendants' Tuchman and Troka stock sales during the period for which

Defendants have admitted the Company's financial results were misstated from 1996 through the

end of the Class Period (the "Fraud Period") are relevant.  While Defendants were engaged in their

backdating scheme during the Fraud Period, TeleTech insiders including the Individual Defendants

sold a total of 6,967,458 shares of stock for $152,146,046 in proceeds, as listed below:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| COBURN | STEVEN | 6/9/1997 | 30,000 | $25.50 | $765,000 |
| | | | 30,000 | | $765,000 |
| | | | | | |
| DAMMEYER | RODNEY | 11/1/1996 | 15,209 | $29.45 | $447,905 |
| | | 6/2/1997 | 30,000 | $22.08 | $662,400 |
| | | 7/29/1999 | 20,000 | $12.00 | $240,000 |
| | | 7/30/1999 | 20,000 | $12.00 | $240,000 |
| | | 11/29/1999 | 6,859 | $24.56 | $168,457 |
| | | 11/29/1999 | 1,100 | $24.63 | $27,093 |
| | | 11/29/1999 | 1,000 | $24.75 | $24,750 |
| | | 11/29/1999 | 100 | $24.69 | $2,469 |
| | | 3/9/2000 | 10,000 | $39.69 | $396,900 |
| | | 3/9/2000 | 8,750 | $39.63 | $346,763 |
| | | | 113,018 | | $2,556,737 |
| | | | | | |
| DELANEY | BRIAN | 8/8/2006 | 15,000 | $8.36 | $125,400 |
| | | 8/8/2006 | 6,000 | $7.78 | $46,680 |
| | | 8/8/2006 | 6,000 | $8.86 | $53,160 |
| | | 8/8/2006 | 750 | $5.01 | $3,758 |
| | | 2/26/2007 | 25,000 | $8.59 | $214,750 |
| | | 2/26/2007 | 3,000 | $8.86 | $26,580 |
| | | 8/9/2007 | 7,500 | $8.36 | $62,700 |
| | | 8/9/2007 | 6,000 | $7.78 | $46,680 |
| | | 8/9/2007 | 750 | $5.01 | $3,758 |
| | | 9/10/2007 | 25,000 | $8.59 | $214,750 |
| | | | 95,000 | | $798,215 |
| | | | | | |
| DWIVEDI | KAMALESH | 2/16/2007 | 20,000 | $4.09 | $81,800 |
| | | 2/16/2007 | 18,750 | $8.57 | $160,688 |
| | | 2/16/2007 | 96 | $4.09 | $393 |
| | | 2/20/2007 | 22,204 | $4.09 | $90,814 |
| | | | 61,050 | | $333,695 |
| | | | | | |
| GENTRY | DEBORAH | 11/24/1999 | 10,000 | $21.93 | $219,300 |
| | | | 10,000 | | $219,300 |
| | | | | | |
| HOPKINS | GREGORY | 8/9/2007 | 75,000 | $6.24 | $468,000 |
| | | | 75,000 | | $468,000 |

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| LIVINGSTON | JOSEPH | 11/1/1996 | 82,300 | $31.00 | $2,551,300 |
| | | 12/15/1999 | 50,000 | $26.69 | $1,334,500 |
| | | | 132,300 | | $3,885,800 |
| MEHTA | SHRIKANT | 5/29/2007 | 85,000 | $33.07 | $2,810,950 |
| | | | 85,000 | | $2,810,950 |
| MEYERSON | MORTON | 12/3/2003 | 5,100 | $10.94 | $55,794 |
| | | | 5,100 | | $55,794 |
| SCHUTZMAN | ALAN | 8/9/2007 | 23,000 | $12.60 | $289,800 |
| | | | 23,000 | | $289,800 |
| SHOOTMAN | ALEX | 8/29/2006 | 50,000 | $8.32 | $416,000 |
| | | | 50,000 | | $416,000 |
| SILVERMAN | ALAN | 11/23/1999 | 50,000 | $22.08 | $1,104,000 |
| | | 12/12/2000 | 16,800 | $23.03 | $386,904 |
| | | | 66,800 | | $1,490,904 |
| SLOAN | STUART | 11/1/1996 | 108,634 | $31.00 | $3,367,654 |
| | | | 108,634 | | $3,367,654 |
| SPERBER | JEFFREY | 5/21/2002 | 668 | $12.48 | $8,337 |
| | | | 668 | | $8,337 |
| TUCHMAN[8] | KENNETH | 7/31/1996 | 1,933,000 | $14.50 | $28,028,500 |
| | | 11/1/1996 | 1,100,000 | $31.00 | $34,100,000 |
| | | 11/1/1996 | 984,600 | $31.00 | $30,522,600 |
| | | 11/1/1996 | 360,000 | $31.00 | $11,160,000 |
| | | | 4,377,600 | | $103,811,100 |
| WEINGARTEN | RICHARD | 8/22/1996 | 2,000 | $21.09 | $42,180 |
| | | 11/1/1996 | 27,159 | $29.45 | $799,833 |
| | | | 29,159 | | $842,013 |
| YOUNG | SHIRLEY | 2/16/2007 | 15,000 | $8.80 | $132,000 |
| | | | 15,000 | | $132,000 |

---

[8]     Excludes shares sold by Tuchman in the March 2007 Secondary Offering.

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| ZELL | SAMUEL | 7/31/1996 | 950,000 | $14.50 | $13,775,000 |
| | | 11/1/1996 | 378,750 | $29.45 | $11,154,188 |
| | | 11/1/1996 | 33,879 | $29.45 | $997,737 |
| | | 5/28/1998 | 25,000 | $12.88 | $322,000 |
| | | 5/29/1998 | 22,500 | $13.25 | $298,125 |
| | | 6/3/1998 | 27,500 | $13.14 | $361,350 |
| | | 6/5/1998 | 2,500 | $13.06 | $32,650 |
| | | 6/9/1998 | 47,500 | $13.14 | $624,150 |
| | | 6/15/1998 | 25,000 | $12.02 | $300,500 |
| | | 6/23/1998 | 12,500 | $13.00 | $162,500 |
| | | 6/24/1998 | 12,500 | $13.00 | $162,500 |
| | | 7/28/1998 | 75,000 | $11.00 | $825,000 |
| | | 7/29/1998 | 5,000 | $10.81 | $54,050 |
| | | 8/7/1998 | 45,000 | $11.00 | $495,000 |
| | | 8/13/1998 | 17,500 | $12.00 | $210,000 |
| | | 8/18/1998 | 10,000 | $12.00 | $120,000 |
| | | | 1,690,129 | | $29,894,749 |
| | | **Total:** | **6,967,458** | | **$152,146,046** |

213.    Defendant Tuchman was highly motivated continue to conceal the scheme in order to sell 5.75 million shares of his privately owned TeleTech common stock at $36.50 per share for gross proceeds of nearly $210 million in the March 2007 Secondary Offering.  Defendant Tuchman's sale in the offering was both unusual and suspicious in timing and amount coming just four months before the TeleTech initiated its September 2007 investigation into options backdating.

214.    In addition, the artificially inflated price of TeleTech shares was used as currency to fund numerous acquisitions during the Fraud Period, which were key components of the Company's growth strategy, including but not limited to:

- In May 1997, the Company acquired 100% of the common stock of Telemercadeo Integral, S.A. for consideration of $4.2 million, consisting of **100,000 shares** of the Company's common stock and cash of $2.4 million.

- On or about February 17, 1998, the Company acquired the assets of Intellisystems, Inc. for $2.0 million in cash and **344,487 shares** of common stock, which included 98,810 shares of treasury stock.

- On or about June 8, 1998, and June 17, 1998, the Company consummated business combinations with Digital Creators, Inc., which included the **issuance of 1,069,000**

- 103 -

*shares* of Company common stock, and Electronic Direct Marketing, Ltd. ("EDM"), which included the obligation to issue *1,783,444 shares* of Company common stock.

- On or about August 26, 1998, the Company consummated a business combination with Outsource Informatica Ltda., which included the issuance of 606,343 shares of Company common stock.

- On or about December 31, 1998, the Company acquired 100% of the common stock of Cygnus Computer Associates Ltd. for approximately $660,000 in cash and **324,744 shares** of common stock in the Company.

- On or about March 18, 1999, the Company acquired 100% of the common stock of Pamet River, Inc. for approximately $1,821,000 in cash and **285,711 shares** of common stock in the Company.

- On or about August 31, 2000, TeleTech acquired Contact Center Holdings, S.L. ("CCH"), through the exchange of **3,264,000 shares** of the Company's common stock for all of the issued share capital of CCH.

- On or about December 20, 2000, the Company completed a business combination with Newgen Results Corporation ("Newgen") that included the exchange of **8,283,325 shares** of the Company's common stock for all of the issued shares of Newgen.

- On October 27, 2000, TeleTech acquired iCcare Limited for approximately $4.0 million consisting of $2.0 million in cash and $2.0 million in stock.

### Applicability of Presumption of Reliance:
### Fraud-on-the-Market Doctrine

215. At all relevant times, the market for TeleTech's securities was an efficient market for the following reasons, among others:

(a) TeleTech's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, TeleTech filed periodic public reports with the SEC and the NASDAQ;

(c) TeleTech regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and

(d)    TeleTech was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public

marketplace.

216.    As a result of the foregoing, the market for TeleTech's securities promptly digested

current information regarding TeleTech from all publicly available sources and reflected such

information in TeleTech's stock price. Under these circumstances, all purchasers of TeleTech's

securities during the Class Period suffered similar injury through their purchase of TeleTech's

securities at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF THE *AFFILIATED UTE*
## PRESUMPTION OF RELIANCE

217.    Plaintiffs are also entitled to the *Affiliated Ute* presumption of reliance because

defendants' fraudulent scheme primarily involved a failure to disclose and/or concealment of the

material facts concerning defendants' backdating and spring loading of options grants, which

information plaintiffs would have wanted to know and which would have caused investors to not

have purchased shares of TeleTech at the prices they traded at during the Class Period.

## TRANSACTION AND LOSS CAUSATION

218.    Defendants' publication of materially false and misleading statements at the

beginning of the Class Period allowed Defendant Tuchman to sell over $209.87 million of common

stock to the public in the March 2007 Secondary Offering. Thereafter, during the remainder of the

Class Period, these false statements also had the intended effect of causing TeleTech's shares to

trade at artificially inflated levels. Moreover, as direct result of TeleTech's publication of these false

statements, during the Class Period shares of the Company traded at a high of over $40.00 per share soon after the Secondary Offering in early-April 2007.

219.    Contrary to the positive statements made by defendants during the Class Period, or contained in the Secondary Offering Registration Statement and Prospectus, on November 8, 2007, defendants revealed that the Company would come nowhere near achieving guidance previously sponsored and/or endorsed by defendants, and that TeleTech would be forced to take large charges for its impaired assets and lack of reserves.  That day, defendants reported that the Company could be forced to restate its financial results as far back as 1999 as a result of failing to properly account for tens or possibly hundreds of millions of back-dated and improperly priced options. These belated disclosures had an immediate, adverse impact on the price of TeleTech shares.

220.    Accordingly, the following day, November 9, 2007, shares of TeleTech fell from a prior day's closing price of $22.61 per share, to an intra-day and 52-week trading low of $18.76 per share – an immediate decline of over 17%.  That day, over 4.13 million shares traded as TeleTech shares lost nearly half their value from the $36.50 price at which Defendant Tuchman liquidated almost $210 million of his personally held TeleTech shares at the end of March 2007.

221.    Then on July 16, 2008, TeleTech filed its 2007 Form 10K revealing the full extent and duration of Defendants fraudulent scheme to backdate options.  On the following day, July 17, 2008, TeleTech common stock fell $4.63 per share closing at $13.27 per share on extremely heavy volume of more than 11.6 million shares.  A nearly 26% decline from the previous closing price of $17.90 per share on or about July 16, 2007.

222.    These dramatic share price declines eradicated much of the artificial inflation from TeleTech's share price and caused real economic loss to investors who purchased this stock during the Class Period and/or in connection with the March 2007 Secondary Offering.  The decline in

TeleTech's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' illegal and improper conduct being revealed to investors and to the market. The timing and magnitude of TeleTech's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to defendants' fraudulent conduct.

## NO SAFE HARBOR

223.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of TeleTech who knew that those statements were false when made.

224.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT V

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against Defendants TeleTech, the Individual Defendants
### and the Auditor Defendant

225.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

226.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

227.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

228.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TeleTech common stock.  Plaintiff and the Class would not have purchased TeleTech common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

229.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of TeleTech common stock during the Class Period.

## COUNT VI

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

230.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

231.    The Individual Defendants acted as controlling persons of TeleTech within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of TeleTech, and their ownership of TeleTech stock, the Individual Defendants had the power and authority to cause TeleTech to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding injunctive relief;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: September 2, 2008                COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                   SAMUEL H. RUDMAN
                                   ROBERT M. ROTHMAN

                                   ROBERT M. ROTHMAN

                                   58 South Service Road, Suite 200
                                   Melville, NY 11747
                                   Telephone: 631/367-7100
                                   631/367-1173 (fax)

                                   *Lead Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2008, a copy of the foregoing Consolidated

Amended Complaint was sent, via U.S. Mail, postage prepaid to the following parties on the

attached service list.

_____
Robert M. Rothman

Service List

Jonathan E. Richman
Corinne D. Levy
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel:  (212) 259-8000
Fax:  (212) 259-6333
jrichman@dl.com
clevy@dl.com

Ralph C. Ferrara
Geoffrey H. Coll
DEWEY & LEBOEUF LLP
1101 New York Avenue, Suite 1100
Washington, D.C. 20005
Tel: (202) 986-8000
Fax: (202) 986-8102
rferrara@dl.com
gcoll@dl.com

Timothy R. Beyer
BROWNSTEIN HYATT FARBER SCHRECK
410 Seventeenth Street
Suite 2200
Denver, CO 80202-4432
Tel: (303) 223-1100
Fax: (303) 223-1111
tbeyer@bhfs.com

Susan Stevens
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173
Tel: (212) 547-5400
Fax: (212) 547-5444
slstevens@mwe.com

Jamie A Levitt
MORRISON FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104-0050
Tel: (212) 468-8203
Fax: (212) 468-7900
jlevitt@mofo.com

Laurence Berman
Matthew Oster
MCDERMOTT WILL & EMERY LLP
2049 Century Park East
38th Floor
Los Angeles, CA 90067
Tel: (310) 277-4110
Fax: (310) 277-4730
lberman@mwe.com
moster@mwe.com

Gary J. Hacker
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES
Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Fax: (212) 735-2000
Gary.Hacker@skadden.com