UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

In re TELETECH LITIGATION    :    Master File No. 1:08-cv-00913-LTS

    :
_____
    :    <u>CLASS ACTION</u>

This Document Relates To:    :

    :
    ALL ACTIONS.    :
_____ x

DECLARATION OF ROBERT M. ROTHMAN
IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT

# TABLE OF CONTENTS

Page

THE ACTION.................................................................................................................2

THE PARTIES...............................................................................................................3

I.      LEAD PLAINTIFF...........................................................................................3

II.     THE DEFENDANTS.........................................................................................3

        A.      The Teletech Defendants ......................................................................3

        B.      The Underwriter Defendants.................................................................4

        C.      The Auditor Defendant .........................................................................4

THE ALLEGATIONS ...................................................................................................4

I.      CLAIMS ASSERTED AGAINST THE COMPANY AND THE INDIVIDUAL
        DEFENDANTS .................................................................................................4

II.     CLAIMS ASSERTED AGAINST THE UNDERWRITER DEFENDANTS....6

III.    CLAIMS ASSERTED AGAINST ERNST & YOUNG ...................................7

THE PROPOSED SETTLEMENT.................................................................................7

I.      EVIDENTIARY SUPPORT FOR THE PROPOSED FACTUAL FINDINGS,
        INCLUDING THOSE PURSUANT TO RULES 11 AND 23 OF THE FEDERAL
        RULES OF CIVIL PROCEDURE ...................................................................9

        A.      Rule 23 Factual Findings ......................................................................9

                1.      The Members of the Class Are so Numerous that Joinder of All
                        Class Members in the Litigation Is Impracticable ....................10

                2.      There Are Questions of Law and Fact Common to the Class....11

                3.      The Claims of the Lead Plaintiff are Typical of the Claims of the
                        Class..........................................................................................11

                4.      Lead Plaintiff and Its Counsel Have Fairly and Adequately
                        Represented and Protected the Interests of All of the Class
                        Members ....................................................................................12

                5.      Question of Law or Fact Common to Class Members Predominate
                        Over Any Questions Affecting Only Individual Members.........13

**Page**

        a.    The Market for TeleTech Stock Was Efficient Throughout the Class Period.................................................................................14

    6.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy ...........................................16

  B.    Rule 11 Findings ......................................................................................17

II.  THE FACTUAL MATTERS CONSIDERED BY LEAD PLAINTIFF'S COUNSEL (INCLUDING THE NATURE AND STATUS OF THE "SETTLEMENT DISCOVERY" REFERRED TO IN SECTION 7.1(a) OF THE STIPULATION) AND THE INDICIA OF ARMS' LENGTH NEGOTIATIONS ..........18

  A.    Lead Counsel's Investigation...................................................................18

  B.    Indicia of Arm's Length Negotiations and the Settlement Discovery ..................19

III.  THE RELATIONSHIP BETWEEN THE SETTLEMENT FUND  AND THE AMOUNT OF THE PARTIES' ESTIMATES OF  POTENTIAL RECOVERY/EXPOSURE IN THE LITIGATION ..........................................23

IV.  THE RELATIONSHIP BETWEEN THIS LITIGATION AND SETTLEMENT AND THE DELAWARE LITIGATION AND SETTLEMENT REFERRED TO IN THE STIPULATION.....................................................................................24

V.  ANY ADMINISTRATION OR INVESTMENT EXPENSES ANTICIPATED IN CONNECTION WITH THE ESCROW ARRANGEMENT PROPOSED IN THE STIPULATION..............................................................................................26

VI.  THE MECHANICS OF THE PROPOSED PRELIMINARY APPROVAL, OPT-OUT AND CLAIMS PROCEDURES....................................................................26

  A.    The Process for Providing Notice to the Class ....................................................26

  B.    The Process for the Submission of Claims ...........................................................27

  C.    The Process for Exclusions....................................................................................27

  D.    The Process for Objections ....................................................................................28

  E.    The Process for Distribution of the Settlement Proceeds ......................................28

**Page**

VII.    THE FAIRNESS AND REASONABLENESS OF THE DECISION TO
RELEASE THE UNDERWRITER AND INDIVIDUAL DEFENDANTS
WITHOUT A PAYMENT CONTRIBUTION TO THE SETTLEMENT FUND
AND THE ACCOUNTANT DEFENDANTS WITH A NOMINAL
CONTRIBUTION TO THE SETTLEMENT FUND .......................................................33

THE FACTORS AFFECTING SETTLEMENT COUNSEL IN FAVOR OF
APPROVAL OF THE SETTLEMENT.............................................................................34

    A.    The Range of Reasonableness of the Settlement Fund in Light of the Best
Possible Recovery and the Attendant Risks in Litigation....................................36

        1.    The Risk of Establishing Liability ............................................................37

        2.    The Risks of Establishing Loss Causation and Damages ..........................37

    B.    The Complexity, Expense, and Likely Duration of the Litigation .......................38

    C.    The Reaction of the Class to the Settlement .........................................................39

    D.    The Stage of the Proceedings and the Amount of Discovery Completed..............39

    E.    The Risks of Maintaining the Class Through Trial ..............................................40

    F.    The Ability of the Defendants to Withstand a Greater Judgment.........................40

CONCLUSION.....................................................................................................................40

ROBERT M. ROTHMAN declares:

1.      I am a member of Coughlin Stoia Geller Rudman & Robbins LLP, the Court appointed Lead Counsel in this action for a class consisting of all those who purchased, held or otherwise acquired the common stock of TeleTech Holdings, Inc. ("Teletech" or the "Company") between October 25, 2006 and July 16, 2008 (the "Class"). Based upon my active participation in the prosecution and settlement of this action, I have personal knowledge of the matters set forth herein.

2.      Pursuant to the Court's Order dated November 2, 2009 and the Court's further instructions at the conference held on November 10, 2009, I respectfully submit this Declaration in further support of lead plaintiff's Electrical Workers Local No. 357 Pension and Health & Welfare Trusts' ("Electrical Workers 357" or "Lead Plaintiff") unopposed motion for preliminary approval of settlement of this action pursuant to Federal Rule of Civil Procedure 23(e).

3.      The Stipulation of Settlement dated October 21, 2009 ("Stipulation") provides for the payment of $11,000,000 in cash. If approved, the settlement will resolve all claims asserted by Lead Plaintiff and the Class in this action against defendants.

4.      This case was carefully investigated since its commencement. Lead Counsel thoroughly reviewed and analyzed all publicly available information regarding TeleTech including, but not limited to, its Securities and Exchange Commission ("SEC") filings, financial statements, press releases, and a wealth of analysts' reports and notes rendered by securities firms. Lead Counsel also interviewed several former employees of TeleTech. Moreover, Lead Counsel conducted substantial discovery, including the review of approximately 560,000 pages of documents produced by Defendants.

5.    Lead Counsel also consulted with experts in accounting and damages, thoroughly researched the law pertinent to the claims and defenses asserted, and engaged in ongoing communications with the Court-appointed Lead Plaintiff.

6.    The parties discussed settlement at formal mediated proceedings before the Hon. Daniel Weinstein (Ret.) of JAMS. During settlement negotiations, Lead Counsel made it very clear that while Lead Plaintiff was prepared to assess the strengths and weaknesses of this case, Lead Plaintiff would continue to litigate rather than settle for less than fair value.

7.    The proposed settlement is the culmination of hard-fought negotiations presided over by a mediator with substantial experience. The proposed settlement was obtained only after Lead Plaintiff and Lead Counsel had conducted an extensive independent investigation and received and reviewed more than a half million pages of non-public documents produced by Defendants. As explained in detail below, this proposed settlement represents an excellent recovery for the Class in light of the risks Lead Plaintiff faced in taking this action to trial.

## THE ACTION

8.    This is a federal securities class action pursuing remedies under the Securities Act of 1933 and Securities Exchange Act of 1934 on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of TeleTech between October 25, 2006 and July 16, 2008, inclusive (the "Class Period").

9.    This case concerns, among other things, defendants' manipulation of the Company's stock option grants. Lead Plaintiff alleges that defendants issued materially false and misleading statements regarding the Company's business, its stock option plans and compensation practices, and its financial results. As a result of defendants' actions, TeleTech's publicly traded securities traded at artificially inflated prices during the Class Period, with its common stock reaching a trading high of $40.26 per share before closing at $39.94 on April 13, 2007, as TeleTech consistently reported

outstanding financial results and completed numerous acquisitions using TeleTech common stock as currency for the transactions. In addition, TeleTech's 1999 Stock Incentive Plan (the "1999 Stock Plan") was approved and its directors were elected and re-elected by shareholder votes made pursuant to materially false and misleading Proxy Statements.

10.     According to the Complaint, certain of the defendants took advantage of these falsified financial results, the artificial inflation of TeleTech's stock and the manipulation of its stock option plans by selling millions of shares of their TeleTech stock, resulting in proceeds that were materially enhanced due to the improper backdating of their options.

11.     In addition, defendants' misrepresentations concerning TeleTech's business and financial success enabled defendants to successfully pursue and complete the Company's March 30, 2007 Secondary Public Offering.

## THE PARTIES

### I.    LEAD PLAINTIFF

12.     Electrical Workers 357 was appointed by this Court as Lead Plaintiff by Order dated May 19, 2008.

### II.    THE DEFENDANTS

#### A.    The Teletech Defendants

13.     Defendant TeleTech is a Delaware corporation with its principal place of business located in Englewood, CO. TeleTech purports to be a global business process outsourcing company that provides a range of "front-to-back" office outsourced solutions including customer management, transaction-based processing, and database marketing services.

14.     Defendant Kenneth D. Tuchman served as the Company's Chief Executive Officer and Board Chairman.

15.    Defendant John R. Troka served as TeleTech's Chief Financial Officer, Principal Accounting Officer, and Executive Vice President.

16.    Defendants James E. Barlett, Ruth C. Lipper, William A. Linnenbringer, and Shirley Young[1] served as members of TeleTech's board of directors.

**B.    The Underwriter Defendants**

17.    Defendants Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. Inc. ("Morgan Stanley," collectively with Citigroup, the "Underwriter Defendants") acted as joint book-running managers for Company's March 30, 2007 Secondary Public Offering – distributing millions of shares of TeleTech stock to investors.

**C.    The Auditor Defendant**

18.    Defendant Ernst & Young LLP served at relevant times as TeleTech's outside auditor.

**THE ALLEGATIONS**

**I.    CLAIMS ASSERTED AGAINST THE COMPANY AND THE INDIVIDUAL DEFENDANTS**

19.    Lead Plaintiff alleges, *inter alia*, that the Company and the Individual Defendants made several misstatements and omissions.    Specifically, Lead Plaintiff claims that these Defendants:

- falsely represented that TeleTech's stock option plans would help assure the Company's future success by offering to top executives incentives to put forth maximum effort for the success of the Company's business;

---

[1]    Defendants Tuchman, Troka, Barlett, Lipper, Linnenbringer, Mehta and Young are collectively referred to herein as the "Individual Defendants."

- falsely represented that TeleTech's stock option plans assured favorable tax treatment of stock-based awards and ensured stock-option compensation was tax deductible for the Company;

- falsely represented that stock options could not and would not be granted at less than 100% of fair market value (*i.e.*, stock market closing price) on the date of grant;

- falsely represented that TeleTech's stock option plans were administered by a Compensation Committee comprised of all independent directors;

- falsely represented that the Compensation Committee only granted options in accordance with the terms of the plan, including limiting option exercise prices to not less than 100% of fair market value of the stock on the date of grant;

- falsely represented that the value of the Company's stock option grants was tied to the Company's performance;

- falsely represented that the Company's internal financial, accounting and disclosure controls were adequately designed and functioning in a manner so as to prevent fraud or manipulation;

- falsely represented that TeleTech's strong financial results were due to consistent operational performances across the full spectrum of its businesses;

- falsely represented that TeleTech's financial reports and statements fairly presented its financial condition and results in accordance with Generally Accepted Accounting Principles;

- falsely represented that specified officers of TeleTech had been granted options to buy specified numbers of shares of TeleTech stock at specified prices, *i.e.*, fair market value on the date the options were granted;

- falsely represented that, because of the way TeleTech's stock option plans were structured and administered and because the Company grants stock options at an exercise price not less "than the fair market value of the Company's common stock on the date of grant," TeleTech did not have to recognize compensation expense in connection with its grant, or any subsequent exercise, of stock options;

- falsely represented that TeleTech's stock option plans had been voted for and adopted by its Board of Directors and its shareholders and, therefore, the option shares were validly issued and would not dilute existing stockholders' ownership stake in TeleTech.

## II.    CLAIMS ASSERTED AGAINST THE UNDERWRITER DEFENDANTS

20.    Lead Plaintiff alleges that in connection with the Company's March 2007 secondary public offering of stock (the "Offering"), the Underwriter Defendants acted as joint book-running managers of the Offering, and as representatives of the Underwriters and/or as Lead Underwriters of the Offering – distributing millions of shares of TeleTech stock to investors.  Lead Plaintiff contends that the Underwriter Defendants are liable for making or allowing the inclusion of materially false and misleading statements in the Secondary Offering Registration Statement.

21.    The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into TeleTech's accounting and assumptions that extended well beyond a mere casual review of TeleTech's accounting, financial report and operational and financial controls.  Lead Plaintiff alleges that the failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm that shareholders endured.

### III.    CLAIMS ASSERTED AGAINST ERNST & YOUNG

22.    From May 2002 until May 2007 – prior to and during the Class Period and at the time of the Offering – Ernst & Young purportedly served as the Company's "independent" auditors. While Ernst & Young resigned from auditing the Company on or about May 7, 2007, this was not until after it certified and provided a "clean" audit opinion that was included in TeleTech's 2006 Form 10-K, completed an interim review of the Company's financial statements for the quarter ended March 31, 2007, and consented to the use of its opinion in the March 2007 Offering's Registration Statement.

23.    Lead Plaintiff alleges that Ernst & Young issued its first false and misleading unqualified audit report for TeleTech's 2004 financial statements on March 7, 2005. Subsequent false and misleading unqualified audit reports which pertained to the Company's 2004 financial statements were issued by Ernst & Young on February 20, 2006 and February 7, 2007.

### THE PROPOSED SETTLEMENT

24.    On October 21, 2009, the parties entered into the Stipulation. Subject to the approval of the Court, the Stipulation will fully, finally and forever resolve, discharge and settle the Lead Plaintiffs' claims.

25.    In essence, subject to the approval of the Court, Lead Plaintiff has agreed to settle the action in exchange for a cash fund consisting of $11 million in cash, plus accrued interest.

26.    On October 21, 2009, Lead Plaintiff filed its unopposed motion for an order granting preliminary approval of the proposed settlement pursuant to Fed. R. Civ. P. 23(e).

27.    By Oder dated November 2, 2009, the Court instructed counsel for the parties to appear to address, *inter alia*, the following:

(a)    Evidentiary support for the proposed factual findings, including those pursuant to Rules 11 and 23 of the Federal Rules of Civil Procedure;

(b)     The factual matters considered by Lead Plaintiff's counsel (including the nature and status of the "Settlement Discovery" referred to in section 7.1(a) of the Stipulation) and the indicia of arms' length negotiations;

(c)     The relationship between the settlement fund and the amount of the parties' estimates of potential recovery/exposure in the litigation;

(d)     The relationship between this litigation and settlement and the Delaware litigation and settlement referred to in the Stipulation;

(e)     Any administration or investment expenses anticipated in connection with the escrow arrangement proposed in the Stipulation; and

(f)     The mechanics of the proposed preliminary approval, opt-out and claims procedures.

28.    On November 10, 2009, the Court held a conference with the parties during which the Court requested that Lead Plaintiff provide this Declaration addressing the issues set forth in the Court's November 2, 2009 Order.  In addition, the Court asked Lead Plaintiff to explain the fairness and reasonableness of the decision to release the underwriter and Individual Defendants without a cash contribution to the settlement fund and the accountant defendants with a nominal cash contribution to the settlement fund.[2]

---

[2]     The Court further noted that Lead Plaintiff should make certain revisions to the notice. Those revisions have been made and the Preliminary Approval Order and accompanying exhibits, including the revised notice, have been re-filed with the Orders and Judgments Clerk pursuant to the ECF Rules and Regulations Procedures of the United States District Court for the Southern District of New York.  For the Court's convenience, I attach as Exhibit A a redlined version of the notice that demonstrates the changes made from the prior version.  In addition, in the refiled documents, Lead Plaintiff confirmed certain dates in the Proposed Order and exhibits from 2009 to 2010.

29.    Pursuant to the Court's instructions, Lead Plaintiff respectfully submits this Declaration, the accompanying Declaration of Ellen Gusikoff Stewart and the accompanying Declaration of Scott D. Hakala, PhD, CFA to respond to the questions raised by the Court and further establish that proposed settlement is otherwise fair, adequate and reasonable.

## I.    EVIDENTIARY SUPPORT FOR THE PROPOSED FACTUAL FINDINGS, INCLUDING THOSE PURSUANT TO RULES 11 AND 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

### A.    Rule 23 Factual Findings

30.    If the Court enters the proposed Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order"), the Court will preliminarily certify a Class of all those who purchased or otherwise acquired TeleTech common stock between October 25, 2006 and July 16, 2008, inclusive, as well as those who owned TeleTech common stock at the time TeleTech's 2007 proxy statement was circulated to shareholders to solicit their votes on various matters.  The proposed Class will exclude defendants, the officers and directors of TeleTech during the Class Period, members of their immediate families, and their legal representatives, heirs, successors or assigns, and entities in which defendants have or had a controlling interest.  Also excluded from the Class will be those persons who timely and validly request exclusion of the Class. *See* Preliminary Approval Order ¶3.

31.    In order to certify the Class, the Court will need to preliminarily find that: (a) the members of the Class are so numerous that joinder of all Class members in the litigation is impracticable; (b) there are questions of law and fact common to the Class that predominate over any individual questions; (c) the claims of the Lead Plaintiff are typical of the claims of the Class; (d) Lead Plaintiff and its counsel have fairly and adequately represented and protected the interests of all of the Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering: (i) the interests of the members of the Class in

individually controlling the prosecution of the separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by members of the Class; (iii) the desirability of undesirability of continuing the litigation of these claims in this particular forum; and (iv) the difficulties likely to be encountered in the management of the class action.  *Id.* at ¶4.

32.    To support these findings, Lead Plaintiff submits the accompanying Declaration of Scott D. Hakala, PhD, CFA Regarding Market Efficiency and Loss Causation ("Hakala Decl.").  For the reasons stated below and in the Hakala Decl., Lead Plaintiff respectfully submits that the Court has an adequate basis upon which to make each of the Rule 23 findings.

### 1.    The Members of the Class Are so Numerous that Joinder of All Class Members in the Litigation Is Impracticable

33.    As explained in Lead Plaintiff's Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Settlement dated October 21, 2009 (Docket No. 57), Rule 23(a)(1) requires that the class be sufficiently numerous rendering joinder of all of its individual members impracticable.  This numerosity requirement is presumed when a class consists of forty or more members.

34.    As set forth in the Hakala Decl., approximately 344 identified institutional investors owned TeleTech shares during the Class Period.  Hakala Decl. at ¶9.  Thus, without even considering individual shareholders, the number of Class members far exceeds the 40 necessary to certify a class.

35.    Indeed, the average daily trading volume during the Class Period was 801,380 shares traded.  *Id.* at ¶7.  This represents daily trading volume of more than 1.1% of the average total shares outstanding and greater than a 5% weekly gross turnover.  *Id.*  With that many shares trading and such a high turnover rate, there are likely thousands of the Class members.

36.     As a result, the Class is sufficiently numerous to render joinder of all members impracticable.

### 2.     There Are Questions of Law and Fact Common to the Class

37.     Rule 23(a)(2) requires that there be questions of law or fact common to the class. That requirement is established in this case.

38.     Lead Plaintiff alleges that defendants made a series of misrepresentations and omissions in the Company's SEC filings, press releases, and conference calls with investors.  There will be factual and legal questions common to the Class arising from these misrepresentations and omissions.  These questions include: (a) whether the federal securities laws were violated by defendants' acts and omissions; (b) whether defendants participated in and pursued the fraudulent scheme or course of conduct alleged; (c) whether the Company's publicly-disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts; (d) whether defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts; (e) whether the market price of the Company's shares during the Class Period was artificially inflated due to defendants' wrongful conduct; and (f) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

### 3.     The Claims of the Lead Plaintiff are Typical of the Claims of the Class

39.     Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims of the class.  Here, Lead Plaintiff's claims are typical.

40.     Lead Plaintiff's claims arise from the same events and conduct that give rise to the claims of the other Class members.

41.     As demonstrated in Lead Plaintiff's Certification, dated March 25, 2008 (previously filed as Exhibit C to the Declaration of Mario Alba Jr. in Support of the Motion for Consolidation,

Appointment of Lead Plaintiff and for Approval of Selection of Lead Counsel) Lead Plaintiff purchased TeleTech securities during the Class Period. Thus, Lead Plaintiff's claims are not only similar to those of the other members of the Class, but they are also virtually identical.

42.    Indeed, all members of the Class seek to prove that defendants made materially false and misleading statements during the Class Period and failed to disclose material adverse facts about the Company's stock option practices. As such, Lead Plaintiff and the other members of the Class have been injured by the same course of conduct by the defendants.

43.    Moreover, the damages that the Class members seek arise from the purchase of TeleTech shares at prices that were artificially inflated as a result of defendants' false and misleading statements and omissions, and the subsequent decline in the price of the Company's stock when aspects of the fraud were revealed. Thus, Lead Plaintiff stands in precisely the same position as other purchasers of the Company's shares during the Class Period.

      **4.    Lead Plaintiff and Its Counsel Have Fairly and Adequately Represented and Protected the Interests of All of the Class Members**

44.    Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the class. Lead Plaintiff satisfies the adequacy test.

45.    In fact, Lead Plaintiff has already successfully represented the interests of the proposed Class and demonstrated its adequacy to prosecute this action, by, among other things, researching and filing the operative complaint in this action and mediating this case to a successful resolution. In addition, none of Lead Plaintiff's interests are antagonistic to those of the Class. As discussed above, all members of the Class allege claims arising from the same wrongful conduct. The claims are based on the same legal theories as Lead Plaintiff's claims. Moreover, Lead Plaintiff is clearly committed to the vigorous prosecution of this action. Therefore, the interests of the other members of the Class have been more than adequately protected by Lead Plaintiff.

46. Lead Counsel is also adequate. Lead Plaintiff retained the law firm of Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") to represent it and the Proposed Class in this matter – a firm that has substantial experience in the prosecution of securities class actions. For example, among other noteworthy securities fraud cases, Coughlin Stoia served as lead counsel in *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (MH), 2005 WL 3504860 (S.D. Tex. Dec. 22, 2005), in which it has secured the largest recovery ever obtained in a shareholder class action. Specifically, commenting on counsel's "clearly superlative litigating and negotiating skills" and the firm's "outstanding reputation, experience, and success in securities litigation nationwide," the Enron court stated:

> The experience, ability, and reputation of the attorneys of Coughlin Stoia is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, No. H-01-3624 (MH), 2008 WL 4178130, at *46 (S.D. Tex. Sept. 8, 2008). Thus, Coughlin Stoia is qualified to represent the Class and, along with Lead Plaintiff, has vigorously protected the interests of those shareholders.

### 5. Question of Law or Fact Common to Class Members Predominate Over Any Questions Affecting Only Individual Members

47. The Supreme Court has acknowledged that the predominance requirement "is a test readily met in certain cases alleging consumer or securities fraud. . . ." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). Thus, where, as here, a complaint alleges that defendants have made false and misleading representations and omissions, the issues of law and fact that flow from that conduct predominate over any individual issues, rendering class treatment appropriate.

48. As noted in the discussion of commonality, above, the nature of this case and the elements of Lead Plaintiff's claims involve issues primarily relating to defendants' misrepresentations, false statements and omissions – in short, defendants' liability to the Class.

49.     Reliance is also a question common to all Class members.  The claims asserted rely on the fraud-on-the-market doctrine, where reliance is presumed, and plaintiffs are not required to prove awareness of any particular misstatement or omission.  *Basic, Inc. v. Levison*, 485 U.S. 224, 227 (1988).  The point of *Basic* is that an effect on market price is presumed based on the materiality of information and a well developed market's ability to readily incorporate that information into the price of securities.  Here, because the Company's stock traded on the NASDAQ, Lead Plaintiff is entitled to the presumption of market efficiency.

50.     Although the efficiency of the NASDAQ cannot be seriously disputed, Plaintiff has submitted evidence of efficiency.  *See* Hakala Decl.  In assessing the type of market efficiency required for the fraud-on-the-market presumption, Dr. Hakala considered whether the shares of TeleTech were traded in an efficient market.  *Id.* at ¶6.  Dr. Hakala completed a comprehensive event study, a fundamental financial and economic analysis, and a detailed review of certain company news and disclosures, which additionally demonstrate market efficiency.  Dr. Hakala concluded that there was "strong evidence for the level of market efficiency required for class certification."  *Id.*

### a.    The Market for TeleTech Stock Was Efficient Throughout the Class Period

51.     In *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), the court analyzed five company specific factors to determine market efficiency.  The factors considered in *Cammer* are as follows:

    (a)    Whether the security traded at a large average weekly volume;

    (b)    Whether a significant amount of analysts followed and reported on the security;

    (c)    Whether the security had numerous market makers;

    (d)    Whether the company was eligible to file SEC Form S-3; and

(e)      Whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price.

52.      As demonstrated below and in the Hakala Decl., all of the above factors are satisfied here.

53.      First, TeleTech stock was actively traded, which is an indicia of efficiency.  Hakala Decl. at ¶6(a).  During the Class Period, TeleTech had an average weekly trading volume of 5.0% of its outstanding shares. *Id.* at ¶7.

54.      Second, TeleTech was followed during the Class Period by numerous securities analysts employed by major brokerage firms.  These firms included Merrill Lynch Research, Morgan Stanley, RBC Capital Markets, Wells Fargo Securities, CITI, Craig Hallum Capital and other various groups.  *Id.* at ¶10.  This extensive analyst coverage, in addition to information provided by the Company to the market through SEC filings, conference calls, and investor presentations, supports a finding of efficiency.

55.      Third, at all pertinent times, TeleTech stock traded on the NASDAQ, which makes use of multiple competing market makers.  A large number of market makers results in a higher degree of liquidity of a stock.  In addition, institutional investors held a majority of the shares outstanding.  *Id.* at ¶6(b), Exh. C.

56.      Fourth, TeleTech's shares were in good standing and actively traded on the NASDAQ National and Global Select Market throughout the Class Period and therefore eligible for S-3 registration.  *Id.* at ¶6(c).

57.      Finally, as demonstrated in the Hakala Decl., there was a relationship between new material information and an immediate response in the stock price.  *Id*. at ¶6(e), Exh. D.  In

particular, Dr. Hakala conducted tests that demonstrate that the Company's stock price moved in a statistically significant amount on trade days with material news events as compared to days with no indentified news events.  *Id.*  Specifically, Dr. Hakala conducted a study to determine whether the price of TeleTech's stock behaved differently on those days than it did on other days, which would be indicative of a cause-and-effect relationship between material news and price reaction – the essence of market efficiency.  *Id.* at ¶¶11-19, Exh. D.  Dr. Hakala's tests concluded that the Company's stock traded in an efficient market.  *Id.* at ¶¶20-21, Exh. D.

58.    In sum, Lead Plaintiff has established that the market for TeleTech common stock during the Class Period was impersonal, open, well developed, and efficient, in that the market price of the Company's common stock during this time period reflected the publicly available information concerning TeleTech.  Accordingly, reliance is presumed and Lead Plaintiff satisfies the "predominance" requirement.

### 6.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

59.    Rule 23(b)(3) requires that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Rule 23 (b)(3) sets forth the following factors to be considered in making a "superiority" determination: (A) the interest of members of the class individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

60.    In this litigation, the interest of members of the Class in individually controlling the prosecution of separate actions is minimal, because the costs and expenses of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive.

- 16 -

61.    In addition, Lead Plaintiff is not aware of any similar individual suits currently pending against defendants asserting claims under the federal securities laws. As such, there is no dispute that this Court is a desirable forum for concentrating the litigation of Class members' claims.

62.    Finally, Lead Plaintiff does not envision that any significant difficulties will likely be encountered in managing this case as a class action, especially now that the parties have entered into the proposed settlement. This action is appropriate for class treatment, embodying all of the hallmarks, both in form and in substance, of the types of securities actions that are routinely certified in this Circuit and elsewhere.

### B.    Rule 11 Findings

63.    The Private Securities Litigation Reform Act of 1995 provides:

> In any private action arising under the chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. 78u-4(c)(1).

64.    Accordingly, at final approval, the parties will ask the Court to make the required Rule 11 findings. Because no responsive pleading or dispositive motion has been filed in this case, the Court will only need to make such findings as to the complaint.

65.    Fed. R. Civ. P. 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

66.    The complaint was not filed for an improper purpose.  In addition, the complaint contained claims that are fully recognized by existing law.  Finally, the factual contentions in the complaint had evidentiary support.  Thus, there can be no suggestion that the filing of the complaint violated Rule 11(b).

67.    Rather, the complaint was filed for the proper purpose of seeking redress for violations of the federal securities laws.  The claims asserted therein were warranted by existing law, as those violations arise from defendants' alleged false and misleading statements and omissions to investors.  Finally, the allegations were supported not only by Lead Plaintiff's own investigation, but ultimately by a restatement of TeleTech's financial statements filed by defendants themselves that admits to the core allegations of the complaint.

68.    Accordingly, based on the record, upon final adjudication of the action, the Court will be able to conclude that the parties complied with Fed. R. Civ. P. 11(b).

## II.    THE FACTUAL MATTERS CONSIDERED BY LEAD PLAINTIFF'S COUNSEL (INCLUDING THE NATURE AND STATUS OF THE "SETTLEMENT DISCOVERY" REFERRED TO IN SECTION 7.1(a) OF THE STIPULATION) AND THE INDICIA OF ARMS' LENGTH NEGOTIATIONS

### A.    Lead Counsel's Investigation

69.    Prior to agreeing to the Proposed Settlement, Lead Counsel conducted an extensive investigation into the facts underlying the dispute.

70.    Specifically, Lead Counsel's investigation included, *inter alia*, review and analysis of: (i) TeleTech's filings with the SEC; (ii) securities analysts' reports and advisories about the

Company; (iii) press releases, and other public statements issued by the Company; and (iv) review of media reports about the Company.

71.    In addition, Lead Counsel hired private investigators to interview former Teletech employees with knowledge of the issues alleged in the Complaint.  Lead Counsel's investigators interviewed at least ten such witnesses.

72.    Lead Counsel also consulted with forensic accountants who reviewed the Company's financial reports.

73.    Lead Counsel further had consultations with damage consultants.

74.    Finally, Lead Counsel conducted research of the applicable law with respect to the claims asserted in the action and defendants' potential defenses thereto.

**B.    Indicia of Arm's Length Negotiations and the Settlement Discovery**

75.    The negotiations concerning the settlement were substantial and conducted at all times at arms' length.

76.    Defendants contacted Lead Counsel and expressed an interest in trying to resolve this action through mediation.  While Lead Plaintiff agreed to attempt to resolve this dispute, Lead Plaintiff made it clear throughout the negotiations that it would continue to litigate rather than settle for less than fair value.

77.    The parties exchanged the name of several mediators and ultimately agreed to retain Hon. Daniel Weinstein (Ret.) of JAMS, who has substantial experience mediating cases that allege violations of the securities laws.

78.    Prior to the mediation, the parties exchanged detailed mediation statements that set forth each party's position with respect to the claims alleged in the complaint.

79.    Thereafter, at the mediation, the parties made presentations concerning the merits of the case, damages, and other issues.  The mediation session, which at times was contentious, was always conducted at arm's length under the supervision of Judge Weinstein.

80.    While the parties made some progress at the mediation session, they did not agree to settle the case on that day.

81.    Rather, Lead Plaintiff requested that defendants provide it with certain documents and information necessary for Lead Plaintiff to fully to understand the scope of its claims and the defendants' potential defenses thereto.

82.    In particular, Lead Plaintiff demanded that defendants provide it with internal company documents so that Lead Plaintiff could evaluate any proposed settlement.  Defendants agreed to provide Lead Plaintiff with the requested discovery.

83.    That discovery consisted of approximately 560,000 pages of documents concerning, *inter alia*, Teletech's stock option practices.

84.    The documents produced included:

(a)    Existing Board and Compensation Committee minutes and related packages;

(b)    Documents provided by TeleTech to auditors in connection with the expensing of stock options;

(c)    Stock option spreadsheets;

(d)    Stock option agreements;

(e)    Employee start dates and promotion dates;

(f)    Lists of stock options granted by TeleTech, including information regarding exercises and cancellations;

(g)    Section 16 officers and directors files;

(h)    Employee stock option agreements;

(i)    Journal entries and supporting documents regarding the expensing of stock options;

(j)    TeleTech's management representation letters; and

(k)    Disclosure Committee memoranda.

85.    The documents were produced from the following custodians, among others:

(a)    Ken Tuchman (Chief Executive Officer);

(b)    Jim Barlett (Vice Chairman);

(c)    Christy O'Connor (Corporate Counsel in charge of administration of stock options);

(d)    Elisa Bogart (Legal Assistant);

(e)    David Gilbert (Vice President of Human Resources, involved with new-hire grants);

(f)    Jim Kaufman (Former General Counsel);

(g)    John Simon (Former Head of Human Resources and Former Interim General Counsel);

(h)    Mike Jossi (Head of Human Resources);

(i)    Alan Schutzman (General Counsel);

(j)    Anette Lane (Assistant to the Vice Chairman);

(k)    Sharon O'Leary (Former General Counsel);

(l)    Margot O'Dell (Former Chief Financial Officer);

(m)    Michael Foss (Former Chief Financial Officer);

(n)    Dennis Lacey (Former Chief Financial Officer);

(o)    John Troka (Chief Financial Officer);

(p)    Joe Higgins (Former Corporate Controller);

(q)    Dianne Goldsmith (Assistant to the Chief Executive Officer);

(r)    Steven Posey (Director of Accounting);

(s)    Sean Erickson (President and General Manager of North America); and

(t)    Sheryl Gomez (Director of Human Resources).

86.    Lead Counsel has completed its review of those documents.  Among other things, those documents establish that:

(a)    TeleTech personnel involved in the administration of the Company's stock options failed to abide by the terms of the Company's stock option plans;

(b)    TeleTech lacked adequate internal controls over the Company's equity compensation granting process;

(c)    The Company failed to comply with applicable accounting and disclosure rules relevant to equity compensation;

(d)    The Company backdated certain stock options; and

(e)    Certain stock option awards were not properly recorded under applicable equity compensation accounting rules.

87.    Judge Weinstein remained in contact with the parties throughout the process.  In fact, all negotiations concerning the financial terms of the settlement were conducted through Judge Weinstein and at arms' length.

88.    As a result of the investigation and discovery detailed above, Lead Counsel developed an in-depth knowledge of the strengths and weaknesses of the claims asserted in the action, which has permitted us to fully consider and evaluate the fairness of the proposed settlement to the Class.

89.    After substantial negotiations, the parties agreed to the $11 million proposed settlement presently before the Court.

## III.    THE RELATIONSHIP BETWEEN THE SETTLEMENT FUND AND THE AMOUNT OF THE PARTIES' ESTIMATES OF POTENTIAL RECOVERY/EXPOSURE IN THE LITIGATION

90.    Lead Counsel has utilized its damages consultants to determine the damages to the Class under a variety of models.

91.    Pursuant to the complaint, there were several days on which the Company released news that disclosed to investors that the Company's business, operations and finances were not as had been previously represented.

92.    Under Lead Plaintiff's most aggressive model, all of the declines in the price of TeleTech stock on those days resulted from those disclosures.  That model indicated that the maximum recoverable damages to the Class were approximately $214 million.

93.    The $11 million proposed settlement results in a recovery of 5% of the maximum damages.

94.    A 5% recovery far exceeds the average percentage recovery in cases of this size. Specifically, according to Cornerstone Research, the average recovery in 2008 in cases with maximum damages of $126 - $250 million is 2.8%.  Cornerstone Research, Securities Class Action Settlements, 2008 Review and Analysis, at 6.  Another study, conducted by NERA Economic Study, found that in 2008, the median ratio of settlement to investor loss was 2.7%.  Stephanie Plancich, PhD and Svetlana Starykh, 2008 Trends in Securities Class Actions, at 14.

95.    Defendants, however, did not agree with Lead Plaintiffs' damage theory.  To the contrary, at the mediation, Defendants provided Lead Plaintiff with Defendants' expert's damage analysis.  Because that analysis was provided to Lead Plaintiff during the course of the mediation, we are not permitted to disclose the precise amount of the damages calculated by defendants' expert.

However, we have been authorized to state that, even assuming liability – which defendants contest – defendants' expert concluded that the $11 million settlement exceeds the maximum amount of the recoverable damages. Thus, according to defendants' experts, Lead Plaintiff has recovered in excess of 100% of the damages that it could recover in this case.

96.     Lead Plaintiff conducted additional damage analyses. For example, defendants contended that Lead Plaintiff would be unable to establish loss causation with respect to, among other things, TeleTech's filing with the SEC on July 16, 2008 of its Form 10-K that contained the Company's restatement. According to defendants, by the time of that filing, the market was already aware of the issues concerning the Company's backdating of stock options, as that information was released to investors on November 8, 2007. Defendants argued that the evidence would establish that the decline in the price of the stock after the July 2008 disclosure was due to the Company's contemporaneous announcement of TeleTech's earnings guidance, and not because of the restatement.

97.     While Lead Plaintiff disagreed with defendants' argument, Lead Plaintiff conducted a damage analysis that assumed there was no loss causation arising from the July 2008 disclosure. That damage analysis resulted in maximum recoverable damages of approximately $66 million. Accordingly, the proposed settlement recovers more than 16% of that estimate of damages.

98.     Therefore, the proposed settlement achieves a fair, reasonable and adequate recovery of the estimated damages.

## IV.    THE RELATIONSHIP BETWEEN THIS LITIGATION AND SETTLEMENT AND THE DELAWARE LITIGATION AND SETTLEMENT REFERRED TO IN THE STIPULATION

99.     Concurrently pending with this federal securities fraud class action is a shareholder derivative action pending in Delaware (the "Delaware Action"). The Delaware Action generally alleges that certain of the Company's officers and directors breached fiduciary duties to the

Company because, among other things, they allegedly granted backdated or otherwise manipulated stock options to several of the Company's senior executives. The Delaware Action alleges claims on behalf of the Company, while the instant action alleges claims on behalf of the Company's shareholders.

100. While the settlements of the two cases were negotiated independently, Defendants have insisted that each settlement be contingent on the other for a number of reasons.

101. According to defendants, one reason that the settlements are contingent upon one another is that a portion of the money being paid by defendants' insurers to settle the Delaware Action will be used to fund the settlement of this case. Specifically, $5 million of the funds being paid by the insurers to the Company in connection with the settlement of the Delaware Action will be used to partially fund the $11 million settlement of this action, with the remaining $6 million coming directly from the carriers, the Company, and the auditors. Thus, without the settlement of the Delaware Action, there would be less money available for the settlement fund in this action.

102. Another reason that defendants demanded that the settlements be contingent concerns the fact that, as part of the settlement, defendants will be providing releases to their insurers in exchange for the settlement payments. If defendants were to settle just one case and provide a release to the insurers, they would be left without coverage in the other litigation. The only way for defendants to avoid this predicament is for defendants to settle both cases simultaneously.

103. Finally, defendants demanded that both cases settle at the same time so that they could be relieved of the distractions and expenses associated with ongoing litigation. If they were forced to continue to litigate one of the cases, the marginal utility of settling the other case would be greatly diminished.

## V.  ANY ADMINISTRATION OR INVESTMENT EXPENSES ANTICIPATED IN CONNECTION WITH THE ESCROW ARRANGEMENT PROPOSED IN THE STIPULATION

104.    Plaintiffs have proposed that they deposit the settlement proceeds at Torrey Pines Bank, which will, in turn, invest the settlement proceeds with Federated Investors in a U.S. Treasury Cash Reserves fund.  Any administration or investment expenses anticipated in connection with that proposed arrangement are described in the accompanying Declaration of Ellen Gusikoff Stewart in Support of Preliminary Approval of Settlement.

## VI.  THE MECHANICS OF THE PROPOSED PRELIMINARY APPROVAL, OPT-OUT AND CLAIMS PROCEDURES

105.    In the proposed Order Preliminarily Approving Settlement and Providing for Notice, Lead Plaintiff has suggested that the Court appoint the firm Gilardi & Co. LLC ("Claims Administrator") as the claims administrator to supervise and administer the notice procedure as well as the processing of claims.

106.    The proposed Preliminary Approval Order provides the mechanics for the opt-out and claims procedure.

### A.    The Process for Providing Notice to the Class

107.    The first step in the process will be providing Class members with notice of the settlement.  Paragraphs 5 and 6 of the Preliminary Approval Order provides the mechanism for doing that:

(a)    Within five days of the entry of the Preliminary Approval Order, TeleTech will provide its transfer records to the Claims Administrator;

(b)    The Claims Administrator will then cause a copy of the Notice and the accompanying Proof of Claim and Release to be mailed to all Class members who can be identified with reasonable effort and to be posted on its website;

- 26 -

(c)     The Claims Administrator will then publish the summary notice in the national edition of *Investors' Business Daily*;

(d)     The Claims Administrator will provide proof that the mailing and publishing have been accomplished; and

(e)     Nominees (including brokers and others who hold Class members' stock in "street name") will be requested to send the Notice and Proof of Claim and Release to all beneficial owners of TeleTech company stock, or send a list of the names and addresses of such beneficial owners to the Claims Administrator who will send the documents directly.

**B.     The Process for the Submission of Claims**

108.    The next step in the process will be the submission of claims by Class Members. That step is covered by Paragraph 9 of the Preliminary Approval Order, which requires Class members who wish to participate in the Settlement to complete and submit the Proof of Claim and Release in accordance with the instructions and by the deadline contained therein.  The Claims Administrator shall receive, audit and verify the Claims.

**C.     The Process for Exclusions**

109.    Class members will also be provided with an opportunity to be excluded or "opt-out" from the Class.  As set forth in Paragraph 11 of the Preliminary Approval Order, in order to opt-out of the Class, the Class member must submit to the Claims Administrator a request for exclusion that contains: (a) the name address and telephone number of the person requesting exclusion, (b) the person's purchases, acquisition of TeleTech common stock during the Class period, including the dates, the number of shares of TeleTech stock purchased or acquired, and the price paid for each such purchase or acquisition, and (c) a statement that the person wishes to be excluded from the Class.  In connection with final approval, Lead Plaintiff will provide the Court with a listing of all of those who requested exclusion from the Class.

D.      **The Process for Objections**

110.    In addition, Class members will have the opportunity to object to the proposed settlement. Pursuant to Paragraph 13 of the Preliminary Approval Order, any Class member may appear, either in person or in writing, to express its views as to why the proposed settlement should not be approved as fair, reasonable and adequate, or why a judgment should not be entered thereon, why the plan of allocation should not be approved, or why attorneys' fees and expenses should not be awarded.

E.      **The Process for Distribution of the Settlement Proceeds**

111.    Upon final approval of the settlement, the Claims Administrator will tally the claims and distribute the settlement fund in accordance with the terms of the Court's final approval order.

112.    Pursuant to the proposed Preliminary Approval Order and as set forth in the Notice, all members of the Class who wish to participate in the distribution of the settlement proceeds must submit a proper proof of claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, and attorneys' fees and expenses, the remainder of the settlement fund (the "Net Settlement Fund") shall be distributed according to a plan of allocation (the "Plan of Allocation").

113.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among the members of the Class who submit valid claims. The proposed Plan of Allocation provides that to qualify for payment, a claimant must be an eligible member of the Class and must send in a claim that provides all of the requested information.

114.    The Plan of Allocation was based on an analysis of economic factors and designed to equitably distribute the settlement proceeds to those Class members who suffered economic losses as a result of the alleged fraud, as opposed to market losses caused by market, industry, or other non-fraud related Company specific factors.

115.    Pursuant to the Plan of Allocation, a claim will be calculated as follows:

### Section 11 Claims in connection with the March 2007 Public Offering

Public Offering Price:                              $36.50 per share
Closing Price on the date the lawsuit was filed:    $20.45 per share

For shares of TeleTech acquired **pursuant to, and traceable to, the Company's offering prospectus dated March 30, 2007**, and

a) sold prior to January 25, 2008, the claim per share is the lesser of (i) the Purchase Price per share less the Sales Price per share, or (ii) $36.50 less the Sales Price per share.

b) retained at the end of, or, sold on or after January 25, 2008, the claim per share is the lesser of (i) the Purchase Price per share less the Sales Price per share, or (ii) $36.50 less $20.45.

### Section 10(b) Claims for Common Stock
### Class Period:  October 25, 2006 through July 16, 2008

The allocation below is based on the following price declines as well as the statutory PSLRA 90-day look back amount of $14.16:

November 9, 2007 Price Decline:        $2.18
July 17, 2008 Price Decline:           $4.63

1.  For shares of TeleTech common stock **purchased or acquired, on or between October 25, 2006 through November 8, 2007**, the claim per share shall be as follows:

a) If sold prior to November 9, 2007, the claim per share is $0.

b) If sold on November 9, 2007 through July 16, 2008, the claim per share shall be the lesser of (i) $2.18 (November 9, 2007 Price Decline), or (ii) the difference between the purchase price and the selling price.

c) If retained at the end of July 16, 2008, and sold before October 14, 2008, the claim per share shall be the lesser of (i) $6.81 (November 9, 2007 & July 17, 2008 Price Declines), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

d) If retained, or sold, on or after October 14, 2008, the claim per share shall be the lesser of (i) $6.81 (November 9, 2007 & July 17,

- 29 -

2008 Price Declines), or (ii) the difference between the purchase price per share and $14.16 per share.

2. For shares of TeleTech common stock *purchased or acquired, on November 9, 2007 through July 16, 2008*, the claim per share shall be as follows:

a)  If sold prior to July 17, 2008, the claim per share is $0.

b)  If retained at the end of July 16, 2008, and sold before October 14, 2008, the claim per share shall be the lesser of (i) $4.63 (July 17, 2008 Price Decline), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

c)  If retained, or sold, on or after October 14, 2008, the claim per share shall be the lesser of (i) $4.63 (July 17, 2008 Price Decline), or (ii) the difference between the purchase price per share and $14.16 per share.

### CALL OPTIONS
Class Period:  October 25, 2006 through July 16, 2008

1. For call options on TeleTech common stock *purchased from October 25, 2006 through July 16, 2008*, and

a)  **held** at the end of November 8, 2007 and/or July 16, 2008, the claim per call option is the difference between the price paid for the call option less the proceeds received upon the settlement of the call option contract;

b)  **not held** at the end of November 8, 2007 and/or July 16, 2008, the claim per call option is $0.

2. For call options on TeleTech common stock *written from October 25, 2006 through July 16, 2008*, the claim per call option is $0.

### PUT OPTIONS
Class Period:  October 25, 2006 through July 16, 2008

1. For put options on TeleTech common stock *written from October 25, 2006 through July 16, 2008*, and

a)  **held** at the end of November 8, 2007 and/or July 16, 2008, the claim per put option is the difference between the price paid upon settlement of the put option contract less the initial proceeds received upon the sale of the put option contract;

b)  **not held** at the end of November 8, 2007 and/or July 16, 2008, the claim per put option is $0.

2. For put options on TeleTech common stock *purchased from October 25, 2006 through July 16, 2008*, the claim per put option is $0.

Note: In the case the option was exercised for TeleTech common stock, the amount paid, or proceeds received, upon the settlement of the option contract equals the intrinsic value of the option using TeleTech common stock's closing price on the date the option was exercised.

Note: The combined recovery for the put/call options shall not exceed 3% of the Net Settlement Fund.

| Date | Closing Price | Average Closing Price |
|---|---|---|
| 7/17/2008 | $13.27 | $13.27 |
| 7/18/2008 | $13.32 | $13.30 |
| 7/21/2008 | $13.09 | $13.23 |
| 7/22/2008 | $13.83 | $13.38 |
| 7/23/2008 | $13.40 | $13.38 |
| 7/24/2008 | $12.87 | $13.30 |
| 7/25/2008 | $13.10 | $13.27 |
| 7/28/2008 | $12.66 | $13.19 |
| 7/29/2008 | $12.98 | $13.17 |
| 7/30/2008 | $13.21 | $13.17 |
| 7/31/2008 | $13.60 | $13.21 |
| 8/1/2008 | $14.05 | $13.28 |
| 8/4/2008 | $14.86 | $13.40 |
| 8/5/2008 | $15.50 | $13.55 |
| 8/6/2008 | $15.78 | $13.70 |
| 8/7/2008 | $15.80 | $13.83 |
| 8/8/2008 | $16.00 | $13.96 |
| 8/11/2008 | $16.20 | $14.08 |
| 8/12/2008 | $15.99 | $14.18 |
| 8/13/2008 | $15.98 | $14.27 |
| 8/14/2008 | $15.95 | $14.35 |
| 8/15/2008 | $16.19 | $14.44 |
| 8/18/2008 | $16.01 | $14.51 |
| 8/19/2008 | $15.24 | $14.54 |
| 8/20/2008 | $15.15 | $14.56 |
| 8/21/2008 | $15.03 | $14.58 |
| 8/22/2008 | $15.33 | $14.61 |
| 8/25/2008 | $15.05 | $14.62 |
| 8/26/2008 | $15.10 | $14.64 |
| 8/27/2008 | $15.48 | $14.67 |
| 8/28/2008 | $15.54 | $14.70 |
| 8/29/2008 | $15.42 | $14.72 |
| 9/2/2008 | $16.04 | $14.76 |
| 9/3/2008 | $16.15 | $14.80 |

| Date | Closing Price | Average Closing Price |
|---|---|---|
| 9/4/2008 | $15.62 | $14.82 |
| 9/5/2008 | $15.46 | $14.84 |
| 9/8/2008 | $15.90 | $14.87 |
| 9/9/2008 | $14.88 | $14.87 |
| 9/10/2008 | $15.17 | $14.88 |
| 9/11/2008 | $15.28 | $14.89 |
| 9/12/2008 | $15.19 | $14.89 |
| 9/15/2008 | $14.07 | $14.87 |
| 9/16/2008 | $14.35 | $14.86 |
| 9/17/2008 | $13.87 | $14.84 |
| 9/18/2008 | $14.40 | $14.83 |
| 9/19/2008 | $15.67 | $14.85 |
| 9/22/2008 | $14.72 | $14.85 |
| 9/23/2008 | $14.24 | $14.83 |
| 9/24/2008 | $13.81 | $14.81 |
| 9/25/2008 | $13.94 | $14.79 |
| 9/26/2008 | $13.77 | $14.77 |
| 9/29/2008 | $12.21 | $14.73 |
| 9/30/2008 | $12.44 | $14.68 |
| 10/1/2008 | $12.89 | $14.65 |
| 10/2/2008 | $12.37 | $14.61 |
| 10/3/2008 | $12.38 | $14.57 |
| 10/6/2008 | $11.86 | $14.52 |
| 10/7/2008 | $10.60 | $14.45 |
| 10/8/2008 | $10.90 | $14.39 |
| 10/9/2008 | $10.20 | $14.32 |
| 10/10/2008 | $10.53 | $14.26 |
| 10/13/2008 | $11.52 | $14.22 |
| 10/14/2008 | $10.81 | $14.16 |

116.     This proposed Plan of Allocation was formulated after consultation with Lead Plaintiff's materiality and damages consultants in order to calculate a fair method to divide the Net Settlement Fund for distribution among the Class. The proposed Plan of Allocation attempts to eliminate the effects of market forces unrelated to the alleged misrepresentations and omissions as well as simplify claims administration with attendant reduced cost to the Class. Thus, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this settlement among the Class.

- 32 -

VII.    **THE FAIRNESS AND REASONABLENESS OF THE DECISION TO RELEASE THE UNDERWRITER AND INDIVIDUAL DEFENDANTS WITHOUT A PAYMENT CONTRIBUTION TO THE SETTLEMENT FUND AND THE ACCOUNTANT DEFENDANTS WITH A NOMINAL CONTRIBUTION TO THE SETTLEMENT FUND**

117.    Lead Plaintiff did not insist upon a payment from the Underwriter Defendants in connection with the proposed settlement. The reason for this is that the Underwriter Defendants are fully indemnified in this action by the Company for any liability that they have to Lead Plaintiff or the Class in this action. Therefore, in effect, their potential contribution is being made by TeleTech. Put differently, if Lead Plaintiff insisted upon a settlement contribution from the Underwriter Defendants, that contribution would have come from TeleTech, leaving TeleTech with less money to contribute to the settlement fund. Thus, there would have been no net benefit to the Class by demanding that the Underwriter Defendants make a payment to the Class in this case.

118.    The same is true for the Individual Defendants, who are covered by the same insurance policies that cover TeleTech. If a contribution were made on their behalf, there would have been less money available for TeleTech to contribute to the settlement. Once again, the class would end up with the same sized settlement fund.

119.    As a result, with respect to the Underwriter Defendants and the Individual Defendants, Lead Plaintiff determined that it would be most beneficial to the Class to obtain the settlement fund quickly, rather than litigating for years only to end up with the same amount of money.

120.    With respect to the auditor defendant, Lead Plaintiff believes that its contribution to the settlement is fair, adequate and reasonable under the facts of the case.

121.    From May 2002 until May 2007 Ernst & Young served as the Company's independent auditors.

122.     Lead Plaintiff alleges that Ernst & Young violated auditing standards by providing a clean audit opinion on financial statements that violated Generally Accepted Accounting Principles. In addition, Lead Plaintiff alleges that Ernst & Young was not truly independent because it maintained a business relationship with an individual who served on TeleTech's board of directors.

123.     Lead Plaintiff understands that, absent a settlement, Ernst & Young will claim that it has complete defenses to Lead Plaintiff's claims.  Specifically, Ernst & Young would argue that its audits met all professional standards.  Ernst & Young would further argue that the alleged violation of independence rules did not in any way concern the backdating allegations of the complaint. Moreover, the auditors would argue that Lead Plaintiff would be unable to establish scienter with respect to it.

124.     After carefully considering these potential defenses, Lead Plaintiff concluded that causing the auditor to agree to contribute to the settlement to the extent that it did was appropriate.

## THE FACTORS AFFECTING SETTLEMENT COUNSEL IN FAVOR OF APPROVAL OF THE SETTLEMENT

125.     The settlement is the result of hard-fought negotiations between experienced counsel, including a formal mediation session with the assistance of a retired judge, who have concluded that the settlement is fair, reasonable, and adequate and should be preliminarily approved by the Court. The settlement avoids the hurdles Lead Plaintiff would have to clear not only with respect to proving loss causation and the full amount of the Class's damages, but liability as well, and avoids the significant costs associated with further litigation of this complex securities action, particularly the completion of discovery and trial.  In view of the significant risks and additional time and expense involved in taking this action further in litigation, I respectfully submit that the settlement is fair, reasonable, and adequate.

126.    Through the review of the discovery provided by Defendants, Lead Counsel were better able to evaluate the claims and confirm that the settlement is fair, reasonable, and adequate.

127.    In view of the discovery efforts of Lead Plaintiff, the advice of its experts, and the discussions that occurred during the parties' settlement negotiations, Lead Counsel were able to identify the issues that are critical to the outcome of this case. Lead Counsel have considered the risks of continued litigation, the likelihood of getting past dispositive motions, the costs and delays associated with fact and expert discovery and, if successful, the risk, expense, and length of time to prosecute the litigation through trial and the inevitable subsequent appeals. Lead Counsel have also considered the substantial monetary benefit provided by the settlement in light of the risk of taking the case to trial. Lead Plaintiff was a participant in this assessment and was consulted with, and kept apprised, concerning the settlement negotiations.

128.    Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. We believe that our reputations as attorneys who are unafraid to zealously carry a meritorious case through the trial and appellate levels gave us a strong position in engaging in settlement negotiations with Defendants, even under the difficult and challenging circumstances presented here.

129.    Lead Counsel respectfully submit that, under the circumstances, the settlement represents an excellent result for the Class. The settlement will provide Class Members with a benefit without the risk of no recovery if the litigation were to continue.

130.    Indeed, the following factors, which have been cited by the Second Circuit as the pertinent criteria for evaluating the fairness of a proposed settlement, counsel in favor of approval of the settlement: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Each of these factors supports approval of the settlement.

### A.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks in Litigation

131.    The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks in litigation were important factors in Lead Plaintiff's decision to settle the action and weigh heavily in favor of the settlement.  The Class will receive $11 million in cash in exchange for the release of all claims against Defendants – a significant result for the Class both in absolute terms and when viewed in light of the risks of litigation.  As explained above, according to a preliminary damage calculation performed by Lead Plaintiff's damage consultants, the maximum recoverable damages for the Class would be $214 million.  The $11 million recovery, therefore, represents approximately 5% the Class's maximum provable damages.  Without exposing the Class to the risks of further litigation, Lead Plaintiff has obtained a recovery representing a substantial portion of the Class's theoretical damages and a recovery which exceeds the median settlement recovery in comparable securities cases.

132.    Lead Plaintiff also conducted a damage analysis that assumed there was no loss causation arising from the July 2008 disclosure.  That damage analysis resulted in maximum recoverable damages of approximately $66 million.  Accordingly, the proposed settlement recovers more than 16% of those damages.

133.    Moreover, assessing the merits of this class action settlement – whether serious questions of law and fact exist – supports the conclusion that the settlement is fair, reasonable, and adequate to the Class.  As in every complex case of this kind, Lead Plaintiff and the Class faced obstacles to recovery, both with respect to liability and damages.  While Lead Plaintiff and its counsel believe that their allegations have substantial merit, Defendants have denied liability and assert that they possess absolute defenses to the claims alleged.

### 1.    The Risk of Establishing Liability

134.    Lead Plaintiff recognized that it faced substantial risks if the action continued.  Lead Plaintiff and Lead Counsel heavily considered and analyzed potential risks to continued litigation of the action in determining the settlement's fairness, and in light of such risks, believe the proposed settlement is in the best interests of the Class.

135.    If the action were to proceed, Lead Plaintiff faced hurdles with respect to establishing scienter.  Defendants have contended that none of them acted knowingly or intentionally with respect to the conduct alleged in the Complaint.  While defendants acknowledge that certain errors were made, defendants insist that they did not knowingly violate accounting or disclosures rules.

136.    Lead Plaintiff is confident that it would be able to establish scienter.  After all, stock options do not backdate themselves.  However, Lead Plaintiff understands that a jury may disagree and find that scienter is lacking.

### 2.    The Risks of Establishing Loss Causation and Damages

137.    Lead Plaintiff also faced risks in establishing loss causation and damages.  Defendants argued forcefully that Lead Plaintiff would be unable to demonstrate loss causation because Lead Plaintiff would be unable to prove that the decline in the Company's stock price was related to, or proximately caused by, revelations concerning the alleged misstatements or omissions as opposed to other potential causes.  For example, Defendants claimed that Lead Plaintiff would be

unable to establish loss causation with respect to TeleTech's filing on July 16, 2008 of its Form 10-K that contained the Company's restatement. According to Defendants, by that time the market was already aware of the issues concerning the Company's backdating of stock options, as that information was released to investors on November 8, 2007. Defendants believe that the evidence will establish that the decline in the price of the stock after the July 2008 disclosure was due to a reduction of TeleTech's earning guidance that was included the Form 10-K, and not because of the restatement.

138.    Once again, Lead Plaintiff remained confident that it could establish loss causation and damages, as set forth in the Hakala Decl. However, if they were unable to establish loss causation with respect to the July 2008 disclosure, the maximum recoverable damages would fall from $214 million to approximately $66 million.

139.    In fact, the crucial element of damages would likely be reduced at trial to a "battle of the experts." As a result, if this action were to continue, Defendants would challenge Lead Plaintiff's damage figure and the Class's damages would be substantially reduced if Lead Plaintiff could not prove that the alleged misrepresentations did not cause 100% of the loss. Therefore, Lead Counsel submit that where, as here, the Class will receive a substantial portion of their theoretical damages without undertaking the risk that the Class might receive a much smaller recovery, or no recovery at all, after further litigation, an analysis of this factor weighs heavily in favor of the settlement.

### B.    The Complexity, Expense, and Likely Duration of the Litigation

140.    Lead Plaintiff's claims involve numerous complex issues relating to accounting rules concerning stock options and the Company's internal controls. Although Lead Plaintiff obtained substantial document discovery, Lead Counsel anticipated that formal merits and expert discovery would be time-consuming. Moreover, the costs associated with the completion of merits discovery,

not to mention the costs associated with formal expert discovery, summary judgment, including *Daubert* motions, preparation for trial, a trial, and the inevitable appeals, would be excessive, and the process would require many hours of the Court's time and resources. As a result, it could be years before the Class would receive a recovery, if any. Thus, this factor also supports the approval of the settlement.

### C. The Reaction of the Class to the Settlement

141. Because the parties have not yet sent notice to the Class, there has not yet been a reaction of the Class to the settlement. Thus, the parties are unable at this time to address this factor.

142. However, it should be noted that Lead Plaintiff – a sophisticated institutional investor that has been heavily involved in the litigation throughout its pendency – fully supports the settlement and is pleased with the recovery obtained for the Class.

### D. The Stage of the Proceedings and the Amount of Discovery Completed

143. The stage of the proceedings and the amount of discovery completed fully supports the settlement. By the time the settlement was reached, Lead Plaintiff and Lead Counsel had sufficient knowledge and understanding of the merits of the claims alleged in the action and the defenses that would be asserted by defendants to determine that the settlement is in the Class's best interests. Lead Counsel obtained this knowledge by conducting an in-depth investigation, including interviews with numerous former TeleTech employees, drafting the detailed complaint, drafting a detailed mediation statement, reviewing defendants' mediation statement, attending a mediation, consulting with damage consultants, and engaging in substantial document discovery.

144. Lead Counsel then used the information at their disposal to participate in hard-fought arm's-length settlement negotiations with defendants. The knowledge and insight gained by Lead Plaintiff and Lead Counsel provided Lead Plaintiff and Lead Counsel with more than sufficient information to evaluate the strengths and weaknesses of the Class's claims and defendants' defenses.

### E.    The Risks of Maintaining the Class Through Trial

145.    Although Lead Plaintiff and its expert were extremely confident that the Court would certify the Class, there is no assurance that this would be the case or that the Class would maintain its status as a class through judgment.  Thus, there was a risk that the Class would not be maintained through trial.

### F.    The Ability of the Defendants to Withstand a Greater Judgment

146.    Finally, with respect to the ability of Defendants to withstand a greater judgment, Lead Counsel does not dispute the viability of the defendants' financial resources and has no reason to believe that defendants could not withstand a greater judgment if obtained.  Courts, however, generally do not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement, and in fact, the ability of a defendant to pay potentially more money does not render a settlement unreasonable.

### CONCLUSION

147.    For the reasons set forth herein and the memorandum of law in support of the motion for preliminary approval previously submitted, I respectfully submit that the proposed settlement is fair, reasonable, and adequate and should be preliminarily approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  If called as a witness, I could and would competently testify thereto.

Executed under the penalties of perjury under the laws of the United States of America in Melville, New York, this 11th day of December 2009.

/s/ Robert M. Rothman
_____
ROBERT M. ROTHMAN

- 40 -

## CERTIFICATE OF SERVICE

I, Robert M. Rothman, hereby certify that on December 11, 2009, I caused a true

and correct copy of the attached:

DECLARATION OF ROBERT M. ROTHMAN IN SUPPORT OF
PRELIMINARY APPROVAL OF SETTLEMENT;

DECLARATION OF SCOTT D. HAKALA, PH.D, CFA
REGARDING MARKET EFFICIENCY AND LOSS CAUSATION; AND

DECLARATION OF ELLEN GUSIKOFF STEWART IN SUPPORT OF
PRELIMINARY APPROVAL OF SETTLEMENT

to be served electronically on all counsel registered for electronic service for this case.


_____/s/ *Robert M. Rothman*_____
Robert M. Rothman